Filed: 2/3/2016 10:37:27 PM

Filed: 1/4/2023 3:41 PM
Monroe Circuit Court 5
Monroe County, Indiana
Clerk of the Supreme Court
Court of Appeals and Tax Court

IN THE SUPREME COURT                          EX 12

OF THE

STATE OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| | ) | Cause No. 98S00-1601-DI-12 |
| ANDREW U. D. STRAW | ) | |
| Attorney Number 23378-53 | ) | |

### RESPONSE WITH ANSWERS UNDER PROTEST

I, respondent Andrew U. D. Straw, having received the Verified Complaint for

Disciplinary Action, and recognizing that the Complaint commenced when the

Indiana Supreme Court was *still a defendant* for disability discrimination in my

federal case, hereby respond under protest and provide numbered answers

corresponding to the numbered averments in the Complaint:

My firm belief is that instigating this disciplinary court case was a violation

of my civil rights and a crime under 18 U.S.C. §§ 241 and 242. I also feel it was in

violation of at least 9 rules in the Indiana Rules of Professional Conduct, principally

because the entire proceeding was done in retaliation for my request for relief from

the ADA Coordinator in 2014 and request for relief from the federal court in *Straw*

*v. Indiana Supreme Court*, 1:15-cv-1015-RYL-DKL (S.D. Ind.). I had asked for the

protection of the federal court when my case was still open, but the day after my

motion was with the federal Court, the district judge rapidly wrote an 18-page

opinion and dismissed my case, then mooted my request for injunction to halt this

proceeding.

1

Meanwhile, there is an attack on my integrity as a disability rights lawyer that is visible from my Indiana Roll of Attorneys entry.  It was not right for the Indiana Supreme Court to communicate with me about this case, since the way it started was in defiance of the federal court and my case against the Indiana Supreme Court, the federal rules of discovery, and was on the exact same topic: disability discrimination and harassment, which has gone on for 15 years now.

I make note that there are demands for costs in the Complaint here and this is intimidation.  It is designed to make me acquiesce to the Complaint and perhaps agree to being labeled disabled or incompetent, which would affect every law license that I have, my Virginia license as well as four U.S. district court admissions and one U.S. court of appeals admission.  I am not incompetent.  I am simply very proactive in defending disability rights.

I have a career and I can't allow those allegations from a Court attacking me to sit there on the Internet making me look like I did something wrong, when the very notation that I am under investigation is **another injury** to me.  Therefore, I will answer those questions, but I object to the entire proceeding, which I feel is turning me into a civil rights crime victim.  I have in fact reported the Commission and the Indiana Supreme Court to several federal law enforcement agencies, including the Public Integrity Section of the U.S. Department of Justice.

So I will provide my answers under protest.  Further, I will not be appearing at the hearing on February 25, for the same reasons plus all of the reasons that were in the Motion for Permanent Injunction in the federal court.  This is the day

before the anniversary of my mother's death of Camp LeJeune poisoning, the same

poisoning that gave me bipolar disorder and other neurobehavioral effects.  *See*,

**Straw et. al. v. United States**, 15-2590 (7th Cir.).  See also the Veterans

Administration page on this subject:

http://www.publichealth.va.gov/exposures/camp-lejeune/

It is very important to understand that 1 million people were poisoned,

disabled, and killed by the water at Camp LeJeune.  My mother's breast cancer is

one of the listed conditions.  I have established a group called Children of Camp

LeJeune with hundreds of people like myself who were born at the base hospital, in

one of the most poisonous areas of the base.  I have, as a congressional candidate

and as a lawyer, called for compensation for all affected.  My own daughter's back

was sliced open and her spine rearranged and stabilized with rods and screws as a

young girl.  Scoliosis is one of the deformities I got from the poisons, and I passed it

to her.  This is TV coverage from 2015 showing the bill I have proposed to help those

poisoned:

https://www.youtube.com/watch?v=MKojwUm0qwk

In addition to the scoliosis from Camp LeJeune, I was in a car accident on my

way to the Indiana Supreme Court, where I worked.  The roads were slippery that

morning, 2/22/2001, and there were many car wrecks.  My surgery was even delayed

because there were too many people who needed emergency surgery that day.

3

These are photos of my injuries.



Photo 1: Right Hip/Pelvis



Photo 2: Left Leg/Ankle

The employee manual adopted by the Court stated that the Chief Justice would monitor weather and let employees know if the weather was too dangerous to come to work.  I never received such a call, and there were many accidents due to the inclement weather.  In addition, I have simply been asked to **absorb the injury**. My lawyer, Samuel Ardery of Bloomington, said that if the person who caused it had adequate insurance, the pain and suffering for the rest of my life was worth $500,000.  Because the state of Indiana does not require that much insurance, I ended up with a check for 10% of that, to cover all my medical expenses and pain and suffering for the rest of my life.

The Court was hostile to me when I returned to work.  They took away my handicap parking close to the STAD offices where I worked after just a few weeks, and that left me hobbling to the Court in excruciating pain for about 800 meters each morning and evening.  The discrimination I experienced based on my physical and mental disabilities from the Court is well documented.  I object to this proceeding because Mr. Witte has specifically chosen—exclusively chosen—to attack cases in which I have demanded disability rights, but was denied.

I likely sacrificed more to serve the Indiana Supreme Court and the 400 trial courts in Indiana than anyone else who works there now, with the exception of my passenger on 2/22/2001, Jenny Bauer, who still works at the Court.  If the Court chooses to attack me rather than honor my service, I can't force it to do the right thing.  But I do *know* the right thing.

I have also protested disability access violations by the Indiana Democratic Party, and both the ICRC and the Indiana Supreme Court worked to protect their violations.  Watch the ABC 57 TV coverage and see for yourself that my rights were denied:

https://www.youtube.com/watch?v=2DebpmIA0oc

I have fought for disability rights in my Cook County, Illinois, home.  I was on the front page of the newspaper twice in 2013.  Here is the video the Daily Herald newspaper made on the subject:

http://www.dailyherald.com/article/20131004/news/710049933/

Note that I mention my Indiana Supreme Court accident as I go about my disability work.  It enhances my ability to force businesses and local governments to comply with the law.  I am saying that the accident is a ***benefit*** to me as a disability rights lawyer.  My injuries qualify me to complain and protect the rights of myself and other disabled people.  The same is true of my Camp LeJeune poisoning.

I would suggest that the Court does not realize the depth and breadth of my disability rights work in the United States.  I have made a webpage to demonstrate it:

http://www.andrewstraw.com/balance.html

I have made a webpage to demonstrate my disability access work in Cook and DuPage and Kane counties in Illinois:

http://www.accessviolations.com

I face discrimination each tiny, painful step of the way.  Sometimes I push for disability laws to be interpreted liberally to fully give flight to the law.  For instance, the Rehabilitation Act states that discrimination against disabled people is "continual" in every area of American life.  29 U.S.C. 701ff.  The Americans with Disabilities Act commands the courts to not just dabble in access, but that the purpose of the Act is to "eliminate … discrimination."  That is a tall order, and the Courts have not even tried to achieve that goal.  They find every exception and every doctrine is used to oppose that goal.  The hostility was so strong that the ADA Amendment Act of 2008, signed by President Bush, overturned several U.S. Supreme Court decisions limiting the ADA.  The ADAAA passed **unanimously** in both houses of Congress.  The Supreme Court was misinterpreting the Act, limiting it, attacking it.

I am on the side of Congress here.  I am a disability rights lawyer, and that means pushing for the ***elimination*** of discrimination, not ***dabbling***.  But the Courts are still hostile to the concept of elimination.  The multiple times I have been insulted and my arguments labeled "frivolous" show not that what I was saying was actually frivolous or said in bad faith, but that the Courts were still being hostile to disability rights.  I think I am entitled to disagree with the Courts when the history of disability rights has been so bloodied by the state and federal courts.

Indiana in particular must own up to its **Eugenics** past.  You can't just forget it.  You must own up to it and take strong steps to reverse those attitudes, affirmative action, starting at the Indiana Supreme Court and its agencies.  This is

7

what I told the National Association of Law Students with Disabilities at their annual conference in Baltimore in October of 2015.  I was an invited panel speaker and my topic was "attitudinal barriers" to disability access in the courts and legal profession.  All I talked about was the Indiana Supreme Court, and I feel my expertise in this area was at least honored by that important group.  They are the future disabled lawyers, and they must know that Indiana has such attitudes, and that people like Lilia Judson are serving in national roles while still having those attitudes.  She is dangerous to the civil rights of disabled lawyers.  There were lawyers with bipolar disorder at the NALSWD conference, deaf and blind lawyers, autistic lawyers, and lawyers with cerebral palsy, *inter alia*.  There were lawyers at the highest levels of the federal government there, speaking on these issues and why we are so far behind when the ADA is over 25 years old.

### ANSWERS

1. Admit

2. Admit

### COUNT I: STRAW V. KLOECKER

3. Admit

4. Admit

5. Admit

6. Admit, but Incomplete statement.  The Kloecker letter also demanded that I provide access to my Medicare claims database to the newspaper publisher that Kloecker and Locke Lord represented, and as of this

8

date they still represent that newspaper publisher.  See, *Straw v. Chamber, et. al.*, 14-3094 (Ill. Ct. App. 1st Dist.)

7. Admit, but Incomplete.  This lawsuit was not just a Civil RICO lawsuit, but my attempt to protect the privacy of my own disability and health information from a newspaper I was suing for defamation.  This lawyer and his law firm, one of the largest law firms in the United States, were threatening outrageous fines *from Medicare* in order to allow their newspaper publisher client to have my private health information.  I had no attorney helping me and I was under extreme pressure to do something to protect myself from this demand.  Before I filed this lawsuit, the general counsel of Locke Lord LLP called me and insisted the demands were legitimate, when they were illegitimate on their face.  The facts showed injury.  The issue here appears to be <u>how</u> I attempted to defend my health and disability privacy.

8. Admit.

9. Admit, but incomplete.  I arrived at the $15 million number by taking the $5 million number in the state case below and trebling it according to the Civil RICO statute.

10. This is a legal conclusion that I do not admit or deny.  Locke Lord LLP was clearly an entity that could be an enterprise for Civil RICO.

11. Deny.  I still believe it was correct to characterize that letter making such demands and threats as racketeering.  I may have been mistaken

9

according to the Court, and the Court has the last word, but the facts demanded relief.

12. Deny.  Whatever the final outcome in this case, I still maintain that this amount was the correct about to ask.  *See*, #9.

13. Deny.  I do not believe my case was frivolous.  My facts demanded relief.  I actually took Federal Criminal Law with Prof. Hoffman in Bloomington and received an A- in the class.  Prof. Hoffman wrote a book on this subject and clerked for Chief Justice Rehnquist, and we studied Civil RICO along with other federal criminal statutes.  The Court may have jumped to the defense of this huge law firm, one of the largest in the nation, and in fact J Shadur slammed my case without any hearing or any briefing at all.  He was apparently not interested in hearing from me, but instead quoted 1600s poetry to attack my complaint and demonstrate his superior knowledge of the statute and how to apply it.  This is not an easy statute.  I may have made a mistake, but the way he dismissed the facts in this letter was not right.  On appeal, I introduced an email from the Medicare office that is responsible for the claims database and this reporting.  Medicare said that the defendant was **misleading with its letter** and that I would NEVER receive $1,000 per day fines from Medicare.  Medicare said that I should not give my private health information to that law firm.

The tenor of the Medicare letter supported my concern in every respect, and this was the office in charge of it.

14. Admit.

15. Admit.  I do not admit that it actually was frivolous.  I may have not chosen the correct statute.  Maybe HIPAA or another federal privacy statute would have been better.  However, I did not file this case to harass or for any improper purpose, but to get relief from the outrageous facts presented in the letter (and email), as supported by what Medicare's EDDI office said.  **J Shadur did not issue any sanction against me, or costs.**

16. Admit.  *See*, #15.  **No sanctions or costs were imposed by J Shadur.**

17. Admit.  In my experience as a lawyer, litigation is between two "litigants," which derives from the Latin for "fight."  The same word is used in Italian, *litigare*, and it means to fight.  Every litigation will involve fighting, and fight is a synonym for "attack."  If the judge meant that litigating is illegitimate in a courtroom, I respectfully disagree.  Every defendant will feel attacked.

18. Agree, but Incomplete.  I felt that the letter demanding my health and disability information to be given to a ***newspaper*** was bizarre.  It should not be found "bizarre" that I defended myself, first by contacting the firm, and then by filing suit.  The judge may not have many ***pro se*** litigants who try to use Civil RICO, but the esoteric

arguments used by both the trial and appellate courts seemed bizarre to me, even after having studied the subject in law school.  I wonder about the frame of reference.  Was I the first *pro se* person to bring such a suit?  If he had others pursuing justice under this statute, did he dismiss them with similar poetic flourishes, even derision?  I think my health and disability privacy rights are a very serious matter.  I may not have protected them correctly, but I found the judge's attacks on me to be inappropriate, given his long experience.  J Shadur has in fact been disciplined by the 7th Circuit for his rudeness toward litigants.

See:

http://www.abajournal.com/news/article/posner_opinion_tosses_judge_from_case_partly_for_his_tone_of_derision

It seems apt that this Court, which has discriminated against me repeatedly over the course of 15 years, would choose this case, with a judge equally disrespectful toward me.

19. Agreed, but Incomplete.  Given my previous study of this particular statute and A- in the law school class, I did have at least that level of knowledge of Civil RICO.  To be as knowledgeable through study about this statute as the Court or the 7th Circuit would have taken longer than the statute of limitations.  Again, I did not agree with him and

received no sanctions.  I received no sanctions on appeal.  The U. S. Supreme Court did not sanction me, but simply denied *certiorari*.

20. Agreed.

21. Agreed.

22. Agreed.

23. Denied.  For the same reasons given above, I felt that the facts of my case demanded consideration, and I did not agree with the arguments of J Shadur, or frankly, his hostile and insulting tone toward me.  If anything, I felt after seeing J Shadur's removal by and tongue lashing from J Posner that there may be reasons besides law for the hostility.  In fact, the defendants showed their own problems with ethical reasoning on appeal.  They hired the former law firm of J Shadur to handle the appeal.  When I pointed this out to the 7th Circuit, all threats of sanctions were dropped.  It was a reasonable inference that there was improper influence in the Court when such things happened.  My understanding is that when there are improper actions in a court, if you think you are right anyway, you appeal because it might not be the law, but something other than law taking place.  This was one of the largest law firms in the United States.  I was in poverty and *pro se*.  Why would such a firm take such unethical actions unless to reinforce its power and influence and presence with the District Court and 7th

13

Circuit, where they appeared regularly and this was the first time for

me?  I felt this way and appealed to the U.S. Supreme Court.

24. Denied.  These are legal conclusions and I do not agree with the

characterization.  I felt the other filings were germane.

25. Agreed, but Incomplete.  The defendants hired the law firm that

employed the trial judge immediately prior to his being appointed to

the bench.

26. Agreed.

27. Agreed.

28. Agreed.

29. Agreed, but Incomplete.  The Seventh Circuit did not impose sanctions

because I brought to the Court's attention the glaring ethical violation

by defendant, hiring J Shadur's old law firm.  It was a little too much

for me to get a sanction after they did that, obviously demonstrating

that as one of the largest law firms in the USA, they could do whatever

they wanted, including such unethical behavior.  Defendants should

have been punished, but were not.  Under those ethical circumstances,

I had my doubts about the law and how it was applied also.  I

wondered if there were other connections between J Shadur and one of

the largest law firms in the United States.  Very reasonable to wonder

when a judge like J Shadur has been on the bench since 1980.  As a **pro**

14

*se* litigant living in poverty and disabled, I was not in a position to find

out, so I appealed to test the law that was being presented to me.

30. Agreed.

31. Agreed.

32. Agreed, and it was an honor to have an occasion to do so.  I even cut

my own paper so that it was the correct size.

33. Agreed, but Incomplete.  There was no claim of frivolous by the U.S.

Supreme Court or threats of sanctions.  **There were no sanctions, at**

**any level.**

34. Given the answers I have provided above, I DENY this conclusion and

take issue with the fact that so many important factual details were

left out so as to ***unfairly attack me***.  This case, on reaching the U.S.

Supreme Court, was covered by the national legal media and I had an

opportunity to explain my legal position.  Unlike the courts, Law 360

did not ridicule me or cite 1600s poetry while the defendants violated

ethical rules by hiring the old firm of J Shadur.  See:

http://www.law360.com/articles/613007/supreme-court-won-t-revive-

locke-lord-racketeering-suit

**COUNT II: STRAW V. ABA**

35. Agreed, a very proud part of my resume.

36. Agreed.

37. Agreed.

38. Agreed.

39. Agreed, but Incomplete.  These schools provide this information for gender and race and have done so for decades, as required on the ABA Form 509.  Treating people with disabilities differently is discrimination on its face.

40. Agreed.

41. Agreed.

42. Denied.  I did not have disability-related information needed to make a choice regarding education, and the discrimination in refusing to provide the information was an injury to me.

43. Irrelevant.  I was not intending to use the information for that purpose, but to allow me to attend a Ph.D. program at a school that, from the statistics I sought, discriminated *less*.  My other purpose was to allow other law students to see the same data to make the same decisions.  Disabled people experience "continual" discrimination in every area of life, including education and public services, according to the Rehabilitation Act of 1973.  This is no different from gender and race as a civil rights matter, and that information is provided for the exact same reason: to track civil rights progress.  Here we are in 2016, 25 years after the ADA was passed, and ***ALL*** ABA-Accredited law schools were found to have discriminated in the LSAT "flagging" violations through participating in LSAC in 2014, the same year I filed

my complaint.  As the Department of Justice said, every ABA-accredited law school in the United States participated in this discriminatory system against disabled applicants.  It seems reasonable that when I find a refusal to provide these statistics that the law schools are hiding the historic discrimination and the effects on law school classes.  My lawsuit was proper and in fact very needed, not just for me but for others also.  **I have the right to protect others.**  This right appears in the ADA in the prohibition on "interference, coercion, or intimidation."  42 U.S.C. § 12203(b) See,

http://www.justice.gov/opa/pr/law-school-admission-council-agrees-systemic-reforms-and-773-million-payment-settle-justice

44. Denied.  This information was vital for all disabled people.  Keeping track of disability statistics in law school admissions will improve the status of disabled students, who will no longer be "invisible" as a group.  It will increase the numbers of disabled students and allow them to choose schools with a better record of recruiting them.  More disabled lawyers would be the natural result of tracking this information.  Every disabled American would benefit from having a more robust and numerous disabled lawyer bar.  More people like me.  More people who push for disability access whether the legal system wants to "eliminate" discrimination or just dabble in access.  I strongly DENY.

45. Denied.  The enforcement provisions of the ADA provide protection for the issue I presented.  I invoked the ADA.

46. Denied.  This statement is plainly false, as explained above.  I was asking for discrimination to end in the provision of the INFORMATION.  That information is just as vital a service as it is for gender and race, and it is discrimination to provide that service based on gender and race, but not disability.

47. Denied.  This case was the opposite of frivolous.  It was incredibly needed and it was unfortunate J Durkin did not agree that I had "standing."  Standing is an unfortunate **ableist term** when referring to a lawyer who broke both his legs and pelvis.  Like Democratic J Shadur, Democratic J Durkin refused my disability rights in the lawsuit I presented to him.

48. Agreed.

49. Agreed.

50. Agreed.

51. Agreed, but Incomplete.  I would not expect all 50 law schools, after being found to discriminate on the basis of disability in the LSAC case, to roll over in this case.  The stakes were high for these schools to deny further discrimination, even if plainly present.

52. Agreed, but Incomplete.  After working on my responses, I realized that as a *pro se* litigant in poverty, with severe physical and mental

18

disabilities, to respond to all 50 of these law schools individually

shooting 50 different motions to dismiss was not possible for me.  After

a telephonic hearing with J Durkin, I made this decision.  While each

individual law school posts Form 509 information on its website, and

therefore was part of this scheme, the ABA provides Form 509 and

directs what is to be placed on it.  If I could win against the ABA, it

would accomplish the same thing with less encumbrance, and I came

to that decision after speaking with the judge.  Unfortunately, my

inability to get justice means that Form 509 still appears to exclude

people with disabilities.  For instance, Harvard Law School's 2015 form

demonstrates this:

http://hls.harvard.edu/content/uploads/2015/12/2015-ABA-Standard-
509-Report.pdf

53. Agreed.

54. Agreed.

55. Agreed.

56. Agreed.

57. Agreed.

58. Irrelevant.  The *number* of reasons given by J Durkin do not increase

the quality of those arguments.  The judge may have issued a scatter

shot to make sure something stuck if I decided to appeal it, which I did

not.

59. Denied.  Again, I brought a case under the ADA and I provided ample
    reason for upholding it against these discriminating 50 law schools
    who had been demonstrated in the *same year* that they were flagging
    disabled students' LSAT scores if they asked for accommodations.  I
    think that fact warranted a heightened sensitivity when the very next
    person—me—points to another mechanism for hiding disability in
    admission and enabling discrimination.  Women and minority students
    would not put up with removing these statistics, and no one even tries
    because it is extremely important for anyone making decisions about
    where to attend law school, either as a J.D. student or an SJD or Ph.D.
    student.  The same is true of disability.  This is another case of the
    Indiana Supreme Court attacking my work on disability when its own
    hands are dirty towards me in particular.  Just because a federal judge
    says something is so does not make it so.  J Durkin wanted, again, to
    make the rule in ADA cases "dabbling in removing discrimination"
    rather than "eliminating" it.  He used standing, but he was not correct.
    I want to **eliminate discrimination**, so obviously there is going to be a
    difference, not agreement.  If I were the judge, I would have found
    <u>standing and injury</u>, using the arguments and facts provided.  This
    case was also covered in the legal media.  See,

    http://www.law.com/sites/articles/2015/02/13/judge-aba-neednt-track-
    disabled-law-students/

The case was also in the Chicago Daily Law Bulletin on February 12, 2014.  In that article, I was quoted:

> …Straw represents himself in the case. He contended Durkin was "dead wrong" to rule in the case on standing grounds.
> "I think every American with a disability has standing in the case," he said. "What we're talking about is the pipeline for lawyers with disabilities into the profession."
> Straw also contended that judges as well as law schools and the ABA discriminate against people with disabilities. The courts, he said, do not want more disabled lawyers in the profession.

### COUNT III: STRAW V. SCONIERS

60. Agreed.

61. Agreed, but Incomplete.  She alleged it, but I did no such thing.  Our agreement was that I would present her demand to her employer as negotiations and **I would do no trial work**.  She agreed to this in writing.  I told her when we met that she needed to find her own trial lawyer, since I am not one.  In fact, **she was absolutely not injured**, as was revealed later in the deposition taken of her during the trial in South Bend.  She said that she never stopped working for her employer, who she alleged to me "sexually harassed her."  She said that in the years following my representation of her, she received a raise each year for three years, through 2015.  (Ex. 1, pp. 127-128)  She said in the deposition, under oath, that she enjoyed her job there and wanted to *retire* from there.  (Ex. 1, ln 11-12)  Yet, her lawyer sued me and demanded first $90,000, and later $33,000.  This was unethical on

the part of Attorney Thomas Dixon.  See, my affidavit to the federal court in South Bend.  (Ex. 2, *passim*) This is another lawyer connected to the Democratic Party in South Bend, and he had motivation to injure me after I sued the Indiana Democratic Party over its HQ. Dixon received valuable legal work from the Democrat-controlled City of South Bend after doing this to me.  **Sconiers had no injury**, but wanted to mulct my insurance company and cause me injury by forcing me to pay the $5,000 deductible.  She was successful in this because the Indiana Supreme Court provided Thomas Dixon with its disciplinary complaint that resulted in a 17-month harassment of investigation and finally with **this proceeding**.  (Ex. 2) Ergo, the Indiana Supreme Court and this Commission are **conflicted** with regard to me and this *Sconiers* case.  Dixon dutifully entered the disciplinary complaint from ADA Coordinator Rodeheffer into the state trial court case and when that happened, my insurance company wanted to settle.  I allowed it, since the cost was already rising for them.  So, despite the plaintiff having no injury, my insurance settled and ***I was injured*** because the Indiana Supreme Court improperly influenced the trial court.

62. Agreed, but Incomplete.  I did so because I felt the facts of #61 indicated disability discrimination.

63. Agreed.

64. Agreed.  It was.

65. Agreed.  These were injuries to me.

66. Agreed.

67. Denied.  I alleged that the Court was being used as part of the scheme to discriminate.  Dropping the disciplinary complaint based on my mental disability into the state case shows this to be true.

68. Denied.  They were using instrumentalities of a public entity to discriminate.  This in fact brings them under the coverage of both ADA, Title II, and the retaliation provisions of the ADA.  The regulations implementing the ADA also prohibit those doing business with a public entity from discriminating.  Lawyers are also officers of the Indiana Supreme Court, and hence subject to the ADA.  See, *Indiana Rules of Professional Conduct, Preamble*, clause 1.  The existence of the malpractice case and introduction of the disciplinary complaint provided by the Indiana Supreme Court's *ADA Coordinator* (clearly to injure me and make me lose that case) justified my federal case.  These facts show the Commission is **conflicted** in even considering this count.

69. Denied.  It does not lie in the mouth of the Indiana Supreme Court to call this case frivolous when its own actions caused me injury and necessitated the case.  This is another example of how the Indiana

Supreme Court causes me injury, then comes back to enjoy the fruits of its work by attacking me yet again with ethical complaints.

70. Denied.  It was an attempt to protect my disability rights when I was being attacked by a dishonest client who violated a contract with me in order to mulct from my insurance, a Democratic lawyer in South Bend who had other reasons to retaliate, and a trial court under the supervision of the Indiana Supreme Court, which has attacked me repeatedly and damaged my income and career.  Again, the Indiana Supreme Court must not speak of my ethics when it damaged me like this.

71. Agreed.

72. Agreed.

73. Agreed.

74. Agreed.

75. Agreed.

76. Denied.  Dixon cooperated with this Court both to inject disability discrimination into a state court case in order to injure me and get advantage and he abused process and obtain damages in settlement to which neither he nor his client were entitled.  When I brought Dixon's actions to Mr. Witte, he did nothing.  And I allege he did nothing because the Indiana Supreme Court WISHED for Dixon to attack and harm me.

77. Agreed.

78. Agreed.

79. Agreed.

80. Agreed.

81. Agreed, but Incomplete.  Like the case with Shadur, my facts were not just compelling, but overwhelming, and the existence of the Indiana Supreme Court in the picture led every court involved to discriminate and deny that any injury had happened to me.  My injuries are very real, and this Court has no business poking and prodding at the wound after sticking in the knife.

82. Agreed.

83. Agreed.

84. Agreed.

85. Agreed, but Incomplete.  I attempted to add **this Court as a defendant** because of its discrimination and involvement in my injury.  This entire proceeding is so riddled with **conflict**, the whole matter should be dismissed and I demand this.  My insurance company attorney said that it was worth a try to file the federal case and did not oppose it, but they wanted nothing to do with it.  Once the Supreme Court's disciplinary complaint entered the scene, they immediately wanted to settle.  This is the effect of the Indiana Supreme Court following me around and successfully obtaining bias from every court that exists in

the state.  Trial courts I had served honorably when I was the Supreme

Court's Statistical Analyst at the rank of staff attorney.  This Court

operates like a criminal enterprise that snakes its tentacles over the

whole region when it comes to my disability work and my disabilities.

Defendant Judson holds several positions of national rank that allow

her to defame me, discriminate against me, and injure me, no matter

where I might go in the United States.  She has opened her mouth

against me in newspapers.  *South Bend Tribune*, on or about

November 10, 2010.  I am absolutely disgusted at what I have learned

about this Court and its employees.  The proceeding, started when I

had a federal discrimination case against the Court in the Southern

District of Indiana, began in defiance of that federal court.  But I guess

violating the law is OK when the victim is worthless like Andrew

Straw is to the Court.  Mr. Witte communicated with me, as did his

staff attorney, Angie Ordway, regardless of the Federal Rules of Civil

Procedure on discovery and ethical rules requiring them to

communicate through the Indiana Attorney General's office.  Despite

the fact that the district judge, another Democratic judge, rushed to

the aid of the Indiana Supreme Court and dismissed my discrimination

case immediately after I asked the aid of that Court.  These are

collusion, misconduct, and attempts to injure me and destroy my law

career.  When I initially worked for the Court, I would not have

26

expected such behavior.  My friend, Indiana University Provost Lauren Robel, said I would like working there and she thought highly of Lilia Judson.  She recommended me for the job.  Kurt Snyder, my supervisor there, said Lilia Judson and he were very pleased with my work and wanted to promote me to a Director position.  That was two weeks before my car accident. How times change.  All the cards seem to be on the table *now*.

86. Agreed, but Incomplete.  The judge was cooperating with the trial court and the Indiana Supreme Court.  Who am I?  A disabled lawyer living in poverty who had a special target on his back because the Indiana Supreme Court could not cope with its injuring me.  By its negligence on 2/22/2001, and deliberately thereafter.  The judge prevented me from suing the Supreme Court in his Court, and a judge who is against you often will add an insult, as J Shadur demonstrated. Often the last little poke in the eye is saying "frivolous" so that proceedings like these can commence later, at the convenience of the Indiana Supreme Court.  Again, there is so much **conflict**, no judge in the state has any credibility, state or federal.  I would never practice law in Indiana again unless I got justice against this Court for what it has done.  Voluntarily or forced.  The Commission may exempt itself from the concept of interested and **conflicted**, but the fact is that the Indiana Supreme Court and its agencies are physically and morally

incapable of being decent toward me.  Look at my injuries, *supra*.  Will

that ever be respected?  In the military, an injury like that on the way

to the base to work and provide public services would be awarded a

medal or other honor.  Instead, judges say "bizarre" and "frivolous" and

attack my disability rights work.  There is no honor in this.  You have

hurt me more than you realize.  In a way that cannot be repaid with

money alone.  It would take public demonstrations of respect toward

me.  I actually asked this of the defendants' attorneys in the federal

discrimination case.  I asked to be appointed as an inspector general

for disability rights for the entire Indiana judicial branch.  I am

familiar with the Indiana Judicial Branch.  I was responsible for

statistics for over 400 trial courts, and trial court technology for them.

I provided disability accommodations work for Indiana trial judges and

court participants.  What did all of that earn me in the end?  This

proceeding, where Mr. Witte demands discipline and costs.  With the

defendants so confident that every injury to me will be allowed and

even glorified, I sit and look at you all, at this proceeding, at my having

no money and no car and not having the ability to see my children in 3

years…  You have a lot to do to set this right.  It will not happen by

taking my license away or disciplining me, imposing "costs."  It will

take multiple acts of honor to remove the dishonor that is happening to

me.  **I invented the protective order registry** and Harvard recognized it

28

as one of the top e-government ideas in the USA in 2001, 5 years before

the Court got a grant and built it.  Do me a favor.  Name it after my

dead mother, whose personal death threat by a violent boyfriend with

a gun to her head motivated me to enter that national competition held

by the White House.  Just treat me like a human being.  Stop hurting

me.  Is it that hard?  What I say may be "jumbled" or "confusing" to J

De Guilio, another Democratic judge, but if he really means that, it is

just because he does not know the history here, or that **it is all in fact**

**true**.  The judge's lack of familiarity does not make what I said false.

87. Agreed.

88. Agreed.

89. Agreed, but incomplete.  If you look at my resume, you might

disbelieve parts of it.  Every word is true.  This is my life.  I have

worked at the Supreme Court.  I have worked as corporate counsel for

a billionaire WWII war hero who planned transportation for the whole

nation and provided national security with his aerospace firm.  I was a

law school assistant dean.  There *was* intense discrimination that

ripped apart my career and devastated my earning power.

www.andrewstraw.com is my resume.

www.andrewstraw.com/balance.html describes my disability work.

www.accessviolations.com shows photographs of the outrageous

discrimination against disabled people I documented in Cook, DuPage, and Kane Counties in Illinois.

90. Denied.  This proceeding was necessitated by the discrimination and interference of the Indiana Supreme Court in a malpractice case against me.  It was discrimination and I sought to get relief, but **I never get relief**.  Dixon got $33,000 from my insurance, and that money was as dirty as it gets.  But **he is immune** because *I* am the target and the Indiana Supreme Court hates me.  That does not mean my case was less than meritorious.  It means it is impossible to fight against the highest court in the state when it is not just biased, but downright hateful, resentful, and discriminates actively to prevent me success at every opportunity.  Again, this Court and all of its agencies are **conflicted**.  To discipline me would, as I have said elsewhere, be a violation of 18 U.S.C. §§ 241 and 242.

## COUNT IV: RUTHERFORD V. ZALAS

91. Agreed.

92. Agreed.

93. Agreed.

94. Agreed.

95. Agreed, and all true, but Incomplete.  I consulted with the National Council on Disability prior to filing this complaint.  NCD indicated that the sort of treatment my client, a childhood friend, was getting

was in violation of the ADA.  The NCD, which advises the president

and Congress in Washington DC, described the discrimination issues

extensively in a 2012 report called "Rocking the Cradle: Ensuring the

Rights of Parents with Disabilities and Their Children."

https://www.ncd.gov/publications/2012/Sep272012

96. Agreed.

97. Agreed.

98. Denied.  The defendants used the instrumentalities of a public entity
    to discriminate against a father with disabilities who simply wanted
    time with his children.  The Court stripped his parenting time, and it
    was obvious from the facts in the case that his suicide attempt was
    directly the result of him losing parenting time.  The family law system
    is extremely hostile to disabled parents, stripping their rights as a
    matter of course, always relying on the "best interests of the child"
    standard, which is no standard at all.  It simply allows the judge to
    impose his discretion and biases, and that will almost always result in
    the disabled parent being stripped of rights, as the above report
    describes in great detail.

99. Denied.  Again, the facts are so stark and compelling that it should be
    impossible to conclude that this case was frivolous.  This Commission
    should read the above report and the facts of the underlying family law
    case before making such judgments.  I have known my former client

31

since we were seven years old, went to middle school and high school and college together.  I know he was dying inside when that judge just ripped his children from him and plunged him back into the same depression that caused his suicide attempt.  The logic here is important to dissect.  In order to protect the interests of the children, they were kept from their father, who then attempted suicide after not seeing them for months.  Suicide of a parent is to be avoided for the best interests of the children, their happiness and self-concept.  He luckily survived, I am happy to say, but the judge decided that even more separation was the answer to that.  Permanent stripping of visitation was the brilliant answer of a judge who does not see the dynamic and what was happening, or does not care if he does understand it.  Again, we have **conflict**.  J Bowen is the son of former Governor Bowen.  Governor Bowen appointed former Chief Justice Shepard to the Indiana Supreme Court, and he discriminated against me on the basis of disability.  He fired me and he failed to protect me when he had a duty to do so.  It is impossible to untangle these facts.  **Conflict** is obvious.  The whole proceeding, including this count, should be discarded.  I believe that bringing such counts and such a proceeding can only be another ounce of discrimination, another attempt to rid the Indiana Supreme Court of me and the reminder of these problems between us that will never be resolved until the Court

finds the face to respect me and give me honor.  My disability work is the **epitome of honor**, and as a Christian it is not hard to see what my savior did with his miracles during his ministry.  Disability work.

100.     Denied.  This case was to vindicate disability discrimination and snuff it out at the root.  It is inappropriate to suggest that under the facts of such a case, with the support and counsel of NCD disability rights leaders, I should not have filed the case.  It was clearly right and honorable and in the interest of both the children and the disabled father, my lifelong friend.

101.     Agreed.

102.     Denied.  It should be clear by now that the massive conflicts spattered through these counts are also present here.  I deny all wrongdoing.

103.     Agreed, but Incomplete.  More insults, from judges who are not about to get involved on MY side of any disability dispute when the Indiana Supreme Court is so connected with the trial judge at issue.  And when the Indiana Supreme Court has a long history of discrimination against me.  In fact, my employment with the Indiana Supreme Court meant that I communicated with every trial court in the state when needed for my job.  **Conflict.**  It is impossible to distinguish between conflict associated with the Indiana Supreme Court, the Indiana Democratic Party, one of the largest law firms in

the nation, and my disability advocacy work.  There is simply **conflict**

and it is apparent from the heated tempers of the judges who deny me.

104.     Agreed.

105.     Agreed.

106.     Agreed.

107.     Agreed.

108.     Agreed, but Incomplete.  My client was appalled and scared by

the fact that things went so against his rights after we had read the

NCD report, which supported him.  I suggested that if he could get

another attorney, it may go better for him.  I contacted my malpractice

insurance to protect my client.  I ended up with another $10,000

deductible because the sun never sets on my discrimination.

109.     Agreed.

110.     Agreed.

111.     Denied.  This is a legal conclusion that does not necessarily

follow.  To make this conclusion, like in all of the above counts, you

have to rule out **conflict and foul play**.  Given the existence of conflict

from the Court and other sources, this count should be dismissed like

the others.  It was brought improperly like all of the others, and is yet

another attack on my disability rights work.  Every one of these counts

attack my disability rights advocacy in one way or another.  That is

why this proceeding should be concluded without discipline.

34

## CONFLICT AND RESOLUTION

Conflict is the direct clash of my physical and mental disabilities, my past association with the Indiana Supreme Court, and my demands for disability access from organizations like the Indiana Democratic Party and Locke Lord, LLP.

The thing Mr. Witte completely ignores from this is that I have received such strong honors, such as being found "qualified" to be the general counsel of the U.S. Access Board in 2014, while many of these things were going on. The ABA Commission on Disability Rights honored me as its "spotlight" American attorney with a disability for January 2014. The Indiana Protection and Advocacy Service advanced me to the "finalist" stage in its Executive Director search in 2014. I was found highly qualified to be attorney advisor to the U.S. Army Medical Command in 2014. The conflicts and discrimination I experience from the Court are like cold water that rains down and prevents my success in any area, in any job search. The false entries in the 2001 and 2002 annual reports of the Judicial Branch show a **specific hostility toward me** that must end. *These* proceedings are not legal. If you disciplined me, I would take that result and turn it over to federal law enforcement agencies, who hopefully would treat what I present fairly, with no conflict.

I'm not sure how to resolve this without the conflict ending. That is why I suggested making me "Inspector General for Disability Access" for the Indiana judicial branch to the Indiana Attorney General attorneys. I asked Ms. Ordway to pass along two things I want the Court to put into official press releases. These include stating that I was improperly omitted from the employment rosters in 2001

and 2002, as Statistical Analyst of the Indiana Supreme Court at the rank of staff attorney.  Also, there should be an official release recognizing that my national finalist idea for a protective order database is the origin of the Indiana Protective Order Registry, and it would be an appropriate courtesy to name it after Sandra Kay Isaacs Straw Stevens, my mother.  It exists because of the death threat to her.

I continue to believe that I would be the best person to analyze and audit Indiana courts at all levels for disability access.  The ADA Coordinator is a dismal failure in this respect.  The very idea that she would make a disciplinary complaint—this one!—when her entire purpose is to give life to the ADA is such a disappointment.  You can bet that I would push the boundaries and make recommendations that **"eliminate discrimination"** rather than dabble in access. Being Inspector General for Disability Access would allow me to have a wonderful impact on the practices of the Indiana courts and the Indiana Supreme Court would not have to continue with its national reputation of disability discrimination, which it now has.  Indeed, disability organizations across the nation are watching what happens with this.  Deaf people have sued this court and other courts in Indiana because discrimination is so accepted and normal here.  This discrimination is now well known in Washington.  I don't think I ask that much.  **Protect disabled people.** Don't hurt them or their families.  Don't do what has happened to me.

WHEREFORE, all of the charges in the Complaint should be dismissed and I should be compensated not just for my time, but for the violations of my rights as a disability civil rights leader even in having to defend these cases.   I have asked for

discrimination to stop *enough* and there is *enough* evidence of retaliation that my objections and demand for compensation should be agreed to.

These four cases represent me fighting for disability and health information privacy; refusing to accept retaliation based on disability and abuse of process; refusing to accept discrimination against a lifelong friend with severe mental illness whose children were taken from him solely based on his disability; and to increase the number of disabled lawyers in every ABA-accredited law school in the nation. I am proud of every one of these cases, and I would do it again. You should not be proud that judges insulted me. My work is based on principle, and when judges are not interested in providing substantial justice or eliminating discrimination, but instead hurl insults and the word "frivolous" around, I cannot control them.

But the fact is that **in none of these cases was I ever subjected to sanctions**. That should be enough to show that the charges here are illegitimate. It is also very important to note that even though Judge Young dismissed my discrimination case against the Indiana Supreme Court in January, he did NOT use the word frivolous and he did not dismiss my case with prejudice. (Ex. 3) That means my case was NOT frivolous against the complainant here, and that's a good reason to back off and dismiss these charges with prejudice, because they look like disability discrimination to me. The four counts focus on cases that deal with disability in every instance. Cases where I was defending my own or others' disability rights, and a case of national importance regarding law schools and discrimination.

It appears that my **career in disability rights and civil rights** is offensive to the Court and to Mr. Witte.  He goes so far as to call my reform efforts unethical.  It is no more unethical than Dr. Martin Luther King, Jr. resisting illegal injunctions, which on its face made him in contempt of court, but morally superior to those courts.  It would be worthwhile for the Commission to listen to Dr. King's last speech:  https://www.youtube.com/watch?v=aL4FOvIf7G8  I take such inspiration from it, and watch it when I feel my civil rights oppressed as a disabled person.

Punishing me is a very dangerous position to take because I will continue pushing for disability rights and the more this Court and Commission resist me and retaliate against my work, the more it look like violations of 18 USC §§ 241 and 242 not to mention 42 USC §§ 1983 and 1985.  Don't go there.  Dismiss with prejudice.


I, Andrew U. D. Straw, verify that the above statements and conclusions are made in good faith, are true and correct, and I arrived at them after inquiries reasonable under the circumstances.

Sincerely,

/s Andrew U. D. Straw
1900 E. Golf. Rd., Suite 950A
Schaumburg, IL 60173
(312) 985-7333
Fax: (877) 310-9097
andrew@andrewstraw.com

February 5, 2016

## CERTIFICATE OF SERVICE

I, Andrew U. D. Straw, certify that I have submitted the above RESPONSE AND ANSWERS UNDER PROTEST to the Clerk of the Indiana Supreme Court in PDF format via the Indiana Supreme Court's E-Filing System, on February 5, 2016. This RESPONSE AND ANSWERS UNDER PROTEST was served to Indiana Attorney Disciplinary Commission attorney Angie Ordway on February 5, 2016 via that E-Filing system, Efile.incourts.gov.

Respectfully submitted,

/s Andrew U. D. Straw
1900 E. Golf. Rd., Suite 950A
Schaumburg, IL 60173
(312) 985-7333
Fax: (877) 310-9097
andrew@andrewstraw.com

February 5, 2016