Filed: 1/4/2023 3:41 PM
Monroe Circuit Court 1
Monroe County, Indiana

EX 13

IN THE SUPREME COURT
OF THE
STATE OF INDIANA

IN THE MATTER OF       )
                                 )     Cause No. 98S00-1601-DI-12
ANDREW U. D. STRAW     )
Attorney Number 23378-53    )

**AFFIDAVIT REGARDING HISTORY OF DISCRIMINATION**

I, Affiant Andrew U. D. Straw, hereby make this Affidavit in order to document the discrimination I have experienced, with explanations.

**ORIGINAL DISABILITIES: CAMP LEJEUNE**
**BIPOLAR DISORDER, DEPRESSION, MIGRAINES,**
**SEVERE ALLERGIES, SOCIAL ANXIETY, AND SCOLIOSIS**

1. I was born aboard Camp LeJeune Naval Hospital on 3/19/1969.

2. The Veterans Administration has recognized a list of 15 conditions that will be covered by the Camp LeJeune Family Member Program. These include breast cancer and neurobehavioral effects. My mother died of breast cancer.

   https://www.clfamilymembers.fsc.va.gov/

3. The following are "neurobehavioral effects" which I have had:

   i) Bipolar disorder/Depression (CNS)

   ii) Migraines with Auras (CNS)

   iii) Severe Allergies (CNS disorder)

   iv) Social Anxiety (CNS)

   v) Scoliosis (spine/bone deformity, CNS symptoms)

## INJURIES & SYMPTOMS

4. I have been in the hospital multiple times due to <u>pneumonia</u> that followed from prolonged allergic reactions.

5. While running through a corn field in Elkhart, Indiana, I ran into my cousin and was knocked out, resulting in a **concussion**.  ~1977

6. While my family was on vacation in North Carolina in 1979, during Hurricane David, another car rear-ended ours and I hit the roof of the car with strong force, causing a **concussion**.

7. In high school, my neck became so knotted up that I could not turn it from side to side.  Related to **scoliosis** in my spine. ~1986

8. My neck and back often were in pain in high school.  I never received treatment for scoliosis, but my doctor monitored it and suggested engaging in sports to strengthen my back and neck muscles.  I ran track and wrestled for this purpose.

9. When I was a graduate student at Indiana University, I trained with a Russian martial arts expert and when he attempted to teach me how to fall, he dropped me on the back of my neck three times.  I became dizzy and nauseated and my wife at that time took me to the hospital, where I vomited. Diagnosis: **concussion**.

10. From the time I entered school until graduating in 1987, I experienced severe migraines and bloody noses and vomiting and difficulty breathing due to substances at school such as trees and grass and various objects in the school

building.  My mother fought for the school to remove real Christmas trees because I was **allergic** to them.  She fought for the school to vigorously enforce the no-smoking ban in schools, which was seldom enforced so that the whole school smelled of smoke.  I was sick almost every day until these things were changed, and then my symptoms improved.

11. I took **allergy** shots for approximately 18 years to desensitize my immune system to most of the things to which I was allergic, including pollens, molds, cats and dogs, trees, grasses, soy, cantaloupe, cigarette smoke, penicillin, and several others.

12. My **migraines** are often caused by excessive bright sunlight or even limited exposure to fluorescent lights.  I currently have an ADA accommodation with the Indiana CLE Commission to do my continuing legal education at home over the Internet because I often get a migraine from the fluorescent light at most facilities where CLE is provided.

13. My first workplace was my parents' butcher shop and freezer locker business, Community Locker, 111 W. Washington, Goshen, IN 46526.  My job was to clean up the blood and other byproducts, clean the freezer lockers, and clean the equipment, which was quite sharp and required very careful handling.  The knives in particular were as sharp as razors and washing them to a sanitary level required water hotter than 180 degrees F.  I often became sick with headaches while working there due to the fluorescent lights, but I had

not identified this as the reason.  I thought I was getting sick from cleaning chemicals or other things in the butcher shop.  It was the lights.

14. I was at the top of my high school class and was a National Merit Scholar.  I received the Bausch & Lomb Science Medal for being the top science student in my class.  My SAT score was the 2nd highest in the history of my high school at that time.

15. My parents divorced the same year I started college at Indiana University, and I experienced this as depression.  Dr. McCabe in Elkhart diagnosed my depression and recommended that I take B vitamins.  He said it was normal to feel the way I did with my family splitting up.

16. My first summer after college, I lived with my grandparents on their farm, and I worked as a supervisor for disabled teens doing work on the grounds of the Association for the Disabled of Elkhart County (ADEC).  The teens had a variety of disabilities, including autism, Down Syndrome, and deafness.

17. The next year, I worked as a nurse's aide in Oaklawn Mental Hospital in Goshen, Indiana.  While there, I worked with people who had PTSD, bipolar disorder, depression, sexual abuse, social anxiety, eating disorders, and borderline disorder.

18. From 1992 – 1993, I worked as the assistant manager of a group home for disabled adults.  My clients had a variety of mental disabilities and cognitive disabilities, including Down Syndrome, autism, Asperger Syndrome, and cerebral palsy.  I took my clients into the community to do things such as

4

swim at the pool, get groceries, or sometimes just to take a drive in the van and listen to music they liked.  Southern Indiana is quite beautiful, and I used to do the same thing on my own time.

19. I tutored disabled teens on mathematics and other subjects at the Monroe County Public Library while I was working on my master's degree in Education.

## CAR ACCIDENT

20. I was the Statistical Analyst for the Indiana Supreme Court at the rank of staff attorney, and on 2/22/2001, I was in a car accident on my way to work.

21. In this accident, I broke both of my legs, my pelvis on the rights side, my hip joint on the right side, my nose, and my ribs, and my hand around the knuckles.  Ortho Indy doctor Kaehr provided my emergency surgery.

22. These injuries have caused me to be in excruciating pain, especially my right hip and leg, from 2001 to 2012.

23. In 2012, I got a total hip replacement from Rush Medical Center in Chicago, and the surgeon removed the top 6" of my femur and created an artificial joint.  This improved my pain significantly, but not completely.  I feel pain still shooting down my right leg and in my left leg, which was broken in several places near the ankle.  I have poor balance due to these injuries and am careful not to fall because it could result in severe damage to my right hip or left ankle/leg.

24. I have a handicap placard issued by the State of Illinois.

## EARLY DISCRIMINATION

25. **School** – it took advocacy by my mother to remove the allergens that were giving me trouble at school, including live trees and cigarette smoke inside the school.  Many other families did not like the changes.

26. **School bus** – because I was often weak due to my illnesses, I was a target for bullies on the school bus, who would say rude things to me and physically attack me on a daily basis for the 45-minute ride to school.  The bus driver did nothing when I complained to her.  This bullying was **retaliation**.

27. **Family members** – unfortunately, most of my family members smoked during my childhood, and this caused me to avoid being near them when they smoked.  It was also very difficult to avoid all of the allergens, so I often became sick or had a migraine when we visited people.  Many people do not understand that direct sunlight for someone with my condition can cause a migraine, and when people suggest that I need more sunlight to help my depression, it is like saying a migraine is better than depressive symptoms.

## DISCRIMINATION IN LAW SCHOOL

28. At the Law School I attended, I was the Dean's research assistant. Indiana University-Maurer School of Law had exclusively fluorescent lights and I did recognize the impact of these on me by that time.  I did not spend much time in the building, and instead of aspiring to something like Law Review, I was very active outside of the Law School.  I represented the Law School in student government and demonstrated with a petition to support student aid.

I was honored with a Parker-Powell Award in 1996, my second semester of Law School.  The Parker-Powell Award honors the top 5 student leaders on the Bloomington campus.  I was accommodating myself by staying out of fluorescent light and moving around to various parts of the campus to avoid the fluorescence.

## DISCRIMINATION AFTER LAW SCHOOL

29. After Law School, I worked for a famous transportation planner and entrepreneur, Alan M. Voorhees.  I never experienced any discrimination of any kind when I worked for him.

30. He wanted me to have significant freedom of movement as his corporate counsel and I worked from home sometimes.  He gave me a credit card and I traveled to meet with the leaders of his companies coast-to-coast.  He was a board member of Chase Bank, Delta Airlines, Boeing, Micros, SeaGate, and Autometric Aerospace.  He was very flexible in my working arrangements, and I used that to create a working environment that worked for me.

## INDIANA SUPREME COURT & OTHER DISCRIMINATION

31. The **1st discrimination** I experienced from the Indiana Supreme Court was the refusal of the Court to allow me to do some work from home while I was convalescing.  The Indiana Judicial Service Report was due while I was away and I wanted to help make sure it was done, since publishing this annual report of the judicial branch in Indiana was in my job description, one of my main duties.  The answer was no; you may not work from home.  When I

came back to work, my supervisor stated that the justices were angry that

the Indiana Judicial Service Report was not done and I was responsible for it,

but the Court refused to let me work from home.

32. The **2nd discrimination** was when I came back to work in July of 2001.

Initially, I had a handicapped space near the office where I worked.  After a

few weeks, this was removed, but I still needed it.  Anyone watching me walk

and listen to me groaning in pain would know this, and making me walk a

long distance every morning and evening to the public employees parking

garage was hostile and discriminated.

33. The **3rd discrimination** was giving me a poor work review at the beginning of

September 2001, just a few weeks after I came back to work.  Prior to my car

accident, my supervisor, Kurt Snyder, said that Lilia Judson and he agreed

that I would be promoted.  To talk of promotion before my accident and then

give me a poor review afterwards was discrimination based on my disability

(physical and mental).

34. The **4th discrimination** was after I was assigned to Director Ron Miller, who

openly criticized people with bipolar disorder.  This happened in December

2001, shortly after I revealed my mental disabilities to the Indiana Supreme

Court on its bar exam application, which mandated that I provide this

information.

35. The **5th discrimination** was when I asked Lilia Judson directly in her office if

I could be assigned to another manager, since Miller had said such

disparaging things about people with bipolar.  She said no, I had no choice in that matter.

36. The **6th discrimination** was after I spoke with Judson; Miller wrote all of my duties on a white board so that everyone in the office and any visitor could see.  As I got things done, he crossed them off.  He also sent me to "remedial" computer training.  I felt humiliated.

37. The **7th discrimination** was when the Indiana Judicial Service Report was published in 2001 and 2002 and this annual and very public report omitted my name from the roster of employees on page 5.  This was directed at me, singled me out, because I worked there both years.  This caused my resume to look false if anyone went on the Internet and did a fact check of these reports.

38. The **8th discrimination** was not allowing me to pass the bar along with everyone else using the same procedures, even when I paid and provided a complete application, took the bar exam and passed, passed the Character & Fitness exam, had no criminal record, and in fact was admitted in Virginia in 1999, just 3 years before.

39. The **9th discrimination** was forcing me to attend a hearing specifically about my bipolar disorder as a condition of getting a law license.  I was forced to talk about my mental illness in front of about 12 people, several of whom were officials with whom I worked at the Court.  This was extremely humiliating to me because then people I worked with knew about my bipolar

disorder.  They didn't know why I had it, since I didn't even know that at that time.  Now I know it was from poisoning by the government at Camp LeJeune.

40. The **10th discrimination** was forcing me to sign a consent agreement as a requirement to get a law license.  The consent agreement said that I must see my doctor and take my medications.  There was no evidence that I wasn't doing that, but it became a requirement and a way to humiliate me.  I wanted the license and so signed under duress.

41. The **11th discrimination** was when I was sworn in.  I was very upset on the day I was sworn in, 6/7/2002, because I was again in front of people who knew I had bipolar disorder and who had forced me to sign the consent agreement under duress.  I did not feel honored and respected getting my law license, but instead disrespected and dishonored.  I was so upset that I was unwell at home that night and my doctor told me to take 4 weeks off of work.

42. The **12th discrimination** was when Ron Miller asked me to give him all of the scores of files I created so he could complete the 2002 Indiana Judicial Service Report, and he did so without any reference to me.

43. The **13th discrimination** was when the Chief Justice fired me, a couple days after I came back to work, on 7/11/2002.  This was direct retaliation for taking FMLA leave by Chief Justice Randall T. Shepard.

44. **Discrimination #14** was refusing to acknowledge my work and contributions and insulting my work in the firing letter. While I worked at the Court, I

used every opportunity to help people with disabilities, including a blind judge who needed software, which I convinced JTAC to purchase (Justice Sullivan).  I also went to the Indiana Association of the Deaf and asked for the input of deaf Hoosiers on the court reporting automation system pilot project for which I was the Court's assigned staff member.  If I had not been fired, I would have continued pushing for a system that was accessible to deaf court participants (judges, lawyers, and litigants), and this would have precluded several court cases and complaints by deaf court users 10 years later.  *Prakel v. State of Indiana, et. al.*, Case No.: 4:12-cv-45-SEB-WGH (S.D. Ind.)

The chief justice and the Division of State Court Administration (my former employers) were the defendants in this case.  I was not the only disabled person to receive discrimination.

http://www.theindianalawyer.com/deaf-courtroom-spectator-gets-124500-settlement-from-state-of-indiana/PARAMS/article/37755

I proposed a state and national database of protective orders in real time for a contest announced by President Clinton in the first White House webcast on June 24, 2000.  This idea to protect women and children and disabled people was recognized by Harvard's Kennedy School of Government and the Council for Excellence in Government as one of the top 8 national finalists, one of the best ideas in the nation for e-government in 2001.  The Indiana Supreme Court did not recognize my disability access work or the protective

order database idea recognized by Harvard.  In 2006, without any mention of

my idea, the Court got a grant from the Justice Department and built a pilot

of such a real-time protective order system, and in 2009 the legislature

provided funds and a mandate to expand it to all 92 counties.

https://mycourts.in.gov/porp

45. The **15th discrimination** was in 2006, after I moved to New Zealand and put

my Indiana license into inactive status.  The State Board of Law Examiners

demanded that I provide reasons why I was not giving them the quarterly

medical reports from my doctor as required by the consent agreement

associated with my license.  I said the entire agreement was an ADA

violation after *Tennessee v. Lane*, and when I wrote that to the Board, the

Board voted to remove these requirements and remove the consent

agreement.  2006 was the first time that my 2002 Indiana license was not

encumbered.

46. When I returned to the United States from New Zealand after seven years in

2010, I noticed that the South Bend Tribune reported about trial court

statistics and how there appeared to be errors.  I contacted the reporter and

made a few comments, since I was the statistical analyst for two years and

this was my area of responsibility and expertise.  I performed analytical and

weighted caseload studies on over 400 courts, and I mentioned some reasons

why the statistics might have errors.  Executive Director Lilia Judson of the

Division for State Court Administration attacked me, saying I had "no

authority" to talk about court statistics and labeled me as a "disgruntled" ex-employee.  I had not attacked her personally in this manner, and these numbers are important to any citizen who uses the courts.  That is why the reporter wanted my view.  Attacking me instead of sticking to the facts was **discrimination #16**, and I felt belittled and humiliated rather than respected as a former senior Court employee with responsibility for statistics from **every court in the state**.

47. I ran for circuit court judge in Elkhart County in 2010, but I needed in-patient care for my bipolar disorder for about 10 days due to stress.  That was the last time I have needed in-patient medical care for bipolar.  The Indiana Democratic Party, Elkhart County branch, refused to slate me for judge, and it was clear the reason was my bipolar disability.  **IDP discrimination #1**.

48. In 2011, I ran for Congress in the 2nd District of Indiana.  The Democratic Party in South Bend had maintained its Headquarters in an inaccessible state, with stairs to get inside and no handicap parking in its parking lot, which it shared with other businesses.  This seemed to mock access.

 I made an ADA complaint to the U.S. Justice Department, and ABC 57 covered the story in the fall of 2011.  This is **IDP Discrimination #2**.

https://www.youtube.com/watch?v=2DebpmIA0oc

49. The person who maintained this inaccessible entrance was Butch Morgan, the Democratic district and county chair in South Bend.  Morgan was on the Indiana Democratic State Committee and was a member of the Indiana Election Commission for years.  Morgan forged signatures for Barack Obama and Hillary Clinton in 2008.  He was convicted for these forgeries and served a year in prison for the felonies.

*State of Indiana v. Owen "Butch" Morgan Jr.,* 71D02-1204-FC-000078

https://public.courts.in.gov/mycase/#/vw/CaseSummary/eyJ2Ijp7IkNhc2VUb2tlbiI6Ik1XRTRORFV3TmpFM01USXdPak0yT1RFME9ESXhNalU9In19

On or about May 22, 2011, I ran against Morgan for district chair and lost, 15-1.  I was the first person to run against Morgan since 1994, and the reason I did so was that I wished to bring attention to the lack of access.  Morgan was on the state committee that made the IDP's rules, including Rule 10.

50. After a year of protesting the lack of access, and the total lack of help from the U.S. Justice Department, I filed a complaint with the Indiana Civil Rights Commission in 2012.  The grounds were the lack of access at the South Bend Headquarters (lack of accessible parking and lack of accessible entrances) and discrimination in Rule 10 of the Indiana Democratic Party Rules against inclusion of people with mental disabilities, since only "physical disability" was protected.  The Rule 10 violation was **IDP Discrimination #3**.

14

51. The Indiana Civil Rights Commission Deputy Director and staff attorney found that there was no disability violation, stating that there was "ample parking across the street" and the ramp (2 feet too short, too steep, with no handrails) provided by the Party for the entrance was adequate, even though the signage was deficient, there was insufficient landing space at the top of the stairs, and the doorbell was actually above the second step.  See, *supra*.

52. I appealed this to the full Commission for review.  The Chairperson, Alpha Blackburn, recommended reversal of the staff attorney's findings, and the Commission voted **6-0 in my favor**.

53. The Indiana Democratic Party demanded oral argument and during oral argument the Indiana Democratic Party state chair was present.  The IDP lawyer argued that the Party had a <u>constitutional right not to associate with disabled people</u>, and this was **IDP discrimination #4**.  This is the essence of discrimination—the desire not to associate with disabled people.  It was in fact an admission of the reason for discrimination, but the **ICRC voted 4-0 to reverse** its earlier reversal, without providing even a single reason why.

54. I sought due process in the Indiana Court of Appeals, and the Court of Appeals said that it would not decide this, and that it had no jurisdiction to review a final judgment of the Commission rejecting my asserted disability rights.  This was **Discrimination #17** of the Indiana courts.  The 14th Amendment due process clause does cover state agency actions, and the total lack of a reason for <u>going from 6-0 to 0-4 implicated my right to due process</u>.

55. I appealed to the Indiana Supreme Court for review and enforcement of my due process rights.  This was finally lodged on 9/3/2014.  The Court refused to review the due process violations from the ICRC and dismissed my case on 2/27/2015.

    https://public.courts.in.gov/mycase/#/vw/CaseSummary/eyJ2Ijp7IkNhc2VUb2 tlbiI6Ik5EZzJNRFl3TmpFM01USXdPakUwTmpJd01ERXlZek09In19

56. Refusing to review obvious arbitrary and capricious flip-flopping from the ICRC was **Discrimination #18** by the Indiana courts.  Refusing to give me justice when I was asking for disability rights is a fundamental denial of my rights as a disabled person.

57. While the ICRC case was ongoing, I applied to be appointed as a trial judge in St. Joseph County in January of 2013, and one of the Indiana Supreme Court justices chaired the interview in which I participated.  I was not selected.

58. I was at the center of a major reform effort in South Bend in 2011 and 2012 regarding corruption at the South Bend Housing Authority.  I had about 5 clients who said they were sexually harassed at work or other civil rights were violated.  One of my clients was a senior officer at the South Bend Police Department and claimed harassment by the executive director.  After exposing the matter several times in the media, the executive director resigned, the entire governing board of the Housing Authority was removed and replaced by the mayor, and HUD audited the Housing Authority at my

16

request.  HUD found the Housing Authority to be a "troubled agency" in South Bend.  I also discovered that the executive director was serving on the "Claims Committee" of the Housing Authority's insurance company, and that gave her the ability to squelch any claims or attempts at negotiation in civil rights cases.  The executive director was on the Claims Committee for several years, and I found this in the annual reports of the insurance company.  This was a major reform in South Bend, and every official involved was a Democrat appointed by a Democratic mayor or board.

59. After my work with the Housing Authority in South Bend, 2 people contacted me out of the blue (not through my normal networks) and sought help with a "sexual harassment" case at the St. Joseph County Public Library.  One of these clients, a woman, gave me a video showing her supervisor touching her behind as he walked by her.  This was essentially all the evidence she had. Everything else she claimed was parole evidence.  She asked me to present an offer to her employer (she still worked there) and we had written terms in a representation agreement stating that I would not do any trial work for her and that this was for negotiations only.  At no point did she ever ask me or direct me to file a lawsuit, and given our explicit agreement, I did exactly what I promised to do.  I presented her offer along with her evidence, and this was rejected.  Our agreement was for me to do this and no more.

60. In 2013, my former client, Brenda Sconiers, hired an attorney whose firm's partners gave money to Democratic officials in South Bend, including B.

17

Patrick Bauer, the former Democratic Speaker of the House.  Attorney
Thomas Dixon also received lucrative work from several Democrats on the
City Council and other City offices after suing me.  In late 2013, Dixon sued
me for not filing suit, even after I explained to him that Sconiers never
directed me to do that and I explicitly said I would not do it, since I did not do
trial work at that time.

61. The trial continued through the next year, with my insurance company
diligently pursuing the case, including deposing Brenda Sconiers.  Sconiers
stated under oath that she continued to work at the St. Joseph County Public
Library from 2012 through 2015.  She stated that she got raises each year.
She stated that the work environment improved because the person causing
trouble before had left after my representation of her (and before she hired
Dixon).  She stated that she liked working there and wished to retire from
there.  In other words, she had no damages and she was never fired.  My
presentation of the demand in 2012 appeared to prompt the person who
touched her to leave.  I never received a cent of compensation from <u>Brenda
Sconiers</u>.

62. However, the ADA Coordinator of the Indiana Supreme Court, <u>Brenda
Rodeheffer</u>, responded to my appeal of the ICRC due process violations and
my appeal to her for disability violation help by making a disciplinary
complaint against me on 9/3/2014.  This was the same day my ICRC due
process appeal was officially lodged with the Court.  The purpose of the ADA

Coordinator is to help people with disabilities, not wait until someone wants help, then attack.  This was **Indiana Supreme Court Discrimination #19**.

63. Rodeheffer also notified Attorney Thomas Dixon in Sconiers' case, and Sconiers entered evidence of this disciplinary complaint into the record in the case.  *Brenda Sconiers v. Andrew Straw*, 71D07-1310-CT-000265.

https://public.courts.in.gov/mycase/#/vw/CaseSummary/eyJ2Ijp7IkNhc2VUb2 tlbiI6Ik5qWTJNRFl3TmpFM01USXdPak14TXpVNE56VXhNamM9In19

Informing Dixon of a disciplinary complaint based only on my mental disability, bipolar disorder, was meant to make Dixon and the trial court discriminate on that basis, since it had nothing to do with the case against me at all.  This was **Indiana Supreme Court Discrimination #20.**

64. On January 27, 2015, I wrote to every member of the Indiana Senate and to the chairman of JTAC, Indiana Court of Appeals Judge Paul Mathias.  I told them that I did not believe the e-filing system being proposed by the Indiana Supreme Court would be sensitive to people with disabilities, given the long history of discrimination towards myself and the total lack of disability as a subject of discussion in the proposal, which was available online.  Exactly one month after this, the Indiana Supreme Court refused to review the due process case.  So, that also appears to be retaliation for what I said, and therefore **Indiana Supreme Court Discrimination #21**.

65. The Indiana Supreme Court Disciplinary Commission took up Rodeheffer's disciplinary complaint, on its face only relating to my mental disability, and

then opened an investigation about me.  **Indiana Supreme Court**
**Discrimination #22.**

66. About the time the Disciplinary Commission began his formal investigation, I
submitted to Mr. Witte the fact that Randall T. Shepard built my protective
order database without attribution.  I said the same thing to IUPUI on
February 10, 2015.  The Chief Justice of Indiana fired the person who
invented this very popular system for protecting people.

67. The Disciplinary Commission, Mr. Witte, engaged in about 16 months of
investigation after Rodeheffer's complaint before finally entering a charge
against me.  I felt harassed.  **Indiana Supreme Court Discrimination #23.**

68. The new Chief Justice of Indiana, the officer that hired and fired me in 2000
and 2002, authorized the hearing officer so the case could go forward on
1/11/2016.  **Indiana Supreme Court Discrimination #24.**

69. The Charge has four counts, each concerning and prosecuting as unethical a
disability-related case in which a judge either disagreed with me or said my
case was "frivolous."  **Indiana Supreme Court Discrimination #25, #26, #27,**
**#28.**

70. One of the cases was *Straw v. ABA*, my case against the ABA and the 50 top
law schools in the USA.  I contacted Judge Durkin and his clerk stated that
he did not call the case frivolous and I did not appeal it, so he did not pursue
any sanctions or discipline.  The issue in that case was standing.

71. It appears that <u>Mr. Witte did not contact Judge Durkin</u>, and it appears he did not contact any of the other judges who disagreed with me.  He took the Orders, looked for evidence of disagreement, including the word frivolous, and interpreted this as meaning that I should be disciplined.

72. In fact, **<u>none of these four cases resulted in any sanction</u>**.  The one time sanctions were threatened, by the Seventh Circuit, the Court decided against it because of the enormous ethical violation of the 500+ attorney law firm that I was suing.  Locke Lord LLP had hired the <u>law firm that previously employed the trial judge</u> in the case, J. Milton I. Shadur.  I used this fact to ask for judgment in my favor, and I asked not to be sanctioned because Medicare's EDDI office completely agreed with me, stating that the 500+ lawyer law firm's letter was "misleading" about $1,000/day fines and that I should not give the firm any of the information they asked, or their client, a newspaper I was suing for defamation.

73. I moved to Illinois in 2013 and almost immediately experienced discrimination.  Many businesses in Cook County do not provide handicap parking spaces, including in Streamwood, where I moved.  I sent several demand letters with monetary damages demands, and in return the Chamber of Commerce reported me to the local police, claiming I was a scammer and fraud, even though I said I was a disability rights attorney.  This was **Illinois Discrimination #1**.

74. Two front-page newspaper stories later, the Village did an audit after earlier refusing to work with me, and the Village found about 150 handicap spaces were missing or incorrectly made. I discovered this through a FOIA request. This extrapolates to 18,000 over the whole of Cook County. The Village has an employee entrance and that entrance has two steps and no handicap parking in the parking lot that serves that entrance. **Illinois Discrimination #2**.

75. Someone wrote a letter to the editor, which the newspaper printed, and it stated I was extorting money from local businesses, as well as accusing me of dishonesty in my work. This was **Illinois Discrimination #3**.

76. I filed suit. *Straw v. Chamber, et. al.*, 14-3094 (Ill. Ct. App. 1st Dist.). The letter writer settled with me, as well as others who piled snow into their handicap spaces after my demand letters to them. Locke Lord LLP represents the newspaper and this was the case that motivated the Kloecker letter seeking my private health information. Neither the trial judge nor the Illinois Court of Appeals called my case frivolous under the Illinois Human Rights Act and common law defamation claims.

77. I lost in the *Kloecker* case on appeal to the 7th Circuit and did not get *cert.* at the U.S. Supreme Court. As noted above, there were no sanctions imposed, even though both the trial judge and court of appeals called my case frivolous. I maintained that it was not frivolous and explained why.

78. I attempted to get a business loan in 2013 from the Advantage Illinois
Participation Loan Program, for which Illinois got a $78 million loan from the
U.S. Treasury.  The administrator of the program called me personally and
proceeded to interrogate me about my physical and mental disabilities,
asking if I "seem disabled" such that a bank would notice.  He wanted to
know about my medicines and dosages.  I was rejected for this program and I
made a discrimination complaint to the U.S. Treasury.  **Illinois
Discrimination #4**.  CR-13-8.  The U.S. Treasury denied my claim without
explanation, simply stating that nothing that happened was discriminatory,
even though it obviously was.  This was **Discrimination U.S.A. #1**.  The
Advantage Illinois Participation Loan Program stated that I was only the 2nd
disabled person to seek a loan through them, and the other was a veteran,
who was accepted.

79. When my signature petition for Congress was rejected by the Indiana
Secretary of State on 7/27/2012, I sent a complaint to the U.S. DOJ Disability
Rights Section: DJ# 204-26S-189.  No action was taken for the several
instances of discrimination I had experienced.  I have never received a
helpful response from the Justice Department for any discrimination
claim.  **Discrimination U.S.A. #2**.

80. I also made a complaint regarding the handicap parking around the City-
County Building in South Bend.  All of the parking was utilizing the bike

lane in calculating the access aisles (there were no access aisles).  ICRC
PAha15040308.

81. I made an APRA request that was not fulfilled after 3 years of repeated
promises, and the Indiana Public Access Counselor said my request (about
the Housing Authority and its new commissioners) had "languished."  *Straw
v. South Bend*, 15-FC-139.

82. I founded a political club for people with disabilities called Disability Party,
and it had 1300 followers in 39 countries in 2015.

83. I pursued a case for a childhood friend who had depression and he attempted
suicide due to extended separation from his children.  When the judge then
stripped all parental rights from him, I felt an urgency when he talked with
me about it, and I tried to get that reversed.  I talked with experts on
disability at the National Council on Disability in 2014, and they said that
the ADA does apply to such cases.

https://www.ncd.gov/publications/2012/Sep272012

The federal judge did not want to enforce the ADA, Title II, against a state
trial judge, and accepted what I considered to be frivolous arguments from
the other side that, if accepted, would preempt ALL use of the ADA in family
law cases, when the National Council on Disability had an opposite view.
The law firm for the opposing party made direct personal attacks against me
based on disability in a REPLY that prevented me from responding.  I
responded anyway, because such prejudicial statements deserved response

24

and punishment.  That's not the world we live in.  The other attorney was not punished, and my insurance carrier wished for me to exit the case.  My client also wished me to stop representing him, so I did.  My insurance paid for settlement and I ended up with a $10,000 deductible to pay.  This result was so fraught with disability discrimination; it was inconceivable how any disabled father like my client could ever get justice at either the state or federal level.  The state trial judge was the son of a former governor who appointed Randall T. Shepard to the Indiana Supreme Court.

84. These four cases were chosen: *Straw v. Sconiers, et. al.* (using my mental disability against me in a trial court after intervention of the Indiana Supreme Court ADA Coordinator), *Straw v. Kloecker, et. al.* (defending my health information privacy after threats of $1,000 per day fines by a 500+ lawyer law firm, as well as unethical actions by the other side on appeal), *Straw v. ABA, et. al.*, (demanding disability statistics to improve the ability of potential law students to choose schools more favorable to disabled students, as well as increase the number of disabled lawyers over the long term; the same way women and minorities used the same data.  No claim of frivolous and no appeal.  Judge Durkin's clerk did not indicate the judge supported sanctions.), and *Rutherford v. Rutherford, et. al.* (disabled father wanted his parental rights back, since his suicide attempt was due to alienation from his children, and the judge was imposing even more of this.  Position supported by National Council on Disability).

85. I asked for the Federal Highway Administration to enforce the handicap parking in South Bend, since the ICRC was not doing it.  I met with a senior policy official from U.S. DOT and he assured me this was being worked on in 2015.  The DOT official said the handicap parking would be made around the City-County Building as well as the Federal Courthouse in South Bend, which had no handicap parking around it.

86. I ran for U.S. House of Representative in the 8th District of Illinois for the March 15, 2016 Republican primary.  The timing of the initial hearing for this case is about 3 weeks prior to the election, and appears to be timed to influence that election.  **Indiana Supreme Court Discrimination #29**.

87. When I attempted to get accommodations for my disabilities, the Illinois State Board of Elections in 2015 denied 3 different accommodations I proposed.  One was to allow me to collect signatures online, using the same sort of e-signatures used in state and federal court in Illinois: s/ Andrew Straw. **Illinois Discrimination #5**.  *See also*, 15 U.S.C. 7001, 7004.

88. I asked for the ability to witness signatures online.  This was denied despite the fact that Illinois state courts allow participating in court via video link. Illinois Trial Rule 241.  **Illinois Discrimination #6.**

89. I asked, finally, for the right to collect less signatures, since both of my legs are broken and it hurts to stand for a long time.  This was denied, and when I submitted 128 instead of 475 signatures, my nomination papers were invalidated and I was removed from the ballot on 1/7/2016.  **Illinois**

**Discrimination #7.** Note that this happened in open session of the ISBE 4 days before the Indiana Supreme Court filed its disciplinary court case on 1/11/2016.

90. I filed to be a write-in candidate for the same office, but when I went to deliver my official declaration form, a huge snow pile was in the handicap parking of the Kane County Clerk Election Board Office (January 2016):



**Illinois Discrimination #8**

91. As I mentioned above, there is a massive amount of discrimination in Illinois on the basis of disability.  I have spoken with Chief Laura Paul of the Illinois Attorney General's Disability Rights Bureau, and she encouraged me to continue my work on handicap parking, since her office is not sufficiently staffed to keep up with all of the violations in the state.

92. Please note that I have documented some of the violations on a webpage I set up for the purpose: www.accessviolations.com  Some violations are so obvious, especially when businesses clear the non-disabled spots and put the snow into the handicapped spaces:



## HONORS

93. While I have lost some cases in courts and the Indiana Supreme Court has been a constant source of discrimination, I have also had some success and some honors.  This is why I have had very positive encouragement from Chief Laura Paul, Provost Lauren Robel, Professor Aman at IU-Maurer School of Law, and Angeli Rios, 2015-2016 president, National Association of Law Students with Disabilities, and many others.

28

94. The ABA Commission on Disability Rights honored me as its "Spotlight" American lawyer with disabilities for the month of January 2014. http://www.americanbar.org/groups/disabilityrights/initiatives_awards/spotlight/straw_a.html

95. The U.S. Access Board in 2014 honored me by rating me "qualified" to be the General Counsel of the U.S. Access Board, one of the highest disability law positions in the federal government.  The rank was equivalent to O-7 in the military, Senior Executive Service.

96. The Indiana Protection and Advocacy Service (IPAS) advanced me to the "finalist" stage in its search for a new executive director in 2014.

97. The U.S. Army Medical Command rated me as "highly qualified" to be an Attorney-Advisor there in 2014.

98. I have 8 perfected complaints currently under investigation at the Illinois Department of Human Rights, and that means these were vetted and perfected.  I have another about 20 complaints not yet perfected there and another for the denial of accommodations against the Illinois State Board of Elections.

99. I have made suggestions to the Commandant of the U.S. Marine Corps regarding Camp LeJeune and the poisoning issue.  I have also made comments about access to the National Council on Disability, the Social Security Administration, and sought records regarding disability and FICO scores from the U.S. Treasury and the U.S. Federal Reserve.

29

100.     My proposal for compensation for people from Camp LeJeune was

covered on KLTV in 2015:

https://www.youtube.com/watch?v=MKojwUm0qwk

101.     Last but not least, I wrote to the U.S. Supreme Court on 5/5/2014 with

suggestions for the Court to create a disability access office that could take

advice and complaints from the public about disability access issues all

throughout the judicial system.  Just having an occasion to make such

suggestions was an honor for me.

102.     My resume provides an even broader picture of my work.

www.andrewstraw.com

## CONCLUSION

103.     My resume shows my competence, my care for other people, and my

willingness to push hard when I see discrimination.  The ADA's purpose is to

"eliminate … discrimination."  The Rehabilitation Act of 1973 states that

discrimination is "continual."  I am the sort of person the ADA and

Rehabilitation Act envision will fight for other disabled people as well as

myself.  People like me, who fight back, are provided with protection under

the law against retaliation.

104.      If I, with my expansive experience of disability, identify

discrimination to such a degree that I will bring it to court, **there is disability**

**discrimination**.  If a court can squint and identify disability discrimination *to*

*any degree*, it is imperative that a court admit it and "eliminate" that discrimination.

105.    Because disability discrimination has been rife in every area of American life and Indiana has a history of invidious discrimination as evidenced in the Indiana Eugenics Law of 1907 (sterilizing people like me) and other similar laws, no judge in Indiana should ever allow the word "frivolous" to pass their lips when a disabled litigant or lawyer comes before them seeking relief for disability discrimination.

106.    If Indiana had sterilized me when it found out I was bipolar, then that would have meant that my daughter would never have been born, and she is the New Zealand national champion in French language speaking.  She is fluent in four languages: English, Italian, Chinese, and French.

http://www.odt.co.nz/news/dunedin/360588/trip-takes-care-french

107.    I have claimed and I continue to believe that the 15 years of discrimination has reduced me to SSDI as my main income, and that means I have not had the resources to visit my children in New Zealand, where they live.

108.    I believe this Court has intentionally injured both me and my family, as well as the additional disabled people I would have been able to help without the discrimination and overt as well as covert actions taken against me.

109.    The emotional injuries of such discrimination and retaliation are
amplified by the same bipolar disorder that is the reason for the
discrimination and retaliation.  The more I am attacked, the more the
injuries are multiplied.

110.    And that includes this hearing, which is the next step in the process of
injuring me.

111.    I am a national leader on disability rights even in spite of the
discrimination I put up with.  I would be able to do a lot more if the State of
Indiana supported me rather than acting in such a hateful manner towards
me and other disabled people.

112.    Instead of disciplining me, I feel I should be compensated and given a
position of honor within the Indiana judicial branch.

113.    I have suggested that honor could be in the nature of an independent
inspector general with the power to investigate complaints and take
suggestions from disabled members of the public and their families regarding
Indiana courts at all levels.  I have already worked at that level as the
Court's statistical analyst and I have ample experience with disability law
and policy.  I have suggested that in such a role, I could make an annual
report, the executive summary of which would go in the Indiana Judicial
Service Report.

114.    It would give me such pleasure to make annual recommendations to
make Indiana courts more accessible.  I would put my heart and soul into

such work.  There should be a link at the bottom of every Court webpage in the judicial branch.  All 400+ trial courts as well as every appellate court webpage.  While I would not be interested in any prosecutorial position, I would be willing to write advisory notices and press releases when disabled citizens make complaints.

115.     Judges have harmed disabled people since the beginning of the Republic.  The majority opinion in *Tennessee v. Lane* recognized the discrimination by courts.  The ADA Amendments Act, passed unanimously in both houses of Congress, was required in part because the U.S. Supreme Court was so hostile to disability rights under the ADA, limiting the Act in an irrational and capricious manner.  That means **people brought cases and lost**, just like I did, but it was the federal courts who were wrong.

116.     Our rights are denied on a regular basis by the courts and others, even 25 years after Congress said to "eliminate … discrimination."

117.     I tried to make a difference at the Indiana Supreme Court, but that Court has discriminated and retaliated so much, it motivated me to file a lawsuit to protect my disability rights. *Andrew Straw v. Indiana Supreme Court, et. al.*, 1:15-v-1015-RYL-DKL (S.D. Ind.)

118.     The federal court dismissed my discrimination case against the Indiana Supreme Court without prejudice and he did not label the case frivolous.  This is some indication that the case was not frivolous.  While the federal judge in the *Straw v. Sconiers* case seemed to want to insult me with

claims of "fantastic," the judge in the Southern District of Indiana did not say

anything like that when I sued the Indiana Supreme Court.

119.    **No court issued sanctions** and one judge's clerk said there was no

reason to discipline me given the procedural posture of that case.

120.    Further, Affiant sayeth not.


I, Andrew U. D. Straw, verify that the above statements and conclusions are made
in good faith, are true and correct, and I arrived at them after inquiries reasonable
under the circumstances.

Sincerely,

/s Andrew U. D. Straw
1900 E. Golf. Rd., Suite 950A
Schaumburg, IL 60173
(312) 985-7333
Fax: (877) 310-9097
andrew@andrewstraw.com
February 17, 2016

## CERTIFICATE OF SERVICE

I, Andrew U. D. Straw, certify that I have submitted the above AFFIDAVIT to the Clerk of the Indiana Supreme Court in PDF format via the Indiana Supreme Court's E-Filing System, on February 17, 2016. This AFFIDAVIT was served to Indiana Attorney Disciplinary Commission attorney Angie Ordway on February 17, 2016 via that E-Filing system, Efile.incourts.gov. I will also send her a courtesy copy to angie.ordway@courts.IN.gov

Respectfully submitted,

/s Andrew U. D. Straw
1900 E. Golf. Rd., Suite 950A
Schaumburg, IL 60173
(312) 985-7333
Fax: (877) 310-9097
andrew@andrewstraw.com
February 17, 2016

35