Case 5:22-cv-07718-EJD Document 22-16 Filed 01/25/23 Page 1 of 221

Filed: 1/4/2023 3:41 PM
Monroe Circuit Court 1
Monroe County, Indiana

BRENDA SCONIERS
SCONIERS vs. STRAW

May 07, 2015
1

EX 16

See,
pp. 136-
137

```
1                  STATE OF INDIANA
          IN THE ST. JOSEPH SUPERIOR COURT
2

3    BRENDA SCONIERS,                    )
                                         )
4                        Plaintiff,      )
                                         )
5          vs                           ) Cause No.
                                         ) 71D07-1310-CT-00265
6    ANDREW STRAW,                       )
                                         )
7                        Defendant.      )
     ----------------------------------)
8

9          The Deposition of BRENDA SCONIERS

10         Date:         Thursday, May 7, 2015

11         Time:         8:54 a.m.

12         Place:        Dixon, Wright & Associates, P.C.
                         55255 Birchwood Court
13                       Osceola, Indiana 46561

14

15
     Called as a witness by the Defendant in accordance
16
     with the Indiana Rules of Civil Procedure pursuant
17
     to Notice.
18

19

20
     Reported by
21   Angela J. Galipeau, RPR, CSR
     Notary Public, State of Indiana
22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   APPEARANCES:

 2     MR. THOMAS M. DIXON
            Dixon, Wright & Associates, P.C.
 3          55255 Birchwood Court
            Osceola, Indiana 46561
 4          (574) 315-6455

 5          For the Plaintiff;

 6
       MS. MARCIA A. MAHONY
 7          Kightlinger & Gray LLP
            One Indiana Square, Suite 300
 8          211 North Pennsylvania Street
            Indianapolis, Indiana 46204
 9          (317) 968-8162
            mmahony@k-glaw.com
10
            For the Defendant.
11
                      *       *       *
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 3 of 221

BRENDA SCONIERS                                          May 07, 2015
SCONIERS vs. STRAW                                              3

```
                         I N D E X
             THE DEPOSITION OF BRENDA SCONIERS

DIRECT EXAMINATION
  By Ms. Mahony................................. Page 4

CROSS-EXAMINATION
  By Mr. Dixon.................................. Page 194

REDIRECT EXAMINATION
  By Ms. Mahony................................. Page 207

RECROSS-EXAMINATION
  By Mr. Dixon.................................. Page 215
                    *      *      *

                       E X H I B I T S
NO.             DESCRIPTION                          PAGE
Exhibit 1       Charge of Discrimination              62

Exhibit 2       Photograph                            64

Exhibit 3       Photograph with notations             66

Exhibit 4       Memo from Mr. Woodcox, 7-25-12        85

Exhibit 5       Charge of Discrimination             106

Exhibit 6       EEOC letter, 8-9-12                  111

Exhibit 7       Dismissal and Notice of Rights       112

Exhibit 8       E-mail from Mr. Straw                115

Exhibit 9       Performance Evaluation, 9-26-08      125

Exhibit 10      Performance Evaluation, 11-5-10      125

Exhibit 11      Performance Evaluation, 1-27-12      125

Exhibit 12      Letter dated 1-9-09                  125

Exhibit 13      Handwritten notes                    153

Exhibit 14      Photographs                          155

Exhibit 15      Handwritten note, 8-31-12            160

Exhibit 16      Handwritten note, 9-7-12             162
```



 1                           BRENDA SCONIERS

 2      called as a witness by the Defendant, having first been

 3      duly sworn, was examined and testified as follows:

 4                          DIRECT EXAMINATION

 5   BY MS. MAHONY:

 6   Q.  Would you please state your full name?

 7   A.  Brenda Mae Sconiers.

 8   Q.  And as you probably know, Ms. Sconiers, my name is Marcia

 9       Mahony and I represent Andrew Straw.  First I'm going to

10       go through some housekeeping matters with respect to a

11       deposition.  Have you ever given deposition testimony?

12   A.  No.

13   Q.  I'm going to ask that you don't answer a question if you

14       don't hear or understand the question; is that fair?

15   A.  Could you repeat that, please?

16   Q.  Sure.  Will you please not answer a question unless you

17       hear and understand the question?

18   A.  Thank you.  Okay.

19   Q.  Is that acceptable?

20   A.  That's okay.

21   Q.  If you don't understand, will you stop me and ask me to

22       restate the question?

23   A.  Yes, I will.

24   Q.  If you answer a question, do you agree that it means that

25       you heard and understood the question?



```
 1   A.  Yes.
 2   Q.  So one of the things that will really help the court
 3       reporter is if I ask a question that has a yes or a no
 4       answer, it's important that you answer yes or no rather
 5       than nod your head or shake your head because ultimately
 6       all of this is going to be typed up; and if you just nod
 7       your head or shake your head or say "uh-huh" or "huh-uh,"
 8       it's not clear.
 9           So what's really important here is that it's all very
10       clear.  So if you're answering yes or no, will you agree
11       to say "yes" or "no" rather than nod your head, shake your
12       head or say "uh-huh" and "huh-uh"?
13   A.  Yes.
14   Q.  And sometimes I forget too and I have to catch myself,
15       despite the fact that I've been doing this a long time.
16           Do you have any medical condition that will keep you
17       from answering questions today?
18   A.  No.
19   Q.  Are you taking any drugs that might affect your ability to
20       answer questions today?
21   A.  No.
22   Q.  During the course of the deposition, we will be going from
23       subject to subject.  And sometimes in a deposition, not
24       always, but sometimes in a deposition you may remember
25       something about an earlier question or an earlier subject
```



```
 1      that affects the person's answer to that earlier question.

 2      If that happens to you, will you agree to tell me that

 3      you've remembered something that affects your answer to an

 4      earlier question?

 5  A.  Yes.

 6  Q.  What did you do to prepare for your deposition today?

 7  A.  Went over some of my files and tried to think about the

 8      past.

 9  Q.  What files did you go over?

10  A.  Some of my files with Andrew Straw.

11  Q.  Okay.

12  A.  And some from work.

13  Q.  And from what?

14  A.  Some from work, some notes.

15  Q.  What documents did you look at?

16  A.  Some e-mails.

17  Q.  What things?

18  A.  That Andrew Straw sent me to my e-mail about our case.

19  Q.  Okay.  What are those specifically?

20  A.  Some about when he would -- some things that he filed for

21      me and some things about the case as far as that he sent

22      to my job, copies.

23  Q.  Copies of what?

24  A.  Copies of forms that he sent to my job.

25  Q.  What forms?
```



```
 1   A.  Demand letter and copies of files from the EEOC.

 2   Q.  Okay.  Anything else that you looked at?

 3   A.  Some photos from my job.

 4   Q.  Some photos?

 5   A.  Yes.

 6   Q.  Okay.  Did you look at anything else?

 7   A.  No.

 8   Q.  All right.  You said you looked at e-mails.  How many

 9       e-mails did you look at?

10   A.  Well, I had a stack, so I just kind of went through them.

11       I didn't count them.

12   Q.  Do you have that with you today?

13           MR. DIXON:  I don't have -- I haven't had a

14       chance to look through any of that stuff.

15   BY MS. MAHONY:

16   Q.  The e-mails that you looked through to prepare for your

17       deposition, do you have them with you today?

18   A.  Yes.

19   Q.  Did looking at those e-mails refresh your recollection

20       about some matters?

21   A.  Yes.

22   Q.  I'm going to need those.

23           MR. DIXON:  You have to submit a request.

24           MS. MAHONY:  Okay.  You don't have a copier here?

25       She used them to refresh her recollection.  They're
```



```
 1              discoverable.
 2                   MR. DIXON:   There's no doubt they're
 3              discoverable.
 4    BY MS. MAHONY:
 5    Q.  To the best of your knowledge, and I understand -- if you
 6        don't know the answer to this question, that's fine.
 7            To the best of your knowledge, do you know whether
 8        the e-mails you looked at today have already been produced
 9        to us?
10    A.  No.
11    Q.  And that's a good answer to a bad question.  No, they
12        haven't been produced or, no, you don't know?
13    A.  Can you repeat the question?
14    Q.  Absolutely.  You said you looked at e-mails to prepare for
15        your deposition.
16    A.  Yes.
17    Q.  Have those e-mails already been produced to us?
18                   MR. DIXON:   If you know.  If you don't know, your
19            answer has to be you don't know.
20    A.  I don't know.
21    Q.  That's fair.  You said you looked at e-mails.  Did you
22        look at e-mails other than the e-mails from Andrew?
23    A.  No.
24    Q.  Okay.  You didn't look at any e-mails to prepare for your
25        deposition other than the e-mails from Andrew; is that
```



1      correct?

2   A.  Correct.

3              MR. DIXON:  Objection.  Remember, I said if I

4          lodge an objection don't answer until I lodge the

5          objection.  That question has been asked and

6          answered.  You can go ahead and answer it.

7              THE WITNESS:  Can you repeat the question again?

8              MS. MAHONY:  Can you read back the question,

9          please?

10             (Read back.)

11  A.  Correct.

12  BY MS. MAHONY:

13  Q.  All right.  You said you looked at copies of forms he sent

14      to my job.  When you said "he," did you mean Andrew Straw?

15  A.  Yes.

16  Q.  What forms?

17  A.  Demand letter and copy of papers that I gave to him from

18      EEOC.

19  Q.  Do you remember specifically what papers those were?

20  A.  It was the right-to-sue letter.

21  Q.  Anything else?

22  A.  It was two other copies, the right-to-sue letter, a copy,

23      and -- no, that's all I remember.

24  Q.  So you looked at some other letters, but you don't

25      remember what they were?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 10 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           10

1   A.  Letters that he -- that we had conversation of --

2       conversations about the EEOC letter.

3   Q.  So this is a document you're talking about that you

4       reviewed this morning?

5   A.  Yes, it's a document.

6   Q.  And tell me what document that is that you're talking

7       about.

8   A.  It's a letter that he sent to me.

9   Q.  So a letter from Andrew to you?

10  A.  From Andrew, yes.

11  Q.  Do you have that with you today?

12  A.  Yes.

13  Q.  What was in that letter?

14  A.  It was concerning filing the right to sue.

15  Q.  And I apologize if I asked you this question before.  The

16      letter that you're talking about from Andrew, do you have

17      that with you today?

18  A.  Yes.

19  Q.  All right.  Any other forms or documents that you looked

20      at to prepare for your deposition today, other than what

21      you already talked about?

22  A.  No.

23  Q.  You said that you looked at files from the EEOC.  What

24      files from the EEOC did you look at to prepare for your

25      deposition today?



1   A.   The letter from the --

2   Q.   I'm sorry.

3   A.   The dismissal, the right-to-sue letter.

4   Q.   Any other files from the EEOC that you looked at to

5        prepare for your deposition today?

6   A.   No.

7   Q.   All right.  And you said you looked at some photos for

8        your job?

9   A.   Yes.

10  Q.   And you have these with you today?

11  A.   Yes.

12  Q.   All of those things that we talked about that you used to

13       prepare for your deposition, did it refresh your

14       recollection about the matters that we're going to talk

15       about?

16            MR. DIXON:  Objection.  It's impossible to answer

17         that question since she doesn't know what matters

18         you're going to be talking about.

19  BY MS. MAHONY:

20  Q.   You can answer.

21  A.   Could you repeat the question, please?

22  Q.   I'll restate the question.  The documents that you looked

23       at to prepare for your deposition, did it refresh your

24       recollection about your employment with the library and

25       your interaction with Mr. Straw and the EEOC?



1          He can't help you.  Did those documents help refresh

2     your recollection?

3   A.  Some.

4   Q.  Some.  Which ones?

5   A.  Which ones --

6   Q.  Are there any documents that you looked at to prepare for

7     your deposition that did not refresh your recollection?

8   A.  Did not, no.

9   Q.  They all did?  They all refreshed your recollection?

10  A.  Yes.

11  Q.  Have we talked about all the documents that you looked at

12    to prepare for your deposition today?

13  A.  Yes.

14  Q.  All right.  What's your address, present address?

15  A.  214 South Holiday Drive, South Bend, Indiana 46615.

16  Q.  Who lives there?

17  A.  My husband and I.

18  Q.  What's your husband's name?

19  A.  King Sconiers.

20  Q.  K-i-n-g?

21  A.  Yes.

22  Q.  Does anybody else live there with you?

23  A.  No.

24  Q.  How long have you been married?

25  A.  Ten years and about five months.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 13 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        13

1   Q.  Were you married before you were married to Mr. Sconiers?

2   A.  Yes.

3   Q.  To who?

4           MR. DIXON:  Objection, irrelevant.  You can

5       answer it.  You can answer the question.

6           THE WITNESS:  Yes.

7           MR. DIXON:  Let me just go ahead and explain.

8       There are certain things that I have to do just to do

9       what's called preserving the record just in case we

10      have some dispute down the road that we can bring to

11      the judge.

12          So there will be times when I lodge objections.

13      But in most circumstances, I'll instruct you to go

14      ahead and answer the question.  But you need to let

15      me make the objection; but, like in this case, I'll

16      say go ahead and answer the question.

17  BY MS. MAHONY:

18  Q.  He's just doing his job, and I'm just doing my job.

19  A.  Okay.

20  Q.  You were married before?

21  A.  Yes.

22  Q.  To who?

23  A.  Lorenzo Jackson.

24  Q.  What's your Social Security number?

25          MR. DIXON:  Objection, irrelevant.  You can



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 14 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                      14

1          answer the question.

2    A.  XXX-XX-8690.

3    BY MS. MAHONY:

4    Q.  What's your date of birth?

5    A.  October 29, 1955.

6    Q.  Are you receiving Social Security benefits?

7          MR. DIXON:  Objection, irrelevant.  You can

8          answer the question.

9    A.  No.

10   Q.  Can you tell me about your level of education, please?

11   A.  High school and some college.

12   Q.  Where did you go to high school?

13   A.  Centennial High School, Champagne, Illinois.

14   Q.  Where did you go to college?

15   A.  Parkland.  I just went for a semester.

16   Q.  Did you say Parkland?

17   A.  Parkland College in Champagne, Illinois.

18   Q.  And where are you employed?

19   A.  St. Joseph County Public Library.

20   Q.  How long have you been there?

21   A.  I started in 2001 with another company, but then I was

22        hired in in January 2003.

23   Q.  When you started with the other company, did you work at

24        the St. Joseph County Library?

25   A.  Yes.



1   Q.  But it's your testimony that you were not yet an employee

2       of the St. Joseph County Library; is that correct?

3   A.  Correct.

4   Q.  When you worked for the other company, what was your job?

5   A.  Security.

6   Q.  And I think you told me already.  But would you tell me

7       again when you became an employee of the library?

8   A.  January 2003.

9   Q.  And you still work at the library?

10  A.  Yes.

11  Q.  Have you been involved in any litigation other than this

12      litigation?  And let me back up a little.

13          Your prior husband, did that marriage end in divorce?

14  A.  Yes.

15  Q.  So other than your divorce, have you been involved in any

16      litigation other than this litigation in which you sued

17      Mr. Straw or Mr. Straw sued you?  Let me ask it a

18      different way.

19          Have you been sued by anybody other than Mr. Straw?

20  A.  No.

21  Q.  Have you sued anybody other than Mr. Straw?

22  A.  Yes.

23  Q.  Who did you sue?

24  A.  Well, I had a car accident, like that.

25  Q.  And you sued somebody?



1   A.  My insurance company, but I'm not sure.  I don't remember.

2   Q.  Do you remember the name of the person?

3   A.  No.

4   Q.  So there was some lawsuit about a car accident?

5   A.  Yeah.

6   Q.  Okay.  Do you remember when that occurred?

7   A.  No.

8   Q.  What was your insurance company?

9   A.  Wow, I'm not sure.

10  Q.  All right.  Have you sued anyone else?

11  A.  I'm not sure.  I had an accident at another job before, so

12      it was Venture Store.

13  Q.  Tell me about that, that accident.

14  A.  It was an accident where I hurt my knee.

15  Q.  Did you sue over that?

16  A.  Yes.

17  Q.  Who did you sue?

18  A.  Venture Store.

19  Q.  What was the result of that suit?

20  A.  The result?

21  Q.  What happened?  Was there a trial?

22  A.  No.  It wasn't a trial.

23  Q.  Did it get settled?

24  A.  Yes, it got settled.

25  Q.  All right.  Have you sued anybody else?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 17 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          17

1   A.  No.

2   Q.  Has anyone else sued you?

3   A.  No.

4   Q.  Other than what we talked about, is that correct?

5   A.  Andrew Straw, yeah.

6   Q.  Okay.  Other than the EEOC charge of discrimination you

7       filed against the library, have you filed any other

8       charges of discrimination?

9            MR. DIXON:  Objection, irrelevant.  You can

10          answer the question.

11  A.  Of discrimination?

12           MR. DIXON:  You mean employment-based

13          discrimination?

14  BY MS. MAHONY:

15  Q.  Any.

16  A.  Yes.

17  Q.  Tell me about other charges of discrimination.

18           MR. DIXON:  Objection, irrelevant.  You can

19          answer the question.

20  A.  When I worked for Venture Store, I had a sexual

21      harassment; but I didn't sue anybody then.  It was just --

22      it was the EEOC.

23  Q.  When was that?

24  A.  It might have been 1994 maybe.

25  Q.  Approximately 1994?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 18 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         18

1   A.  Yeah, something around there.

2   Q.  So I want to make sure I got this right.  So you'll

3       correct me if I say something that's incorrect, please;

4       will you do that?

5   A.  Okay.

6   Q.  Okay.  So you filed a sexual harassment charge with the

7       EEOC against Venture Store in approximately 1994; is that

8       correct?

9   A.  Uh-huh.

10  Q.  What was the result of that?

11  A.  I never really knew a result.  I know that the supervisor

12      that we had there left.  And I never got any report from

13      it.

14  Q.  Did you -- I'm sorry.  I didn't mean to cut you off.  Did

15      you have something more to say?

16  A.  I never got any report.  That was it.

17  Q.  Do you know whether you got a notice of right to sue from

18      the EEOC?

19  A.  No.  I don't --

20  Q.  Again, that was a good answer to a bad question.

21          Did you get a notice of right to sue from the EEOC --

22  A.  No.

23  Q.  Let me finish my question because it makes it clearer for

24      the court reporter.

25          Did you get a notice of right to sue from the EEOC



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 19 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          19

1        about your sexual harassment charge against Venture Store?

2   A.   I don't remember.  Not that I remember.

3   Q.   Okay.  Did you sue Venture Store in court?

4   A.   No.  Excuse me, no.

5   Q.   Do you have a copy of your EEOC charge against Venture

6        Store?

7   A.   No.

8   Q.   To the best of your recollection, please tell me what was

9        in that charge of discrimination against Venture Store.

10  A.   Okay.  The hours that I worked were cut when some friends

11       of the supervisor came back from school.  And he would

12       give them my hours so that they can have some hours to

13       work.

14            And also, I remember the supervisor asking me to help

15       him to get his pee-pee wet.  That means some of the other

16       women that worked in the store, to help him to find a

17       woman in the store that he could -- a friend, a woman in

18       the store.

19  Q.   Okay.  Try that again.  I'm not clear.  I heard what you

20       said about the supervisor asked you to get his pee-pee

21       wet.

22  A.   Help him to get it wet by finding him a girlfriend.

23  Q.   Okay.

24            MR. DIXON:  I'm just going to make a record that

25            I'm holding a standing objection to this line of



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           20

1          questioning about a prior sexual harassment charge.

2          That way I won't have to do it for each question.

3               MS. MAHONY:  That's fine with me.

4               MR. DIXON:  And the objection is about relevancy.

5               MS. MAHONY:  Sure.

6    BY MS. MAHONY:

7    Q.  What else, if anything, was in your charge of

8        discrimination about Venture Store?

9    A.  Nothing.  I don't remember anything else.

10   Q.  Okay.  To the best of your recollection, you told me

11       everything that was in your charge of discrimination about

12       Venture Store?

13   A.  Yes.

14   Q.  How did you come to leave employment with Venture Store?

15   A.  I had an accident there where I hurt my knee, but Venture

16       closed.

17               MS. MAHONY:  I'm sorry.  I turned the thing on

18           silent.  I don't know why it did that.  I apologize.

19   A.  The store closed.

20   Q.  You hurt your knee at Venture Store and the store closed?

21   A.  Let me see what happened.  I just remember them closing.

22       They closed the stores down.

23   Q.  Okay.  Did you enter into a settlement about the EEOC

24       charge against Venture Store?

25   A.  No.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 21 of 221

BRENDA SCONIERS                                      May 07, 2015
SCONIERS vs. STRAW                                            21

1  Q.  And I think you told me that you did not sue Venture Store

2      about the EEOC charge of discrimination; is that correct?

3  A.  Correct.

4  Q.  And I should have said that at the beginning, so I

5      apologize.  It's important that you wait for me to finish

6      asking the question before you answer.

7  A.  Okay.

8  Q.  And at the same token, it's important that I wait for you

9      to finish answering a question before I ask another one

10      because it makes it really hard for the court reporter.

11      Depositions are not like normal human communication.

12          All right.  Other than what we've already talked

13      about, have you filed any other charges of discrimination?

14              MR. DIXON:  Objection, irrelevant.  You can

15          answer the question.

16  A.  No.

17  BY MS. MAHONY:

18  Q.  I want to move on to the charge of discrimination you

19      filed against the St. Joseph County Public Library.  Did I

20      use the right entity; it's the St. Joseph County Public

21      Library?

22  A.  Correct.

23  Q.  And you filed just one EEOC charge with the St. Joseph

24      County Public Library; is that correct?

25  A.  Correct.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 22 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                              22

1   Q.   What prompted you to file the charge?

2   A.   I had been working there and trained very professionally

3        to work for the library.  And some things started changing

4        after the person that started the security, the new

5        security system was no longer there; and they hired

6        another person that had been there.  And the supervisor

7        had started --

8   Q.   Can I stop you for a minute?

9   A.   Yes.

10  Q.   Just so we're clear, so one supervisor left the library?

11  A.   Yes.

12  Q.   Who was the supervisor that left?

13  A.   That was Larry Bennett, ex-chief of police of South Bend.

14  Q.   And there is a new supervisor.

15  A.   New supervisor.

16  Q.   Who was the new supervisor?

17  A.   Robert Sanders.

18  Q.   When did this happen?  When did Mr. Sanders start working

19       at the library?

20  A.   Larry Bennett was there, it might have been 2000 and maybe

21       9.  Maybe 2009.

22  Q.   You sound like you're not sure, but you think it was

23       approximately 2009; is that fair?

24  A.   Yes.

25  Q.   Okay.  So it was approximately 2009 when Robert Sanders



```
 1       started as the supervisor for security; is that correct?
 2   A.  I'm not sure about the date.
 3   Q.  Okay.
 4   A.  The year.
 5   Q.  Is that your -- is 2009 your best estimate?
 6   A.  Yes.
 7   Q.  That's fine.  I'm not going to hold you to it.  The record
 8       is pretty clear that you're not completely confident about
 9       that, so that's fine.
10           Do you know Mr. Sanders' position, title?
11   A.  Supervisor.
12   Q.  Security supervisor?
13   A.  Security supervisor.
14   Q.  All right.  You said that some things started changing
15       when the new person was hired.  The new person was Robert
16       Sanders, right?
17   A.  Yes.
18   Q.  What things started changing?
19   A.  The policies and some -- he didn't get along with some of
20       the people that we worked with.
21   Q.  Let's break that down.  So the policies that changed.
22       What policies changed?
23   A.  The library has their own set of policies, not specific
24       which ones, but some of them weren't met or weren't
25       followed as far as some of the way that we treated some of
```



1        the patrons.  They expected you to fight -- I would say he

2        did because --

3    Q.  When you say "he," you mean Mr. Sanders.  Go ahead.

4    A.  To fight.  But most of all, as far as the atmosphere there

5        was okay, it's just some of the policies had changed.

6    Q.  Okay.  What policies changed?

7    A.  Like I say, the library had their own set of policies, and

8        some of them were being broken.

9    Q.  Which were those, which policies were being broken?

10   A.  The way that we handled patrons and bans.

11   Q.  And how was that changed?

12   A.  Well, maybe you didn't go by the amount of days to ban

13       someone that the library had on the list to, you know,

14       like they want you to ban a person for 30 days.  They may

15       give them more days, like, maybe a couple months or a

16       year.

17   Q.  Okay.  And we're talking about -- you're talking now about

18       the library's policy or Mr. Sanders'?

19   A.  The library's policies were being changed by him by not

20       following policies.

21   Q.  Which policies of the library did Mr. Sanders not follow?

22   A.  Like I said, the banning of patrons.

23   Q.  How did he not follow that policy?

24   A.  Sometimes if a patron was supposed to be banned maybe 30

25       days, he may ban them for six months or a year.



1   Q.  Are you aware of the library policy about banning patrons

2       and what it says?

3   A.  Yes.

4   Q.  What does it say?

5   A.  There's a list.  It's according to what kinds of rules

6       that they break.  So there's that list of it that goes

7       down, you know, if maybe they steal something once, you

8       know, maybe 30 days.  And if they steal something twice in

9       that same time, maybe it's 60 days.  And it went on that

10      way.

11  Q.  I just want to make sure I'm clear here.  You're saying

12      there's a library policy that lays out a patron

13      infraction, and then based on that patron infraction, how

14      many days the patron gets banned.  Am I understanding that

15      correctly?

16  A.  That's true, yes.

17  Q.  I would never want to be banned from a library.

18          And you testified that Mr. Sanders made some patron

19      bans longer than the policy said; is that correct?

20  A.  Yes, yes.

21  Q.  Is there any other policies Mr. Sanders didn't follow?

22  A.  Well, as time went on, yes.

23  Q.  Tell me what those were.

24  A.  Well, there were times when, like, maybe when it was time

25      to -- well, this was like if it was time to go home, we



1    had a policy where it would be, like, 15 minutes, time to

2    get up and take your radio and put that away and change,

3    you use the restroom before you leave or something; and

4    they changed that.

5  Q. Help me understand.  What was the policy about?

6  A. When it was time to go home, you know, we always -- they

7    relieve us maybe 15 minutes early.

8  Q. Was that a written policy?

9  A. Well, no.  That was just something that we had done

10   throughout the years.

11 Q. It was just a practice how you guys did things?

12 A. Right.

13 Q. Is that correct?

14 A. But that wasn't basically a library practice.

15 Q. That was just the practice in the security department?

16 A. Right.

17 Q. Okay.  And when Mr. Sanders came, he changed that policy;

18   is that correct?

19 A. Well, it was changed by some people.  Some people he would

20   let do it and some people he wouldn't.

21 Q. And when you say he would let some people do it, you're

22   talking about he would let -- can I finish the question?

23   Poor court reporter.

24       He would let some people leave their position, their

25   location early to change clothes; is that correct?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 27 of 221

BRENDA SCONIERS                                          May 07, 2015
SCONIERS vs. STRAW                                              27

1   A.  Yes.

2   Q.  Would they leave the library entirely early?

3   A.  Yes.

4   Q.  Okay.  So before Mr. Sanders, people sometimes left work,

5       left the building earlier than the shift ended.  Is that

6       your testimony?

7   A.  Yes.

8   Q.  And Mr. Sanders said you can't do that or you can't do

9       that anymore; is that your testimony?  I'm just trying to

10      understand.  I'm not trying to confuse you.

11  A.  No.  He didn't tell me I couldn't do it anymore.  He just,

12      you know -- it was a matter of someone coming to relieve

13      you where he would probably tell the other people not to

14      relieve you.

15  Q.  Okay.  So what happened with you is that -- I'm just

16      trying to get this straight.  Mr. Sanders never told you

17      you couldn't leave early.  He just didn't send a relief

18      person to you that would allow you to leave early?

19  A.  Right.

20  Q.  How do you know it was Mr. Sanders that was making the

21      decision about someone coming to relieve you?

22  A.  They told me.

23  Q.  Who told you?

24  A.  The security officers.

25  Q.  Can you give me their names, please?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 28 of 221

BRENDA SCONIERS                                May 07, 2015
SCONIERS vs. STRAW                                      28

1  A.  Blake Harris and -- I'll just say Blake Harris.

2  Q.  Did anyone else tell you that Mr. Sanders sent him to

3      relieve you?

4  A.  No.

5  Q.  Did this happen just to you or to other people?

6  A.  It happened to other people.

7  Q.  Who else did it happen to?

8  A.  Joseph Kiama.

9  Q.  Anybody else that you're aware of?

10 A.  No.

11 Q.  Okay.  All right.  Any other policies or practices that

12     Mr. Sanders changed, other than not relieving people 15

13     minutes early and the length of time of banning patrons?

14 A.  Yes.  Well, I'm trying to see where we are because he

15     came -- when he came in, they changed; but it got worse as

16     it went on.  So I'm just kind of confused on where we are

17     right now.

18 Q.  Why don't you tell me any policies or practices that Mr.

19     Sanders changed at any time from the way it was before Mr.

20     Sanders was the security supervisor.

21 A.  Okay.  Well, he wanted -- like once there was a fight that

22     broke out and he expected me to jump in the middle of a

23     fight of two guys that walked in off the street and get

24     into the middle of the fight and break it up.

25 Q.  All right.  And you believe that was a change from the



1       security supervisor before Mr. Sanders?

2   A.  Yes, it is.  And it's a change of policy, a library

3       policy.

4   Q.  Is there a written library policy that you're aware of?

5   A.  Yes.

6   Q.  What is the written library policy?

7   A.  They expect all security officers to keep themselves safe

8       at all times.  Spoken from the office, they wanted -- from

9       the office, they wanted you to -- if there was a problem

10      that broke out like that, they want you to call the police

11      so the police can --

12  Q.  I'm sorry.  Go ahead.

13  A.  So that the police can come and handle it.

14  Q.  And this is a written policy, correct?

15  A.  The police -- that's what the people in the office said,

16      head office told Mr. Bennett; and that's what he

17      instructed us to do.

18  Q.  Mr. Bennett was the security supervisor before

19      Mr. Sanders?

20  A.  Right, right.

21  Q.  Do you have a copy of the library policies about officers

22      keeping themselves safe at all times?

23          MR. DIXON:  Objection.  I thought she just

24          testified it was an oral policy.

25  Q.  And if that's right -- my understanding was that the



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 30 of 221

BRENDA SCONIERS                                  May 07, 2015
SCONIERS vs. STRAW                                         30

```
 1        police part was an oral policy, and the officers keeping

 2        themselves safe was a written policy.  Did I get that

 3        wrong?

 4   A.   No.

 5   Q.   So to the best of your recollection, the library has a

 6        written policy about officers keeping themselves safe at

 7        all times, correct?

 8   A.   Correct.

 9   Q.   And to the best of your recollection, before Mr. Sanders,

10        the practice was to call the police if a fight broke out;

11        is that correct?

12   A.   Right, right.

13   Q.   And that wasn't written.  That was a practice; is that

14        correct?

15   A.   That's correct.

16   Q.   Do you have a copy of the library policy that talks about

17        officers keeping themselves safe?

18   A.   Yes.

19   Q.   All right.  So policies changed.  We have three things so

20        far:  Mr. Sanders banning patrons longer than library

21        policy, the practice about being relieved 15 minutes

22        before your shift is over, and this issue of the fighting.

23            Are there any other policies or practices that Mr.

24        Sanders changed, other than those three?

25   A.   Well, he said to us and also his supervisor, forget the
```



Case 5:22-cv-07718-EJD  Document 22-16  Filed 01/25/23  Page 31 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        31

1   policies; policies can change any time.

2   Q.  So when you say "he" said to us, this is the -- are you

3       talking about Mr. Sanders?

4   A.  Yes.

5   Q.  Mr. Sanders said forget the policies?

6   A.  His supervisor said it, and he agreed with him.

7   Q.  What's Mr. Sanders' supervisor's name?

8   A.  David Woodcox.

9   Q.  To the best of your recollection, what policies was

10      Mr. Wilcox talking about when he said the policies can

11      change, forget the policies?

12  A.  The policy of the library, the book that they have with

13      the library policies in it.

14  Q.  Any specific policies that he was talking about that

15      you're aware of?

16  A.  No.  He just said the policies.

17  Q.  Okay.  So other than those four items about policies or

18      practices changing, is there any other policy or practice

19      that Mr. Sanders changed?

20  A.  Also, we have a policy, sexual harassment policy and no

21      employee should be subject to sexual harassment policies.

22      That means as far as speaking, sexual explicit

23      conversations, touching, and that type of thing.  It's in

24      the policy handbook also.

25  Q.  Do you have a copy of that policy?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 32 of 221

BRENDA SCONIERS                                  May 07, 2015
SCONIERS vs. STRAW                                        32

1  A.  Yes.

2  Q.  And before Mr. Sanders came, were you aware of that

3      policy?

4  A.  Yes.

5  Q.  And did that policy tell employees what to do if they

6      thought they were being subjected to harassment, subject

7      to harassment?

8  A.  Yes.

9  Q.  What did the policy tell employees to do?

10 A.  Report it to human resource or your supervisor.  Report it

11     to your supervisor.  Or if you didn't feel comfortable

12     reporting it to your supervisor, report it to someone

13     else, a supervisor over him or just go up.

14 Q.  And I think you said or human resources; is that right?

15 A.  Yes.

16 Q.  Okay.  Any other policies or practices that Mr. Sanders

17     changed?

18         If you want to take a minute to think about it,

19     that's fine.  Just let me know when you're ready.

20             MR. DIXON:  Actually, why don't we take a minute.

21         We can't consult when a question is pending, but I'm

22         going to use the restroom.  If you need to take a

23         break at some point, we can do it after a question.

24         Otherwise, when a question is pending, that's not a

25         time for us to take a break or consult.  So we can do



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 33 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                      33

1        it two ways.  If you feel like you need a break, you

2        can take your time and answer her question and then

3        we'll take a break; or you can just take some time

4        now and I'll just use the restroom real quickly.  So

5        it's up to you.

6             THE WITNESS:  Okay.  I can go ahead.

7             MS. MAHONY:  I promise not to ask anything.  I

8        might ask isn't this a beautiful day; but other than

9        that --

10            (Pause in proceedings.)

11            (Read back.)

12   BY MS. MAHONY:

13   Q.  Do you want to hear again the ones that I have that you've

14       already talked about?

15   A.  No.

16   Q.  So as you sit here today, you can't think of any other

17       policies that Mr. Sanders changed?

18   A.  Yes.  The environment, changed the environment.

19   Q.  How did he change the environment?

20   A.  It was just a whole different, what do you call it, things

21       went on, I guess what would you call hostile, hostile

22       environment.  That was also in the policies that we

23       weren't supposed to have a hostile environment.

24   Q.  How was it hostile?

25   A.  When we had a new person to come in, and I don't want to



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 34 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          34

1       jump over too far from the policy, but we had a new person

2       that come in.

3   Q.  Are you talking about Mr. Sanders?

4   A.  No.

5   Q.  New security officer?

6   A.  A new officer.

7   Q.  All right.  Who was that?

8   A.  That was Danielle Alexander.

9   Q.  Okay.

10  A.  And she created arguments, and she was --

11  Q.  How?

12  A.  She argued with other officers, stepped over officers --

13  Q.  Can you tell me all the things about how she argued and

14      stepped over other officers?

15  A.  When she came in, she would talk back to other officers.

16  Q.  Can you tell me all of the incidents that you recall in

17      which Ms. Alexander talked bad to other officers or

18      created arguments or stepped over officers, I think you

19      said?

20  A.  Well, she came in there like -- just like she was the new

21      supervisor, and she would say bad things to people.

22  Q.  What bad things did she say?

23  A.  Well, like, for instance, this fight that took place in

24      the front here.

25  Q.  With patrons?



1  A.  With the patrons, and I went to the back to talk to one

2      patron that was in a fight.  And the police officer came

3      in front and he wanted to speak to me, and she asked me to

4      stay, "You stay in the back and let me go up there."  And

5      I said no because this was my incident.

6         And so after I talked to the police, Robert called a

7      meeting.  I guess she told him that she didn't like me

8      because I didn't let her go in the front.  So he called a

9      meeting.

10 Q.  Let me make sure I'm clear.  She didn't want you to go in

11     the front and talk to the police, right?

12 A.  She wanted to do it.

13 Q.  She wanted to talk to the police?

14 A.  She felt like I didn't know how to do it, and so he called

15     a meeting right after that.

16 Q.  Robert Sanders did?

17 A.  Robert Sanders and Dave Woodcox also called a meeting.

18     And in the meeting, they ran the camera back on the fight

19     and let most -- all of the officers see what happened with

20     the fight and pointed out that -- it was actually two

21     officers there pointed out what we should have done.  And

22     she said --

23 Q.  Let me just stop you.  I want to make sure I'm clear.  So

24     Mr. Sanders and Mr. Wilcox showed the video of the fight

25     and criticized the way you and another officer handled it?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 36 of 221

BRENDA SCONIERS                                May 07, 2015
SCONIERS vs. STRAW                                       36

1   A.  Right.

2   Q.  Who was the other officer?

3   A.  Joseph Kiama.

4   Q.  All right.  You were going to say something else?

5   A.  So in the meeting, she told them -- she said I asked --

6       Danielle Alexander said in the meeting that, "I asked

7       Brenda to let me go in the front and handle it because she

8       don't know how to break up a fight."

9   Q.  Okay.

10  A.  And I looked at her and I told her, "You don't know what I

11      know how to do."  And she went on to argue.  And another

12      supervisor asked her to be quiet, said, "Be quiet, ladies.

13      Keep it down."

14  Q.  So you and Danielle argued?

15  A.  Yeah.

16  Q.  Okay.  We're talking about all the times that

17      Ms. Alexander created arguments, talked bad to other

18      officers or stepped over officers.  Any other examples of

19      when she did that?

20  A.  Yes.  Joseph --

21  Q.  Joseph Kiama?

22  A.  Yes, she said that -- she asked for him not to speak over

23      the radio because he was African and nobody can understand

24      him anyways.  And you're talking about the hostile --

25  Q.  I'm talking about examples.  You said Danielle



```
 1        Alexander --

 2   A.   Right.

 3   Q.   -- created arguments, talked bad to other officers and

 4        stepped over officers.  I want to know all the times that

 5        you remember her doing that.

 6   A.   Okay.  Well, at one point there was a female in the

 7        restroom that was sick, and I was called to that.  And I

 8        went in to speak to the female and ask her if she was okay

 9        and what I needed to get her.

10             And before I could go out of the restroom door to get

11        a chair -- that's what she wanted -- Danielle stepped

12        right over my feet and went right in and took over as if I

13        wasn't even there.  And I left that situation.

14   Q.   Any other examples of Danielle creating arguments,

15        stepping over officers or talking bad to other officers?

16   A.   Yes.  Well, one thing, like I said, creating the

17        hostile -- she was really flirty.

18   Q.   Tell me all the times that she was flirty that you

19        remember.

20   A.   She came in that way.  She came in that way with -- she

21        used to work for the maintenance department.

22   Q.   At the library?

23   A.   She worked for the maintenance department.  I think.

24   Q.   At the library?

25   A.   Yes, at the library.  She worked at night.  She worked at
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 38 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          38

1        night.  And so then they had talked about a new officer
2        coming in, and it was her.  But they said she had a lot of
3        experience, so they were going to give her -- promote her
4        to security.
5   Q.   Tell me about everything that you saw or heard about in
6        which she was being flirty.
7   A.   I saw her in the office all the time with Robert and
8        another supervisor, Walter Morris, that was assistant
9        supervisor.  She was in the office with them all the time.
10       And you could just hear her laughing and talking.  She
11       talked about how her husband never wanted to have sex with
12       her blatantly in front of everybody.
13            And she talked about being pregnant all the time, but
14       she never did have a baby.  She had two children.  Her
15       husband, she talked about her husband, how they didn't get
16       along at all.  And Dave Woodcox's office that she had
17       worked with before -- she was no longer in that
18       department.  She stayed in and out of that office all day
19       long with different men.  Dave Woodcox.
20  Q.   Who is Dave Wilcox?
21  A.   That's Robert Sanders' supervisor.
22                MR. DIXON:  I think it's Woodcox.
23  BY MS. MAHONY:
24  Q.   Thank you.
25  A.   She stayed in and out of his office all day.  They walked



1   through the library laughing and talking.  And at one time

2   I heard her say, "Where are they," walking toward the

3   security office, "Where are they?  Come on.  Let's walk

4   where they are.  I'll harass all of them."

5   Q.  Who is this?

6   A.  That's what Danielle said.

7   Q.  Danielle said, "I'll harass all of them"?  Who was she

8       talking about when she said, "I'll harass all of them"?

9   A.  They were walking back toward the security office.

10              MR. DIXON:  I don't think you heard her question.

11          Who was she referring to?

12  BY MS. MAHONY:

13  Q.  When she said, "I'll harass all of them"?

14  A.  The security officers because they were coming that way.

15      And they just laughed, I mean --

16  Q.  I'm sorry.  And you said she stayed in Dave Woodcox's

17      office off and on during the day all day laughing.  What

18      was she laughing about?

19  A.  That's just what she did all the time, even when she was

20      in Robert's office and flirting with him.

21  Q.  How did she flirt?

22  A.  Like sometimes she'd be in a tight spot and he'd slip by

23      her.  And when he got by her, he would hold on to her

24      hips.  (Indicating.)

25  Q.  Let me stop you for a minute because, remember, the court



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 40 of 221

BRENDA SCONIERS                                      May 07, 2015
SCONIERS vs. STRAW                                              40

1   reporter is writing all this down.  I think I understand

2   visually what you're talking about.  We have to be more

3   specific so it's clear.

4        So when you say she was in a tight spot, you're

5   talking physically like between a door opening and a chair

6   or tell me --

7   A. Just imagine a chair here and she's there, and Robert

8      would see her in a spot.  And he would walk by and grab

9      her in the back on her hips side to side and hold on

10     instead of -- he didn't step through.  He would hold on,

11     and she would wiggle and wiggle while he was there.

12  Q. And when you say she would wiggle --

13  A. She would wiggle her behind, you know.  And that's just

14     the kind of thing that she would do.

15  Q. Any other things, as you sit here today, any other

16     incidents of her being flirty, I think is the word you

17     used?

18  A. Yes.  As long as I had been there, I never really knew

19     they had a shower down in the office.  She had another job

20     and she worked parks.  She worked for the park security.

21     And so she would go down there and take showers.

22  Q. Was this an example of her being flirty?

23  A. Yes.

24  Q. Okay.  She would take showers.  Whose shower was it?

25  A. It was a shower.  And to this day I never even went down



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          41

```
 1        there.  I've been all over the building.  It's a shower
 2        way in back of the maintenance department.
 3   Q.   Okay.
 4   A.   And she would go down and she'd tell them, "I'm going down
 5        there to take a shower."  Really, you take a shower where
 6        the men are down there in the maintenance department?  And
 7        like I say, that wasn't her department, but she would go
 8        down there and take showers.
 9   Q.   How is it that you believe that that's flirty?
10   A.   Well, she said she let the guys see her.
11   Q.   She told you this?
12   A.   She said, "The guys see me.  I don't care."
13   Q.   The guys see her how?
14   A.   See her when she's naked.
15   Q.   And she told you this?
16   A.   She says she don't care maybe because -- I don't remember
17        if she said because she'd been in the Army or whatever,
18        but she said she didn't care.
19   Q.   And we're talking about the maintenance guys?
20   A.   Yeah.
21   Q.   All right.  Other than what you've already told me, are
22        there any other examples of Danielle being flirty?
23   A.   Well, it was all the time.  But I remember one time --
24        maybe this wasn't flirty.  She was filing her fingernails
25        up.  She would sit at the desk and file her nails.  And
```



1       she would file, you know, really fancy.  And then so all

2       the dust would go over the desk.

3            And so when it was time for me to relieve, I come to

4       relieve her, and she just get up and walk away and go into

5       Robert's office.  And I stopped her and say, "Danielle,

6       you got dust all over the desk here.  What is that?"  And

7       she just show her fingernails like that and just go on in

8       the office.

9  Q.  All right.

10 A.  And I speak to Robert about it.

11 Q.  Robert Woodcox?

12           MR. DIXON:   Sanders.

13 A.  Robert Sanders.

14 BY MS. MAHONY:

15 Q.  Sorry.  Robert Sanders.

16 A.  And he wouldn't do anything.

17 Q.  What did you say to him?

18 A.  I told him exactly what happened.  I said, "Robert,

19      Danielle filing her fingernails here."

20 Q.  I'm sorry.  Tell me exactly what you said to Mr. Sanders.

21 A.  I told him that she was filing her fingernails, and she

22      had dust all over the desk.  And I said -- and then I

23      asked her, "What is this?  She just flipped her

24      fingernails and walked into your office."  And he didn't

25      say anything.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 43 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          43

1  Q.  Did you ask him to do something about it?

2  A.  I told him what she did, and I told him I didn't

3      appreciate it; but I cleaned it up myself.

4  Q.  Do you want a break?

5  A.  No, I'm all right.  And then one time --

6  Q.  And you told Mr. Sanders you didn't appreciate Danielle

7      leaving her fingernail dust all over the desk?

8  A.  Right.  Because that's where the officer -- that's the one

9      desk that we all go to.  And when we relieve -- and I

10     didn't think that was clean to leave her shavings there.

11         But then there was another time that she was leaving.

12     She had came, I think it was maybe two hours into her time

13     being there --

14 Q.  Two hours into her shift?

15 A.  About two hours into her shift, and I was talking to

16     Robert about -- he was standing at the desk here, and we

17     were talking about something.  I'm not sure what it was,

18     but she was leaving.  I didn't know where she was going or

19     anything.  But as he spoke with me, she came walking and

20     had on some big really dark shades on.

21 Q.  Glasses?

22 A.  Glasses.  So he was talking to me and turned and looked at

23     her and turned back to keep talking and she said, "Hey,

24     don't you turn head when you see me coming."  And he just

25     kind of laughed a little bit.  And then he went back to



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 44 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        44

1    whatever we were talking about.  After he turned and

2    looked at her, she said, "Okay.  Now."  And then she went

3    on to tell him where she was getting ready to go.  It was

4    insulting to me.

5 Q.  All right.  Any other examples of Danielle being flirty or

6    acting in any way inappropriately?

7 A.  Yes.  Like I said, there's another guy there.  He worked

8    in maintenance also.

9 Q.  What's this person's name?

10 A.  I can't even think of his name right now.  He was there

11    for a short time, but she liked him.  And she liked him

12    also.  And so he came on shift -- he came in right at 3:30

13    before I would leave, and she always went in the office

14    with him, always went in there with him.  And they both

15    stayed in there in the maintenance office.

16        She was in security, and they always went down there

17    when he came and they would stay in there for a while and

18    then they would leave out.  And that happened all the

19    time.  Like even if you run the camera back, which you can

20    review the cameras any time.  And, like, I work in the

21    daytime.  And sometimes we view the camera at night to see

22    what was going on.  And you can see her go in there and

23    out.

24        And also, like I say, she had another job.  So the

25    employees weren't allowed to carry weapons into the



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 45 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                            45

1    library.  And she wore her weapon.  She wore her weapon

2    into the library.

3  Q.  How do you know that?

4  A.  Because I saw her with them on.

5  Q.  How many times?

6  A.  I'll say maybe four or five times.  One time she lost a

7    weapon.  She misplaced a weapon, and she thought that she

8    left it in Robert's office.  And she went in -- she came

9    in -- she wasn't even on the clock.  She came in and she

10   went in his office and she was -- I mean, she tore drawers

11   open looking for whatever she was looking for.  And she

12   tore it up looking for it.

13       And then she went to -- another employee had had

14   their purse in that drawer down there.  So she came to the

15   other girl, which it was Donica Hagler.  She approached

16   her in a really bad way, and she asked her, "Did you see

17   anything down there in the drawer as far as a weapon?"

18 Q.  And how did you come to know about this situation with her

19   losing her weapon?  Did you see it, or did you hear about

20   it?

21 A.  I saw her digging through.

22 Q.  You saw her digging through a drawer?

23 A.  She was digging through the drawer.

24 Q.  How do you know she was looking for a weapon?

25 A.  I found out because she called back and she said, "I



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 46 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           46

1        thought I left" -- I'm not sure if it was a Taser or a

2        gun.  She called back to let Robert know that she thought

3        she left it there.

4   Q.   How did you know about that?  Did you talk to her?

5   A.   I talked to her on the telephone.

6   Q.   And what did she say on the telephone?

7   A.   She said I thought I had left something that go to her

8        weapon belt.

9   Q.   You're not sure if it was a Taser or a gun?

10  A.   I'm not sure what it was.

11  Q.   So this is a conversation that you had with Danielle?

12  A.   Yes.

13  Q.   And tell me as much detail as you can about that

14       conversation.  What did she say and what did you say?

15  A.   She asked was Robert there.  I think he wasn't there at

16       the time, but he ended up -- he found out because she --

17  Q.   Tell me about the conversation in as much detail as you

18       can.  Danielle called and you answered the security office

19       phone, right?

20  A.   She called back.

21  Q.   So tell me in as much detail what you said and what she

22       said.

23  A.   She said she thought she left something in that drawer in

24       Robert's office.  But she did approach Donica Hagler.

25  Q.   Before you move on to that, I want to finish the



1    conversation between you and Danielle.  So she called and

2    said I think I left something in the drawer.  Did she say

3    something else?

4  A.  She did say something else.  She was like really

5    hysterical.  And she dug and dug, and then she --

6  Q.  This is in the conversation on the phone?

7  A.  The conversation on the phone after she found out -- she

8    found the weapon.  She found what she was looking for.

9  Q.  How do you know that?

10  A.  Because she said she found it.

11  Q.  Tell me about this conversation on the phone with

12    Danielle.

13  A.  She called and asked was Robert there yet, and Robert was

14    not there.  "Oh, okay.  Well, I found" -- I'm not sure if

15    it was part of a Taser or gun, but part of a weapon.

16  Q.  So she told you she found this Taser or gun?

17  A.  Yes, she found it.  She thought she had left it in there,

18    but she put it somewhere else.  I forgot where she said

19    she put it at.

20  Q.  And she said she put it someplace else, and you don't

21    remember where?

22  A.  Uh-huh.

23  Q.  Anything else in that conversation with Danielle?

24  A.  No.  Just to tell Robert, you know, tell Robert that she

25    found it.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 48 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              48

1  Q.  Okay.  And we're talking about Robert?  We're talking

2      about Robert Sanders?

3  A.  Robert Sanders, yes.

4            MR. DIXON:  I think we might do our discussion

5            again about interrupting.  Because in that whole line

6            there was a lot of jumping in back and forth.  If

7            she's asking a question, don't answer while she's

8            asking a question.

9  BY MS. MAHONY:

10 Q.  And I'll do my best because sometimes it gets confusing.

11      So we're talking about all the inappropriate things

12      Danielle said.  Other than what you already told me about,

13      is there any other incident in which Danielle did

14      something that you believe to be inappropriate?

15 A.  Yes.  It never ended.  Once she came in screaming and

16      crying and falling out in the office.

17 Q.  What was she crying and screaming?

18 A.  She never really said at the time, but I know she later

19      told me she had went to the doctor and found out that she

20      was pregnant.  And she had told the people at the hospital

21      or something that she was going to blow this MF up.  And

22      they were going to put her on some medication.  But I

23      don't think she meant she was going to blow the library

24      up.  I think she was talking about the hospital or

25      wherever she was talking -- speaking to the doctors.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 49 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                            49

1   Q.  Okay.  I want to go back to her coming in and screaming
2       and crying.  What was she screaming?
3   A.  I don't know what she was screaming about.  She was just
4       screaming.
5   Q.  Words?
6   A.  She was just screaming.  And she came in and she opened
7       Robert's door.  And I was sitting at the station,
8       monitoring station.  So I went in to help and to pick her
9       up.  She was big, but she was falling on the floor.  And I
10      stayed there until -- I guess until somebody else came.
11  Q.  I just want to be clear.  She wasn't screaming any words?
12  A.  No.
13  Q.  Any other incidents in which Danielle behaved in a flirty
14      manner or in any way inappropriate?
15  A.  Yeah.  She told Joseph Kiama, again, this other guy, she
16      told him that she would beat his ass.  He couldn't whoop
17      her; she would beat his ass.  She came around the corner
18      from our monitoring station and said that.
19  Q.  Did you hear this?
20  A.  No.  He told me that she said it.
21  Q.  Did Joseph tell you what led up to that comment?
22  A.  No.  I don't remember.  I don't remember what it was.
23  Q.  Okay.
24  A.  But I don't think she intended -- maybe she didn't intend
25      for him to hear, but she was coming around the corner and



 1   |   he heard her.
 2   | Q.   All right.  Any other incidents in which Danielle acted
 3   |      flirty or in any way inappropriately?
 4   | A.   Yeah.  It never stopped.  But at this point maybe I could
 5   |      take a break and think about it some more.
 6   | Q.   Sure.
 7   | A.   Because it was so much.
 8   |              MR. DIXON:  Okay to take a break?
 9   |              MS. MAHONY:  Sure, as long as you guys don't
10   |          talk.  There's a question pending.
11   |              MR. DIXON:  Go ahead and answer the question to
12   |          the best of your ability then, and then we'll take a
13   |          break.
14   | BY MS. MAHONY:
15   | Q.   Are there any other incidents in which Danielle acted in
16   |      any way flirty or in any way inappropriately?
17   | A.   Yes.
18   |              MR. DIXON:  Okay.  Let's take a break.
19   |          (Recess taken.)
20   | BY MS. MAHONY:
21   | Q.   I want to say to you, Ms. Sconiers, that I'm not going to
22   |      rush you.  I'm going to give you all the time.  The court
23   |      reporter isn't going to type in "the plaintiff sat and
24   |      thought for two minutes."  The transcript of this
25   |      deposition isn't going to say that.  So if you need to



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 51 of 221

BRENDA SCONIERS                          May 07, 2015
SCONIERS vs. STRAW                              51

1      think, take your time to think.  I'm not going to rush

2      you.

3   A.  Yeah.

4           MR. DIXON:  And the other thing that I would add

5           to that is if the answer is "I don't remember" or "I

6           don't know for sure," that's a perfectly legitimate

7           answer in terms of asking for details of

8           circumstances.  And that's why she asked you at the

9           beginning of the deposition if you remember something

10          later on about a question earlier on, that might

11          trigger your memory and say, "Oh, remember back when

12          I said this."  Just as an example, "I know I said

13          Taser and gun, but now I remember it was a gun

14          because now I remember she said she needed to do

15          this."  Those types of memories might come back to

16          you.  But if they don't, then that's --

17  BY MS. MAHONY:

18  Q.  Just so you know what's going to happen here, right now

19      this line of questioning we're in right now, I'm asking

20      you for all the inappropriate or flirty things that

21      Danielle did.  And I'm going to keep asking that question

22      until you can't remember anymore.  And it doesn't mean

23      that your memory is wrong.  I'm just going to keep asking

24      because I want to get from you as you sit here today

25      everything you remember.



```
 1   A.  And I'm trying to remember everything.  But a lot of stuff
 2       through the time is, like, you know, just -- you know how
 3       you try to move on, but you can't move on right here.  You
 4       got to remember it.
 5   Q.  It's my job to ask you specific questions and to ask you
 6       for the specifics.  And it's your job to give me the
 7       specifics to the best of your ability.  And I don't think
 8       your lawyer disagrees with that.
 9               MR. DIXON:  That's exactly right.
10               THE WITNESS:  It was plenty of stuff of a sexual
11           nature, but also the hostile stuff.  Do you want to
12           hear that also?
13               MR. DIXON:  She will ask her questions about all
14           of those different areas.
15   BY MS. MAHONY:
16   Q.  Okay.  We're still talking about Danielle.  And I want you
17       to tell me all the inappropriate things that Danielle did
18       whether it was of a sexual nature or a nonsexual nature.
19           So here's my question:  Other than the things we've
20       talked about already and that you already told me, can you
21       remember any other incidents in which Danielle did
22       something inappropriate in a sexual way, inappropriate in
23       a nonsexual way, inappropriate in any way?  Can you
24       remember other incidents?
25   A.  Yeah.
```



1   Q.  Tell me each and every one of those incidents that you

2       recall as you sit here today.

3   A.  Okay.  I can't tell you which day specifically, but she

4       would leave, like if it wasn't her lunch hour or whatever,

5       she just could leave whenever she wanted to.

6   Q.  Leave work?

7   A.  Leave work, yeah.  She could leave work.  And sometimes

8       she would leave and she would bring Robert food back, but

9       she would still be on the clock.

10  Q.  How do you know she was still on the clock?

11  A.  Because when -- you know, if she come to work at 10:00 and

12      she'd be leaving by 12:00.

13  Q.  So how do you know she was -- she hadn't clocked out?

14  A.  Because we don't have a clock.  Besides that, no, we don't

15      have a clock.

16  Q.  So there's no time clock?

17  A.  No.  There's no time clock.

18  Q.  How do you --

19  A.  If we take a break, it's like we supposed to stay at the

20      library when we take a break.

21  Q.  Okay.

22  A.  And if you take lunch, then your lunch is like four hours,

23      at least four hours after you've been there, not just like

24      a couple hours when you get there.

25  Q.  All right.  So you said you know she didn't clock out



1       because you don't have a clock?

2   A.  Right.

3   Q.  So does that mean that you don't know whether she got paid

4       for the time she was away?  You didn't see her time

5       records?

6   A.  No, I didn't see her time records.

7   Q.  So you don't know whether she was gone while she was

8       getting paid; is that correct?

9   A.  I believe she was getting paid.

10  Q.  Why do you believe that?

11  A.  Because I think she would have complained if she got

12      docked for leaving.  I don't think she would have been

13      leaving like that if you just get there too because we

14      fill our time cards out, and our time cards have to

15      specifically say the 30 minutes.

16  Q.  So for any of the incidents in which you said you saw her

17      leave during her shift, did you see her time card?

18  A.  No, I didn't see a time card.

19  Q.  So you don't know whether she was getting paid for the

20      time she was gone?

21  A.  No.

22  Q.  All right.  Tell me any other incidents in which Danielle

23      did anything in any way inappropriate.

24  A.  Well, I seen her leave and go out in the library truck

25      with Dave Woodcox and go out and leave with him in the



1     truck and go somewhere and come back.

2  Q.  What was inappropriate about that?

3  A.  Well, we're security officers.  And, like I say, it wasn't

4     her lunchtime.  I know that.  I would just see her leave

5     and maybe she would say where they were going or say they

6     were going to get something to eat, and then she'd take

7     her lunch later on.

8  Q.  So let me just make sure I've got this right.  You saw her

9     leave with Dave Woodcox, and they left in a library truck.

10    And she said what to you?

11  A.  I think she would say they were going -- maybe it was her

12    birthday or something like that, and I think he would

13    probably take her somewhere to eat.

14  Q.  And do you recall her saying that, or are you --

15  A.  Yeah, I knew it was her birthday.  I knew somehow it was

16    her birthday.

17  Q.  What do you recall her saying?

18  A.  "Dave taking me to eat for my birthday," or when she get

19    back she would say it.

20  Q.  Are there any other incidents in which Danielle behaved in

21    any way in which you believe was inappropriate?

22  A.  At this point I wouldn't say if it was her or Dave

23    Woodcox.  He come from behind the monitoring station.

24  Q.  We're still talking about Danielle?

25  A.  Yeah.  He come behind the station where she was and just



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 56 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         56

1       getting her shoulders and give her a massage and right

2       there behind the monitoring station, the same place I had

3       gotten written up -- that's our office.  Same place I got

4       written up for speaking with one of the officers, he

5       called, too long.

6   Q.  How many times did you see Dave Woodcox give Danielle a

7       shoulder massage?

8   A.  Maybe several times, maybe two or three times.

9   Q.  Are there any other incidents when you -- that you believe

10      Danielle behaved inappropriately in any way?

11  A.  Yes.  She got in a fight one time, a fight with a patron.

12      It was a big fight.

13  Q.  All right.  Any other incidents in which you believe

14      Danielle behaved in any way inappropriately?

15  A.  Can I think some more?

16  Q.  You bet.  Just let me know when you're ready.

17  A.  Okay.  Like we relieve each other on the clock.

18  Q.  What does that mean "relieve each other on the clock"?

19  A.  Like 11:00 o'clock.  One hour we stay in the front and one

20      hour we go back and sit at the monitoring station for an

21      hour, and we get up and we walk around the clock.

22  Q.  Okay.

23  A.  And then it got to the place where she relieved you

24      whenever she wanted to.  She didn't come at the time when

25      she was supposed to come.  And she didn't only do me that



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 57 of 221

BRENDA SCONIERS                                May 07, 2015
SCONIERS vs. STRAW                                        57

1      way, she did other officers, Joseph Kiama that way also.

2   Q.  How do you know she failed to relieve Joseph Kiama?

3   A.  Because they got into it, and he told Robert about it.

4   Q.  Did you witness this?

5   A.  Yeah.

6   Q.  You witnessed Joseph Kiama telling Robert about it?

7   A.  Yes.

8   Q.  All right.  Any other incidents in which Danielle behaved

9       in any way inappropriately?

10  A.  Sometimes our office, the monitoring station, there might

11      be a time when another officer may need to come back there

12      to get some papers to write a report or maybe sometimes

13      look at the camera really quick or the computer.  And we

14      keep our belongings back there too.  She had asked for

15      Robert to not let him -- she didn't want him back there

16      when she was back there because she wanted her peace.

17  Q.  And did you witness this conversation?

18  A.  No, not the conversation.

19  Q.  What did you witness?

20  A.  Joseph Kiama told me that Robert came to him and said that

21      Danielle doesn't want you back there when she's back

22      there, so don't go back there when she's there.

23  Q.  All right.  So the monitoring station is the security

24      office; is that correct?

25  A.  That's for the security officers.  That's where we -- like



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 58 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                                58

1     I just explained, that's where we keep our coats and our

2     jackets and the computer, and we get our papers for our

3     reports and first-aid kit, everything like that.  But

4     there's a separate office, and that's the office where

5     Robert is.  That separate one is right directly -- it's a

6     closed-in office.

7  Q.  So just so I'm clear, you don't have any personal

8     knowledge of Danielle not wanting Robert Sanders to go

9     back there.  This is something you heard from Joseph

10    Kiama, right?

11 A.  Not wanting him to go back there, yes.  Yeah, he called

12    him and he let him know that Robert called Joseph.

13 Q.  And Joseph told you this?

14 A.  Right.

15 Q.  You didn't witness it?

16 A.  No.

17 Q.  Any other incidents in which Danielle behaved in any way

18    inappropriately?

19 A.  Let me think.  At this point I'm trying -- there's nothing

20    I can think about right, you know.

21 Q.  So as you sit here today, you can't think of any other

22    incidents in which Danielle acted inappropriately?

23 A.  Not that that's it, but I can't think of anything more

24    right now.

25 Q.  Later on in the deposition, if you think of something



1       else, will you let me know?

2   A.  Yes.

3   Q.  And if you think of something after the deposition, will

4       you let your lawyer know to tell me?

5   A.  Yes.

6   Q.  Okay.  Any other incidents in which Danielle behaved in a

7       flirty manner, other than what we've already talked about?

8   A.  Well, in a flirty manner, yeah, she did because she used

9       to -- whenever, like, maybe she was off and she would come

10      to visit, she would --

11  Q.  She wasn't working?

12  A.  Yeah.

13  Q.  Okay.

14  A.  She dress up and her breasts, have that out, and just kind

15      of float around and laugh really loud and go in the office

16      and have long conversations.  And kind of what they did

17      was kind of made themselves out of one group.

18  Q.  And when you say "they," who is they?

19  A.  The supervisors and her.

20  Q.  What are their names?

21  A.  Robert Sanders and Walter Morris was there at the time

22      then.  But Walter went back to not being a supervisor

23      after that.

24  Q.  Morris, is that M-o-r-r-i-s?

25  A.  Yes.  And they were kind of like a group.  It was a group



1      thing.

2   Q.  Anybody else?

3   A.  Yeah, Dave Woodcox.

4   Q.  Dave Woodcox?

5   A.  Yeah.

6   Q.  All right.  When you said showing her breasts, was her

7       breast fully exposed?

8   A.  Not fully, but it would be out and just the way that

9       she --

10  Q.  Let's stick with the breasts to get this clear.  Were her

11      nipples showing?

12  A.  No.

13  Q.  Was she covering up more than a bikini top would cover up?

14      I'm just trying to be clear here.

15  A.  She was full-breasted.  I'm not saying -- she was

16      full-breasted, but it was just the way that she, like I

17      say, came in and laughed and bent over and talked to them

18      and how they kind of googled over her, you know.

19  Q.  When you say they googled over here, what do you mean?

20  A.  They get together and be right over her, and she'd be

21      laughing and joking.

22  Q.  When you say "right over her," tell me what you mean.

23  A.  Standing over here, she'd lean and you could just tell the

24      situation.

25  Q.  How could you tell?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 61 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                             61

1   A.  By the way that they weren't working.  They weren't

2       working, and she was there not working also.  And she

3       would just -- sometimes she dress up and come in and laugh

4       and they'd go in the office.  And you could hear her loud,

5       screaming, laughing.  And every time she would come out,

6       it was just like we were working; and to me that's

7       disrupting.

8           We were working.  We were at the station, and she'd

9       come in and go in the office.  And they'd be talking and

10      laughing.  And she had this extra loud laugh.  And

11      whenever she would open the door, she would do this loud

12      laugh, ha-ha-ha, and it was kind of nerve-racking by being

13      at work.

14  Q.  Okay.  Other than what we talked about, are there any

15      other incidents in which Danielle behaved in a flirty

16      manner?

17  A.  Yes.

18  Q.  Tell me what they were.

19  A.  I need to think some more.  Right now, just I can say I'm

20      just -- I can't think of any more.  I know there's some

21      things, but I just can't think about it anymore.

22  Q.  Is there anything that you can look at that would refresh

23      your recollection?

24  A.  Anything that I can look at?

25  Q.  That would refresh your memory about anything else flirty



1      that Danielle did?

2  A.  I'm not sure if I understand that, that question.

3  Q.  Is there anything that you can do, look at or do to

4      remember any other flirty things that Danielle did?

5  A.  No.

6  Q.  Okay.  So I just want to make sure I'm clear here.  You

7      think there were some more; but as you sit here today, you

8      can't think of any other incidents in which you think

9      Danielle was flirty other than what you told me; is that

10     right?

11 A.  Yes.

12 Q.  And as you sit here today, you can't think of anything

13     else that Danielle did that was inappropriate other than

14     what you told me today?

15 A.  Not at this moment.

16 Q.  Is there anything you can do to remember anything else?

17 A.  No.

18              (Exhibit 1 marked for identification.)

19 Q.  Fair enough.  Ms. Sconiers, the court reporter has handed

20     you what's been marked Defendant's Exhibit 1.  You look at

21     that; and after you have a chance to look at it, let me

22     know.

23 A.  Okay.

24 Q.  Tell me what Defendant's Exhibit 1 is.

25 A.  It's a charge of discrimination.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 63 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           63

1   Q.  And it's the charge of discrimination that you filed; is
2       that correct?
3   A.  Yes.
4   Q.  On the bottom left-hand part of the charge of
5       discrimination, it has what appears to be your signature.
6       Is that your signature?
7   A.  Yes.
8   Q.  And did you fill in the July 30, 2012?  Did you write
9       that?
10  A.  Yes.
11  Q.  And you remember doing that?
12  A.  Yes.
13  Q.  What prompted you to file this charge of discrimination
14      with the EEOC?
15  A.  Well, mainly after being touched by my supervisor on the
16      behind inappropriately and reporting it to the library
17      human resource and vice president of the library, Deb
18      Futa.  I waited around after Joseph Kiama and I showed
19      them the video of this inappropriate touching, and both of
20      them -- both viewed it at separate times.  I kind of
21      waited around to see what was going to go on, what would
22      they say, or what was going to happen after that.
23  Q.  And you reported it to -- what's the last name?
24  A.  F-u-t-a.
25  Q.  And what's her position?



Case 5:22-cv-07718-EJD    Document 22-16    Filed 01/25/23    Page 64 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          64

1  A.  She's vice president.

2  Q.  Of the library?

3  A.  Of the library, yeah.

4  Q.  Who was the other person?

5  A.  Connie Nicely.

6  Q.  Connie with a C?

7          MR. DIXON:  It's an Hispanic last name.

8  A.  Nicely.

9  BY MS. MAHONY:

10  Q.  How do you spell that?

11  A.  N-i-c-e-l-y.

12  Q.  Okay.  And what's Connie's position?

13  A.  She's the human resource manager.

14          (Exhibit 2 marked for identification.)

15  Q.  Okay.  Ms. Sconiers, the court reporter has handed you

16      what's been marked Defendant's Exhibit 2.  Can you tell me

17      what that is?

18  A.  This is the monitoring station here, and this is the place

19      where the security officers are.  This is our office here

20      where we do our reports and everything.  This is the back

21      -- that's my supervisor inappropriately touching my

22      behind.

23  Q.  So when you were talking about a monitoring station

24      earlier and where officers put their belongings,

25      Defendant's Exhibit 2 is a picture of that place you were



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 65 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                            65

1      talking about?

2  A.  Yes.

3  Q.  And so it's your testimony today that Defendant's Exhibit

4      2 shows your supervisor inappropriately touching your

5      behind?

6  A.  Yes.

7  Q.  And what supervisor is that?

8  A.  Robert Sanders.

9  Q.  And this is the only time that happened on the day that

10     this camera got this picture, right?

11 A.  Yes.

12 Q.  And it looks to me like this happened on December 13,

13     2011; is that right?

14 A.  Yes.

15 Q.  At 13:32?

16 A.  Uh-huh.

17 Q.  So that's 1:30 in the afternoon; is that right?

18 A.  Uh-huh, yes.

19 Q.  So tell me about that incident.

20 A.  Well, I was there at the monitoring station, and I was

21     doing -- I was walking that day.  So I had did my rounds

22     till I was talking to Joseph Kiama.  And by me doing my

23     rounds, I was going to go upstairs and get him something

24     to drink.  So he was handing me some change to go to the

25     pop machine.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 66 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                              66

 1   Q.  Who is "he"?

 2   A.  Joseph Kiama.

 3              (Exhibit 3 marked for identification.)

 4   Q.  I only have one more of these, but I'm going to make this

 5       Defendant's Exhibit 3, please.

 6              MR. DIXON:  Is this the same one?

 7              MS. MAHONY:  It is.  What I want her to do is

 8          write on one of them and identify who is which

 9          person.  I didn't think of that when I was getting

10          these copied.

11   BY MS. MAHONY:

12   Q.  Okay.  The court reporter has handed you what is marked

13       Defendant's Exhibit 3.  What I'd like you to do is draw an

14       arrow from each person and put their name so we know who

15       each person is, if you know all the people.  I don't know

16       if you know all the people.  Go ahead.  Do you need a pen?

17   A.  Thank you.  So you want me to do it on 3?

18   Q.  Sure.

19              MR. DIXON:  On 3.

20   A.  Draw an arrow like this?

21   Q.  Yep.  I've seen your signature on this, and your signature

22       is a whole lot neater than mine.  So if you could make it

23       as neat as you could because it's going to be an exhibit.

24   A.  (Complying.)  Like that?

25   Q.  Yes.  Can I look at this for a second?  I just want to



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 67 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                      67

 1      make sure I can read it.  One person you've identified

 2      that looks to me like you said Sara Taylor; is that right?

 3  A.  Uh-huh.

 4              MS. MAHONY:  Do you want to look at that?

 5              MR. DIXON:  No, I'm good.  I know who they are.

 6  BY MS. MAHONY:

 7  Q.  All right.  So you were talking with me about the

 8      inappropriate touching.  And you were -- you told me that

 9      you were talking to Joseph Kiama, and that's Joseph Kiama

10      behind the monitoring station, right?

11  A.  Uh-huh.

12  Q.  And then what happened?

13  A.  I was supposed to go up and get him a Coke because I was

14      the roaming officer.  And as I reached over to get the

15      money for the Coke, Robert, who was in the office, he had

16      come out, and he rubbed my behind.

17  Q.  Can you see the office from this picture, the office door?

18  A.  That door right directly behind you.

19  Q.  Would you identify that?

20  A.  (Complying.)

21  Q.  So on Defendant's Exhibit 3 you've marked "office."

22      That's the supervisor's office for the security

23      department; is that right?

24  A.  Yes.  Should I put supervisor?

25  Q.  I'm sorry?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 68 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           68

1  A.  Should I put supervisor's office?

2  Q.  Sure.

3  A.  Okay.

4  Q.  Your handwriting is a lot nicer than mine.

5  A.  (Complying.)

6  Q.  So on what part of your behind did he touch?

7  A.  The back side.

8  Q.  From top to bottom where did he touch, was it on your hip?

9  A.  In the middle of the back side of my butt.

10 Q.  So in terms of the -- we were looking at you from the

11     back, from left to right, about in the center from left to

12     right?

13 A.  Uh-huh.

14 Q.  How did he touch your behind?

15 A.  Right in the middle.

16 Q.  Okay.  How long did the touching last?

17 A.  It didn't last long, but I felt it.

18 Q.  Would it be fair to say it was a second or less?

19 A.  Yes, it would be fair to say that.

20 Q.  And what happened after he touched you?

21 A.  After he touched me, I had just taken the money in my

22     hand.  So I was kind of like -- I fell forward.  I just

23     remember falling forward.

24 Q.  You fell onto the ground?

25 A.  No.  I fell forward toward the desk like what just



BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              69

1      happened, you know, like that.

2   Q. And I want to describe -- I'm going to do my best to

3      describe what you did physically so it's clear for the

4      court reporter.  So when you say you fell forward, your

5      shoulders leaned forward?

6   A. Yeah, my shoulders leaned forward.  My shoulders leaned

7      forward, almost like a jerking, almost like a jerk

8      forward.

9   Q. What happened at that point.  What happened next?

10  A. I walked around -- okay.  Mind you, it's still a video.

11     It's still cameras.  So I know I'm on camera.  So I walk

12     around and I told Joseph, I said, "Joseph, did you just

13     see what happened?"  And he said, "What, Brenda?"  He call

14     me Brenda Mae.  "What Brenda Mae, what?"  I said, "He just

15     touched my behind."  And he said, "Oh, no, he couldn't do

16     that.  He's the supervisor."

17         But I was still walking, you know, just I walked

18     behind -- yeah, behind the monitor desk, and we was still

19     talking --

20  Q. I'm sorry.

21  A. We was still talking, "Really, Brenda Mae?  Really?"  But

22     we were talking low.

23  Q. He didn't see it because he was behind the desk?

24  A. He was behind the desk, but he run the camera right back.

25     He run the camera back and saw it.



1  Q.  Right before you went to get the Coke, you did it right

2      then?

3  A.  Yeah.  I don't even remember if I went and got the Coke.

4      I don't remember.

5  Q.  Where was Mr. Sanders?

6  A.  He just kept walking.

7  Q.  So this touching was as he was walking by you?

8  A.  Yeah, he came out the office and -- well, I can hear the

9      door.  I can hear the door come out.  And then I felt --

10     as I reached for the money, I felt it.

11 Q.  So I just want to make sure I've got this right.  And if I

12     don't, I want you to tell me because it's really important

13     that we get this all correct.  And I don't want to

14     misunderstand what you're saying.

15         Mr. Sanders came out of the office.  As he was

16     walking -- and he was moving the whole time he was

17     touching you for that second?

18 A.  Yeah.

19 Q.  And then you and Mr. Kiama looked at the video of it?

20 A.  Yeah.

21 Q.  Okay.  What happened next?

22 A.  He was just talking about it.

23 Q.  You and Mr. Kiama talked about it?

24 A.  We were talking about it.  And he was saying -- well, we

25     were just kind of shocked, "Really?  He did?"  I think we



1          talked about going up and reporting it.

2    Q.  Yes.

3    A.  But before then, you know, man --

4                MS. MAHONY:  Let's take a break.

5                (Pause in proceedings.)

6    A.  Really, I had a lot of respect for Robert.  I really did,

7          you know.

8    BY MS. MAHONY:

9    Q.  Before that, before the touching?

10   A.  Yeah.  He was a fireman, you know.  I always looked at

11         that as a good thing because sometimes they will tell you

12         the work that they do.  And so you think you never know

13         who might have to rescue you or if your house is burning.

14             So I always respected them because we did have

15         firemen that volunteered throughout the time that I was

16         there.  When I started, I worked with a fireman and he

17         just volunteered.  That's what he did in the beginning.

18         He was a volunteer.  We had other guys, they would come

19         in, like, four hours a day and stuff, you know.  I just

20         had a lot of respect for them.

21   Q.  And at some point you decided to report this incident to

22         Connie Nicely and Deb Futa.  And I apologize if I'm

23         pronouncing those incorrectly.  When did you decide to

24         report it?

25   A.  Well, we were talking about going up there.  I was talking



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 72 of 221

BRENDA SCONIERS                                      May 07, 2015
SCONIERS vs. STRAW                                              72

1    about it.  Joseph too, up to the human resource.

2  Q.  Thank you.  And I really appreciate you being specific

3       like that because ultimately a judge is going to read

4       that.  And I'll try as much I can to catch you.

5            When you say "we" decided to go up there, the judge

6       doesn't know that means HR.  So if you do that, I'll try

7       to catch you.  I understand a deposition is not normal

8       human communication.

9            So you decided to go to HR?

10 A.  We talked about it.

11 Q.  You and Joseph?

12 A.  Yeah.  And he said, "Brenda Mae, you got to go up there."

13      And, you know, and I'm thinking about it because I know it

14      happened.  I know it wasn't right.  And the main thing I'm

15      thinking, you know, this guy -- I work in security for the

16      library.  And we have a policy like that's how we ban

17      patrons, if patrons come in there and say anything

18      inappropriately to a patron or touch one, they're quick to

19      get you out of there.  They're quick to get you out of

20      there.  You say something to a person, they report that

21      this guy knocked on the bathroom door, they said you're

22      banned, you got to go, you know.  That's how it was --

23 Q.  I'm sorry.

24 A.  Also, we have a lot of young workers that work there, like

25      that girl right there.  That's a young girl.



Case 5:22-cv-07718-EJD  Document 22-16  Filed 01/25/23  Page 73 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                    73

1   Q.  When you say "a young girl," that's the girl in dep -- let

2       me finish.  We just want to be clear.  In deposition

3       Exhibit 3, the worker that you identified as Sara Taylor

4       is a young girl.  That's the girl you're talking about?

5   A.  Yes.

6   Q.  Do you know how old she is?

7   A.  Then -- she probably about 25, 26 now.  But then that's

8       several years ago.  But we have college, young college

9       students that come in and they come in and help out for

10      their school in the children's department or books.  And

11      young volunteer girls, we have them also.

12  Q.  Go ahead.  I'm sorry.

13  A.  You go ahead.

14  Q.  I want us both to be really clear.  When you were talking

15      about where he touched you, was that the small of your

16      back, above that, below that, the small of your back?

17              MR. DIXON:  The back or the rear-end, she

18          testified to the rear-end.

19              MS. MAHONY:  She did.

20  BY MS. MAHONY:

21  Q.  If I were to talk about the small of your back, you

22      understand in your body what we're talking about there?

23  A.  You want me to show you on my behind?

24  Q.  Are you comfortable doing that?

25  A.  Yes, I am.  Is this okay?  Right here (indicating).



1           MS. MAHONY:  Can we go off the record?

2           (Discussion held off the record.)

3           MS. MAHONY:  I'd like the record to reflect that

4       the plaintiff volunteered with the permission of her

5       lawyer to point to the place where Mr. Sanders

6       touched her in the middle of her butt.  It was below

7       the small of her back.  I was trying to understand.

8    BY MS. MAHONY:

9    Q.  And it was on your behind, correct?

10   A.  Correct.

11   Q.  So I asked you what led you to report to HR.  Is there

12       anything else you wanted to say about that?

13   A.  Okay.  Well, first of all, like I say, I worked security

14       there, and we have young kids there.

15   Q.  "There" being the library?

16   A.  At the library we have children there and, you know, when

17       you think about it, you know, I've been through so much

18       there.  But if he touched me and I'm right there in the

19       department, that's what I was thinking about.  What would

20       he do to somebody else, kids, some of the younger ones or

21       another person, you know.

22   Q.  And these are the kinds of things that you've testified

23       about that led you to report to HR; is that correct?

24       These are the kinds of concerns you had that led you to

25       report this to HR, correct?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 75 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          75

1   A.  Yes.

2   Q.  When did you report to HR and to the vice president,

3       Ms. Futa?

4   A.  Well, this is how we ended up doing it because, like I

5       said, Joseph and I had been talking about it.

6   Q.  And every time you say "Joseph," you're talking about

7       Joseph Kiama?

8   A.  Joseph Kiama.  So we decided -- it was about a week later

9       because I just -- because I had so much on my mind about

10      what this could do, you know.  And so Joseph decided that

11      he wants if Deb Futa and Connie Nicely came by, we would

12      just show them.  We would just show them the video.  So he

13      was behind the monitoring station.  And I was standing

14      around.  And so the first person that we showed was the

15      human resource that Joseph run the camera back was for

16      Connie Nicely as she came down.

17  Q.  How did Connie Nicely come down to see it?  You asked her,

18      Joseph asked her, someone else asked her?

19  A.  She came down.  We were standing there.  And we said,

20      "Connie, come here.  We've got something to show you."

21  Q.  So Connie just happened to be walking by?

22  A.  She actually was getting ready to go to lunch or

23      somewhere.  Somewhere she was about to go.

24  Q.  When was this?

25  A.  It was about a week after that.  So Connie came on back.



1   She came back behind the security desk.  And he said,

2   "Connie, I got to show you something."  And then he ran

3   it.  And she stood there and she looked at it and she kind

4   of laughed a little bit.  And then she went on out the

5   door.

6   Q.  Did she say anything?

7   A.  No, she didn't say anything.

8   Q.  Did anyone say anything?

9   A.  No.  Connie --

10  Q.  I should have asked it this way:  Did you say anything?

11  A.  No.

12  Q.  Did Mr. Kiama say anything?

13  A.  No.  She just kind of laughed a little bit and went on,

14      went on through the monitoring station and out the back

15      door there.  This is the employee entrance.

16  Q.  And I just want the record to reflect that the plaintiff

17      is marking on Deposition Exhibit 3; she's marking the

18      employee entrance.

19          And so when you say Connie continued, did you say

20      continued out the door that you've marked as the employee

21      entrance?

22  A.  Uh-huh.  She came back here, she came this way, and she

23      stopped and she walked.

24  Q.  So when she came -- when you say she came through here --

25  A.  The monitoring station.



1    Q.   Okay.  So do I understand that you reported it further to

2         Deb?

3    A.   Yeah.

4    Q.   Tell me about that.

5    A.   With this one, I think Joseph called her office.  I'm not

6         sure how we got her down there.  And I was also standing

7         around.  I wasn't so close to the desk when Deb came.

8         When Connie came there, I was standing close by.  But when

9         Deb came down I was standing near the desk, and he called

10        her back also.

11   Q.   So you didn't call Deb and ask her to come down and see

12        the video?

13   A.   No.

14   Q.   And to the best of your recollection, Mr. Kiama called her

15        and asked her to come see the video?

16   A.   Uh-huh.

17   Q.   Tell me about when she came down.

18   A.   So Deb came down and she went behind the monitoring

19        station, and he showed it to her and she watched.  And she

20        said, "Is that Robert?"  She said, "Oh, man.  That's a

21        liability."  That's what she said.  Like I say, I'm

22        standing near.  So really, you know, I'm thinking that

23        maybe she's going to say something, but she got on the

24        elevator and went back upstairs.

25   Q.   So she didn't say anything after she said that's a



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 78 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         78

1    liability?

2  A.  No, not that I can remember anything after that.  And she

3      went and got on the elevator and went back upstairs.  And

4      that was the last about that too.

5  Q.  I'm sorry.  Can you hold on just one second?  Thank you.

6      What were you going to say?

7  A.  So after that, I felt, you know, that the right people saw

8      the video.

9  Q.  Okay.  Did you talk to them again about this incident with

10     Robert touching you?

11 A.  No.  No, I haven't talked about that at all.

12 Q.  A while ago I asked you what led you to file the EEOC

13     charge, and you talked about this touching incident; and

14     that's how we got into the touching.  Do you recall that

15     testimony?

16 A.  Uh-huh.

17 Q.  So it's my understanding, and I need you to correct me if

18     I'm wrong, that it was that touching by Robert Sanders

19     that led you to file Defendant's Exhibit 1, the EEOC

20     charge; is that correct?

21 A.  It was that touching, yes, and the waiting for the human

22     resource or them to do something, say something to me or

23     let me know what was going to go on because they saw it.

24 Q.  Did they ever do anything?

25 A.  Take a break?  My allergies is taking in.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 79 of 221

BRENDA SCONIERS                                                      May 07, 2015
SCONIERS vs. STRAW                                                           79

1            MR. DIXON:  Do you want some water?

2            (Pause in proceedings.)

3            (Read back.)

4   A.  As far as I know, nobody ever told me that they did

5       anything.

6   BY MS. MAHONY:

7   Q.  And they didn't contact you?

8   A.  They never contacted me.

9   Q.  Did you at any point talk to anybody to follow up?

10  A.  Huh-uh.

11  Q.  Was that a no?

12  A.  That was a no.  Really to tell the truth, I was really

13      frozen.  I was frozen here because Joseph Kiama and Robert

14      Sanders, for some reason after Robert was supervisor, for

15      some reason they just didn't click at all.  They didn't

16      click at all.  And really after this, Danielle had came

17      and things got really worse.  And that was shortly after

18      this.  Things got so bad -- and Joseph, he was reporting.

19      He was reporting.  And they let him know --

20         And I saw the write-up that he was causing problems.

21      He was causing problems in the security -- with the

22      security department.  And if he continued to cause

23      problems that he was going to be dealt with and possibly

24      terminated because of it.  And this guy was good.  This

25      guy did his job well.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 80 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                      80

1  Q.  When you say "this guy," who is this guy?

2  A.  Joseph Kiama, he was there.  Larry Bennett, he trained us

3      and he trained us very well.  And Joseph, I actually got

4      him the job there at the library because we worked for the

5      company before I started with the library.  We worked at

6      that company, not together; but I noticed him working

7      there also.  And I would see him sometimes come through

8      the library.  And I knew that he was a good worker.

9          And so I talked to Larry Bennett about him, and Larry

10     told me to have him fill out an application and we would

11     get him in for an interview.  At that time too, Larry had

12     me helping him with a lot of things there and also with

13     hiring some of the people in also.  So this guy, he was

14     good about his business at work.  He didn't play around.

15     He didn't flirt around.  He did things by the rules.  For

16     some reason --

17 Q.  Do I understand you to say that Danielle started working

18     at the library not too long after this touching

19     incident -- let me finish -- reflected in Defendant's

20     Exhibit 2?

21 A.  Yes.

22 Q.  Do you know when Danielle started working at the library?

23 A.  It was around March.

24 Q.  March of --

25 A.  2012.



1  Q.  All right.  And when did Joseph first get in trouble that

2      you're aware of for causing problems in their mind?

3  A.  Well, I can't say when he first got in trouble, but I

4      knew -- like I say, before he seemed to be okay.  But for

5      some reason he and Robert, they started not getting along.

6  Q.  And do you know when they started not getting along?

7  A.  I think it was little by little, but I'm not sure.

8      Probably shortly after Robert -- shortly after he was a

9      supervisor, but mainly --

10 Q.  When did Robert become a supervisor?  Is that the one you

11     thought it was 2009, but you weren't sure?

12 A.  I'm not sure if it was 2009.  It could have been later

13     than that.

14 Q.  Just so I'm clear, shortly after Robert became a

15     supervisor.  So pretty soon after he started there, they

16     didn't get along?

17 A.  I noticed there was a discrepancy.

18 Q.  From the very beginning?

19 A.  I don't know if it was from the beginning.

20 Q.  But shortly?

21 A.  Shortly.

22 Q.  Shortly after?

23 A.  Yeah.

24 Q.  Okay.

25 A.  And I couldn't really figure what was going on or why they



1          didn't get it on that good.

2   Q.   So you filed your charge of discrimination, Defendant's

3          Exhibit 1, on July 30, 2012.  The touching had been in

4          December of 2011, right?

5   A.   Right.

6   Q.   Okay.  What caused -- what made you decide to file this

7          charge of discrimination?

8   A.   Well, because after that touching and stuff, like I said,

9          I was just kind of pondering and waiting for the library

10         to say something, do something.  It was just kind of

11         dragging on.

12            And during the time it was dragging on, Danielle got

13         hired.  And Dave and Robert and everything just started

14         changing quickly.  And I even got written up, and I had

15         never been written up before, for talking to Joseph.  And

16         like I say, Dave had told him he causing problems by

17         reporting incidents that were going on.  And so that --

18  Q.   Hold on.  Let me ask you more about that.  Did you hear --

19         you said Robert told Joseph he was in trouble?

20  A.   Dave -- I think Dave was the one.

21  Q.   Woodcox?

22  A.   Because I did get to see -- I did get to see the charge.

23  Q.   What did it say?

24  A.   That he was causing problems.  Was it a write-up or did he

25         tell him that?  I think he told him that.  But Joseph said



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 83 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         83

1      that Dave told him if he kept causing problems.  And I'm
2      not sure if he wrote it up -- this is what he told me.
3      He's causing problems for the security department, and he
4      would be written up and possibly -- I don't think he used
5      the word termination, but, you know, get away from the
6      library.  It might have been a write-up.  I'm not quite
7      clear right at this moment what it was.
8  Q.  When did Joseph tell you this?  Do you remember when
9      Joseph told you that?
10 A.  Sometime after, probably right around March.  I'm not
11     really sure.
12 Q.  Okay.
13 A.  But I know he reported a few incidents, but I'm not really
14     sure which.
15 Q.  Do you remember whether it was before or after Danielle
16     started?
17 A.  No.  I don't remember, no.
18 Q.  Okay.
19             MR. DIXON:  Hold on just a second.  Were you
20         planning -- I don't know if we didn't have discussion
21         about this, but were you planning on going to lunch
22         with your husband?
23             THE WITNESS:  No.
24 BY MS. MAHONY:
25 Q.  So I asked you what led you to file a charge of



1    discrimination.  You said you were waiting for the library

2    to do something about the touching.  And you didn't hear

3    anything, right?

4  A.  Uh-huh.

5  Q.  And then Joseph was having problems, and then Danielle --

6    or at some point Danielle got there and there were

7    problems.  And are those all the reasons you decided to

8    file this charge of discrimination?

9  A.  I think I had been on a vacation or something and I was

10   talking to Joseph.  And he was -- we were at the

11   monitoring station, and he was reporting to me some things

12   that had went on.

13  Q.  Do you remember what he reported to you?

14  A.  Let me remember.  But something had happened with Danielle

15   in a garage.  Something happened.

16  Q.  Would you mind taking a minute to see if you remember?

17  A.  Okay.  Let me see.

18  Q.  Thanks.

19  A.  I don't remember what it was.

20  Q.  So you remember you came back from vacation.  Joseph said

21   something had happened with Danielle, and then what?

22  A.  And so we were talking about it.  I think it was maybe --

23   I leave usually about 3:30 or 4:00.  It was maybe 3:30

24   then.  But I got called down to Dave's office.  And Robert

25   was off that day.  And I think it was Robert -- I mean



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 85 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          85

1    Dave Woodcox and Bruce Burnett.  They were in the office

2    downstairs.

3        And they called me down there, and they said that he

4    was writing me up because he noticed I hadn't been doing

5    my job.  And he had asked Robert to write me up, I think

6    he said six weeks ago; and Robert never did.  And he

7    noticed me standing at the monitoring station too long.

8        (Exhibit 4 marked for identification.)

9  Q.  Ms. Sconiers, the court reporter handed you what's been

10     marked Defendant's Exhibit 4.  Is this the write-up that

11     you were just testifying about?

12 A.  Yes.

13 Q.  Did he hand this to you when he called you down to the

14     office?  Was this already prepared?

15 A.  Yes.

16 Q.  Please tell me to the best of your recollection everything

17     that was said in the meeting by you, by Dave Woodcox, and

18     by Bruce Burnett.  Is there anything in addition to what

19     you already told me?

20 A.  That was it.  And he said he had asked Robert to give me a

21     warning about this.  I don't think it was very much said

22     in there.  Only I didn't sign it because, like I say, it

23     was nothing out of the ordinary that I did at work in the

24     years I had been there.  I still do the same thing right

25     now.



1  Q.  So what did he say about how you were not performing your

2      job duties as expected?

3  A.  Could you repeat that, please?

4  Q.  The first sentence of this said, "I have noticed on

5      several occasions that you were not performing your job

6      duties as expected."  Did he give you any examples of how

7      you were not performing your job duties as expected?

8  A.  No.

9  Q.  And the third sentence reads you and another employee were

10     at the same location chatting and looking at the computer

11     for personal business for nearly an hour at the monitoring

12     station.  Was that other employee Joseph Kiama?

13             MR. DIXON:  Kiama.

14 BY MS. MAHONY:

15 Q.  Kiama, thank you.  Is it true that you were at the

16     monitoring station for nearly an hour that morning?

17 A.  Well, I was there.  I opened up.  In the first place, I

18     opened up the library, and I sit for two-and-a-half hours.

19     I always sit there for two-and-a-half hours in the

20     morning.  So that when another officer come in, sometimes

21     we go over reviews or what's going on, reports, and so

22     forth and so on.  But I didn't really keep up with the

23     time.  Sometimes if we got a report or we talk about it

24     and you can go and roam, walk.

25 Q.  Were you sitting at the monitoring station for nearly an



1       hour chatting about personal business?

2   A.  I wasn't sitting there.  Joseph was sitting there.

3   Q.  You were standing?

4   A.  Yeah, I was standing there.

5   Q.  Why were you -- and you were standing there for nearly an

6       hour?

7   A.  I'm not sure if it was an hour.  We were working -- we

8       were doing work.  So, no, I don't think it was an hour.

9   Q.  Let me just be clear.  You said that earlier you were

10      there for about two-and-a-half hours at the desk?

11  A.  That's when I open up in the morning.

12  Q.  And you sit at the desk?

13  A.  Right.

14  Q.  So later, this situation later when you're not sitting

15      there, you're standing on the outside of the monitoring

16      station; is that right?

17  A.  Right, on the outside of the monitoring station when a new

18      officer comes in then to relieve me.

19  Q.  So you were standing there.  And you're not sure if it was

20      nearly an hour?

21  A.  Right.

22  Q.  Could it have been nearly an hour?

23  A.  It could have been.  Maybe I probably walked away, you

24      know, to maybe use the restroom.  Because usually when I'm

25      up, I go and use the restroom and take a roam around the



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 88 of 221

BRENDA SCONIERS                          May 07, 2015
SCONIERS vs. STRAW                               88

1      building.  This particular Monday, I think it was a Monday

2      when I came from vacation, we had reviewing of reports.

3   Q.  So that time that could have been an hour, were you

4      chatting about personal business?

5   A.  We were talking about work business.  He didn't know what

6      we were talking about.  And at some point there could have

7      been something said, but what we were mainly talking about

8      was what was going on at work.

9   Q.  So when you say at some point there could have been

10     something said, are you saying there could have been some

11     personal stuff mixed in with the work stuff?

12  A.  There could have been something said.

13  Q.  Something said that was personal?

14  A.  Yeah.

15  Q.  And did you have an assigned post at that time that was

16     different than the monitoring station?

17  A.  No.  I didn't have an assigned post.  At that point you're

18     free to roam.  You're free to roam, go to the third floor,

19     second floor, third floor.

20  Q.  So you were supposed to be roaming?

21  A.  Yeah, I was supposed to be roaming, yes.

22  Q.  All right.  So you got written up, and that's when you

23     decided to file the charge of discrimination with the

24     EEOC; is that correct?

25  A.  Yeah.  I felt that was enough right there.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 89 of 221

BRENDA SCONIERS                                     May 07, 2015
SCONIERS vs. STRAW                                              89

1   Q.  And it was just five days after you got this warning, July

2        25, 2012, five days later you filed the charge of

3        discrimination with the EEOC, right?

4   A.  7-25-12 on here.

5                MR. DIXON:  She's talking about the EEOC charge.

6   Q.  I'm talking about both.  So five days after you got the

7        written warning, you filed the charge of discrimination

8        with the EEOC; is that right?

9   A.  Let me look at the date here.

10  Q.  Sure.  It's at the bottom.

11  A.  Yeah, that's right.

12  Q.  Okay.  All right.  So I want to turn your attention,

13        please, to the EEOC charge that's Defendant's Exhibit 1.

14        It's four lines down.  The sentence that reads, "Since

15        that time, I have been written up for performing my job

16        duties as expected."  Tell me what you mean by that

17        sentence.

18  A.  That was my normal job.  I don't feel like I was doing

19        anything out of the ordinary.  As a matter of fact, when

20        Robert did come back and I reported it to him -- and he

21        just disagreed with it.  He disagreed with it, and he

22        said, "Yeah, he's telling me to write you up, and I told

23        him that you were doing good."

24  Q.  So you and Robert disagreed with Mr. Woodcox, that you

25        should have been out roaming, right?



```
 1   A.  Well, I don't have to -- it is time to roam, but I can

 2       also catch up on reviews.  Like I say, I had been on

 3       vacation.  And I do the same thing right to this day.

 4   Q.  But if the director of the security department tells you

 5       you need to be roaming, then your job is to roam, right?

 6   A.  If the director of the security department --

 7   Q.  Is Mr. Woodcox not the director of the security

 8       department?

 9   A.  Well, he's Robert's supervisor, yeah.

10   Q.  And Mr. Woodcox is the one that gave you the written

11       warning, right?

12   A.  Right.

13   Q.  And if Mr. Woodcox tells you that you need to be roaming

14       instead of standing at the security desk, that's what you

15       should be doing, correct?

16   A.  Well, I'm not going to answer that.

17   Q.  Does Mr. Woodcox have the authority to tell you you need

18       to go roam and not stand at the security desk?

19   A.  He has the authority, but he never came to me and said

20       roam.  He never came to me and said that.

21   Q.  Until July 25?

22   A.  Until that when he pulled me downstairs.

23   Q.  But you don't dispute that he had the authority to say you

24       shouldn't be standing at the desk and you should be

25       roaming; you agree he has that authority?
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 91 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           91

1  A.  Yes, he does.

2  Q.  Are there any other job duties that -- that sentence that

3      I read out loud, "Since that time, I have been written up

4      for performing my job duties as expected," that doesn't

5      mean anything other than that July 25th write-up; that's

6      the only thing that that's talking about?

7  A.  Yeah, that's this write-up here.

8  Q.  Okay.  There's a sentence, gosh, three from the bottom.

9      It says, "After this, Dave Woodcox and Bruce Burnett,

10     assistant maintenance supervisor, male," and then that

11     sentence doesn't get ended.  Do you know what you wanted

12     to say about Dave Woodcox and Bruce Burnett?

13 A.  I'm sure I said it, but I don't know why it stopped there.

14     I have no idea.

15 Q.  You don't remember?

16 A.  What I said to her then, no, I don't know what I said to

17     her.  I know I talked to her, but I don't know why she --

18     after this "Dave Woodcox, supervisor, male," I'm not sure

19     why she made it like that.  But I'm sure that I did have

20     some things that I reported to her at that time, but --

21 Q.  Was it that you -- and I don't want you to guess.

22 A.  Okay.

23 Q.  That sentence that doesn't end with a period, it ends with

24     a comma.  So what I interpret this -- and if my

25     interpretation is wrong, I need you to tell me.  I



Case 5:22-cv-07718-EJD  Document 22-16  Filed 01/25/23  Page 92 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                            92

1      interpret this to say, "I think in writing me up, Dave

2      Woodcox and Bruce Burnett discriminated and retaliated

3      against me."  I interpret that to be referencing the

4      write-up.  Am I right about that?

5   A.  I'm not sure why she wrote this how she wrote it.

6   Q.  Let me ask this then, and that's a fair answer.  Did Mr.

7      Woodcox do anything else to discriminate against you or

8      retaliate against you other than writing you up?

9              MR. DIXON:  You mean before or after the

10          write-up?

11  BY MS. MAHONY:

12  Q.  Any time.

13  A.  I felt he did -- I think both of them guys did because

14      sometimes I was there alone, only security officer there,

15      and sometimes I tried to get a relief from them.

16  Q.  From them, when you say "them" --

17  A.  From Dave Woodcox and Bruce Burnett.  And there was a

18      bucket for some reason -- I think they used that for

19      salting in the back -- they would tell me to go pee in

20      that bucket right there.

21  Q.  How many times did that occur?

22  A.  Five, four or five, six times.

23  Q.  When did that happen?

24  A.  In the mornings when I was there, I'm not sure about the

25      dates, but sometimes when I needed a relief.  But I'm not



1    sure.

2    Q.  Was it before you filed this charge of discrimination or

3        after?

4    A.  It was before and probably after.  I'm sure it was after

5        too.

6    Q.  How many times did it happen before?

7    A.  Before, maybe I'll say maybe two or three times.  And like

8        I said, it happened after that too.  That's why I wondered

9        sometimes did they ever see this or did they ever know

10       about this.

11   Q.  So when they -- how many times did they tell you to go pee

12       in the bucket?  Was that just one time?

13   A.  No.

14   Q.  How many times was that?

15   A.  They used to do it in the morning.  Sometimes when I would

16       ask for relief, I would say two, maybe two, three times

17       before I did this, also after I filed this.

18   Q.  All right.  Did Mr. Woodcox or Mr. Burnett -- is it

19       Barnett or Burnett?

20   A.  Burnett.

21   Q.  So it's spelled correctly in the EEOC charge, about three

22       lines from the bottom?

23   A.  I'm not sure if he have an E on the end of that.

24   Q.  Okay.  So did Mr. Woodcox or Mr. Burnett do anything else

25       to discriminate against you other than what's in the



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 94 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                            94

1      charge, or other than what you've already talked about?
2   A.  Well, if you know, Mr. Woodcox, he always has -- he got
3       nasty ways, nasty things to say to you.
4   Q.  Tell me what he'd say.
5   A.  He said, "You're too old.  How old are you?"
6   Q.  He said that to you?
7   A.  He said that to me before.
8   Q.  How many times did he say that to you?
9   A.  I'll say maybe four times.  I mean --
10  Q.  Was it before or after you filed the charge of
11      discrimination?
12  A.  Both.
13  Q.  How many times before and how many times after?
14  A.  Maybe -- I don't know because he just said stuff all the
15      time.  He don't stop.  Like I said, you wonder -- it just
16      makes you wonder.
17  Q.  What else did Mr. Woodcox say to you that was
18      inappropriate?
19  A.  Sometimes, you know, like it would be a younger person.
20      It doesn't have to be a worker.  "She's younger than you.
21      How old are you?"  That's what he says.  There's another
22      girl there.  I don't know if I should say this about
23      another person that worked there.  Donica Hagler somehow
24      they got into --
25  Q.  How do you spell her last name?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 95 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              95

1  A.  H-a-g-l-e-r.  And she's a female officer.  She's no longer

2      there, but they got into some kind of radio

3      misunderstanding.  And when he walked back to the

4      monitoring station and she tried to explain, he told her

5      to, "Eat shit."  And she reported it.  And she also left

6      work too.  So this guy here, he says what he wants to come

7      out his mouth any time.  So I sit there at work, even now,

8      but I just try to get along with him.

9  Q.  So he's still employed there?

10 A.  Yeah.

11 Q.  When did he start working there, before you were there?

12 A.  No.

13 Q.  When did Mr. Woodcox start?

14 A.  Can I take a break?

15          MS. MAHONY:  You bet.

16          MR. DIXON:  The pending question is do you know

17      when Mr. Woodcox started working there?  If you know

18      the answer to that, you can answer and then take a

19      break.

20 A.  Larry left.

21 BY MS. MAHONY:

22 Q.  Larry Bennett?

23 A.  Larry Bennett left when he came because they wanted him to

24     be Larry's supervisor.  So that's why Larry left because

25     he didn't want him to be his supervisor.  So Larry left.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 96 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           96

1     He was there, I think he was there for five years.  Maybe
2     in '98.
3              MR. DIXON:  Okay.  Do you need a break now, just
4        a general break?
5              THE WITNESS:  Not '98.
6              MR. DIXON:  Go ahead and answer the question.
7              THE WITNESS:  2008.  I'm fine.  I just needed to
8        take a breath.
9  BY MS. MAHONY:
10 Q.  Has Mr. Woodcox always been nasty like this?
11 A.  Yes.
12 Q.  Okay.  All right.  Did Mr. Burnett do anything else to
13     discriminate against you other than -- in your opinion,
14     other than what you already talked about or put in your
15     charge of discrimination?
16 A.  Mr. Burnett is not so -- he's not so bad, but he has told
17     me to -- he's heard Dave tell me to use the blue bucket.
18     So he kind of joked around and said it too.  He said it
19     too a couple times.
20 Q.  Was this before --
21 A.  Before and after.
22 Q.  And did he say anything other than to use the bucket to
23     pee?
24 A.  No.
25 Q.  Okay.  Did either Mr. Woodcox or Mr. Burnett do anything

1    to retaliate against you?

2  A.  Mr. Woodcox -- to my -- what I think he did because

3    Mr. Woodcox went to some people that were friends of

4    mine -- well, I'll say one girl, and he went to her

5    supervisor and asked her not to come up and talk to me.

6  Q.  Do you know why he did that?

7  A.  No.

8  Q.  Did Mr. Woodcox do anything else that you think was

9    retaliation, other than telling your friend not to talk to

10   you?

11 A.  Not that I can think of right now.

12 Q.  And what do you think, if anything, this was in

13   retaliation for?  How was that retaliating against you,

14   telling your friends not to talk to you?

15 A.  I thought maybe it was because I filed this charge here.

16   But that's what I thought, but I'm not really sure.

17 Q.  So he didn't do anything before you filed the charge to

18   retaliate against you?

19 A.  Before I filed this, yeah, he did.

20 Q.  What did he do to retaliate against you before you filed

21   the charge?

22       MR. DIXON:  Can I just interject?  I want to make

23      sure you understand the question.  She's talking

24      about his retaliation against you, not just anything

25      he did that was wrong, but specifically you felt was



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 98 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           98

1            in retaliation for something.  I just want to make
2            sure you understand the question.
3    A.  Okay.  Can you repeat the question, please?
4    BY MS. MAHONY:
5    Q.  You bet.  Before you filed this charge of discrimination,
6        Defendant's Exhibit 1, what did Mr. Woodcox do to
7        retaliate against you?
8    A.  I don't remember him -- I don't remember.  You talking
9        about this letter here?  I don't remember him doing
10       anything.
11   Q.  Let me back up.  You said that Mr. Woodcox went to your
12       friends and said don't talk to Brenda.
13   A.  Right.
14   Q.  Was that before or after you filed the charge of
15       discrimination, if you know?  And hold on.  Don't answer
16       that for a second because I may be able to help us out
17       here.
18   A.  That was after.  Yeah, it was after.
19   Q.  All right.  So it's your testimony today that Mr. Woodcox
20       went to your friend and told your friend not to talk to
21       you after you filed the EEOC charge of discrimination?
22   A.  Right.
23   Q.  Did Mr. Woodcox do anything to you before you filed the
24       EEOC charge of discrimination that was retaliation?
25   A.  No.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 99 of 221

BRENDA SCONIERS                                          May 07, 2015
SCONIERS vs. STRAW                                              99

1   Q.  Did Mr. Burnett do anything to retaliate against you

2       before you filed the EEOC charge?

3   A.  No.

4   Q.  Did anyone at the library do anything to you that was

5       retaliation before you filed the EEOC charge?

6           MR. DIXON:  Can you specify retaliation for what?

7   BY MS. MAHONY:

8   Q.  No.  Before you filed the charge of discrimination, do you

9       think there's anything that anyone did that was

10      retaliation for anything?

11          MR. DIXON:  I'm going to object to that question

12      as calling for a legal conclusion.  It's got specific

13      meaning in the law --

14          MS. MAHONY:  I'm asking her opinion, not a

15      lawyer's opinion.

16          MR. DIXON:  My objection is still --

17  A.  I'm not clear.

18  Q.  The EEOC charge of discrimination, you said you -- you

19      signed.  Let me back this up.

20      The EEOC charge of discrimination, Defendant's

21      Exhibit 1, did you write this?  Did you type this up?

22  A.  No.

23  Q.  You talked to somebody and that person typed it up?

24  A.  Yes.

25  Q.  Did you tell someone at the EEOC that you thought you had



1    been retaliated against before you signed this charge of

2    discrimination?  Do you remember if you told someone I

3    think I've been retaliated against?

4  A.  Yeah, I think -- yeah, I must have.

5  Q.  So what did you think had happened that was retaliation

6    before you filed this charge of discrimination?

7  A.  I think by the supervisor touching me and Danielle came

8    in, and then they let her just walk all over.  Yeah.

9  Q.  Is there anything else that you think was retaliation?

10           MR. DIXON:  Same objection, but go ahead and

11      answer the question.

12  A.  I can't think of it right now.

13  BY MS. MAHONY:

14  Q.  So when you say they let Danielle just walk all over, is

15    that all the things you've already talked about -- let me

16    finish the question.  Is there something new other than

17    what you've already talked about with Danielle?

18  A.  Not at this time.

19  Q.  So the retaliation is Mr. Sanders touching you, Danielle

20    coming in, and the other things you talked about earlier

21    about Danielle coming in and they let her walk all over.

22    Anything else?

23  A.  Not at this time.

24  Q.  Okay.  So is it fair to say the things that form the basis

25    of the discrimination are the same things that form the



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 101 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                             101

| 1 | basis, in your mind, of the retaliation?  You think you |
|---|---|
| 2 | were discriminated against because the supervisor touched |
| 3 | you and Danielle came in and the things that Danielle did |
| 4 | and they let Danielle walk all over you?  Is that the |
| 5 | discrimination, right, in your mind? |
| 6 | A.  I don't really know how to answer that right now. |
| 7 | MR. DIXON:  I think we should take a little |
| 8 | break. |
| 9 | MS. MAHONY:  Okay. |
| 10 | (Recess taken.) |
| 11 | BY MS. MAHONY: |
| 12 | Q.  I apologize to be repetitive, but I just want to make sure |
| 13 | we're clear.  Other than what we've already talked about, |
| 14 | is there anything else that anyone at the library did that |
| 15 | you think is retaliation? |
| 16 | A.  Okay.  So far -- see, I don't know who knew what, but is |
| 17 | it fair to say Danielle?  I mean -- |
| 18 | Q.  So you're saying Danielle retaliated against you? |
| 19 | A.  When she came in, I wasn't sure if they brought her in to |
| 20 | run me out or, you know, I wasn't sure what the deal was. |
| 21 | So I would say that the reason why she was doing what she |
| 22 | wanted -- what she was doing was because I think -- and I |
| 23 | don't like to say things that I'm not really sure, but it |
| 24 | felt that way. |
| 25 | Q.  Did she treat you -- did Danielle treat you worse than she |



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 102 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                      102

1        treated other people?

2    A.  She treated me pretty bad, yeah.

3    Q.  That's not the question.

4    A.  Yes.

5    Q.  Are you aware of any facts that would suggest that the

6        library hired Danielle to run you out?

7    A.  No.

8    Q.  All right.  But you think that's what Danielle wanted?

9    A.  It seemed that way.

10   Q.  All right.  Other than what we've already talked about, is

11       there anything else that anybody did at the library that

12       you think is retaliation?

13   A.  So I'd say Dave Woodcox.  Did I say him?

14   Q.  What about Dave Woodcox?  In addition to what we've

15       already talked about?

16   A.  Okay.  He wrote me up.  Yeah.

17   Q.  And that was retaliation in your mind?

18   A.  Yeah.

19   Q.  Okay.  In your mind, what was that retaliation for?

20   A.  I'm not sure if I said already, but I told Deb and Connie

21       about -- well, we had showed them and Connie the film.

22   Q.  Okay.  Are you aware of any facts that show that Dave

23       wrote you up because you showed Deb and Connie the video

24       of Robert Sanders touching you?

25   A.  I had never been written up before.



1   Q.  Any other facts?  So the fact that you had never been

2       written up before.  Is there anything else that leads you

3       to believe that writing you up was in retaliation for

4       telling Deb and Connie about Robert Sanders touching you?

5   A.  I think, like I say, I had been talking to Joseph.  And

6       they told him that he was causing problems.  And I

7       continued be a coworker with him.

8   Q.  And we already talked about that.  Is there anything else

9       that we haven't talked about?

10  A.  No.

11  Q.  So that's everything you've told me, everything about

12      retaliation, right, what you believe to be retaliation and

13      why?

14  A.  That I can think of right now.

15  Q.  Other than what we already talked about, is there anything

16      else at the library that you think was discrimination?

17  A.  Yes.

18  Q.  Okay.  What else?

19  A.  Well, I feel -- can I say the library discriminated

20      against me?  If we showed them the video of what happened

21      and they never did anything, to my knowledge, or never

22      came to me and said what they were going to do --

23  Q.  Okay.  Is there anything else that you think anyone at the

24      library did that was discrimination other than what we've

25      already talked about?



BRENDA SCONIERS                                      May 07, 2015
SCONIERS vs. STRAW                                          104

1   A.  Okay.  I said Robert Sanders, right?

2   Q.  Robert Sanders touching you?

3   A.  Right.

4   Q.  Okay.  Anything else?

5   A.  And Danielle.  Right now, that's it.

6   Q.  All right.  Your charge of discrimination also says you

7       believe you've been discriminated against based on your

8       age.  What do you think was discrimination or retaliation

9       based on age?

10  A.  Well, I tell you what, when I went in here, I went and

11      told them it was sexual harassment.

12  Q.  When you went in where?

13  A.  When I went in the EEOC.

14  Q.  You went to the EEOC.  Okay.

15  A.  I told them it was sexual harassment and told her my

16      story, which it was not this little story.  It was a

17      bigger story than this.  But the lady there, if this is

18      her still, I'm not sure, Nancy O'Brien, she said -- told

19      me that the way that she put the discriminated,

20      retaliation due to my sex, female, and my age, she

21      instructed me to put that.

22  Q.  So the EEOC told you to add the age part?

23  A.  Yeah.  She instructed me to add the age part because she

24      said it would help my case better.

25  Q.  Is there anything you believe was discrimination on the



1    basis of age?

2  A.  It could have been.

3  Q.  I'm not asking if it could have been.  I'm asking you do

4      you believe you were discriminated against based on your

5      age?

6  A.  Yes.

7  Q.  How?

8  A.  I'll say that Dave sometimes told me, "You're old," and

9      then --

10 Q.  And I think you told me about those --

11          MR. DIXON:  Let her answer the question before

12      you ask the next one.  Go ahead.

13 A.  Dave told me sometimes, "You're old," and some women would

14     walk by and he would say, "She's younger than you," and

15     sometimes he'd say, "You're older than I am."  He did

16     that, yes.

17 BY MS. MAHONY:

18 Q.  Anything else that anyone at the library did that you

19     think was discrimination on the basis of your age?

20 A.  No.

21 Q.  Okay.  Is there anything anyone at the library did that

22     you think is retaliation on the basis of your age?

23 A.  On the retaliation?

24 Q.  Because of your age?

25 A.  No.



1           (Exhibit 5 marked for identification.)

2   Q.  I apologize.  This is not a good copy, but it's the best I

3       have.  Ms. Sconiers, after you have a chance to review

4       what the court reporter handed you as Defendant's Exhibit

5       5, tell me you read it, please.

6   A.  I'm ready.

7   Q.  Tell me what this is, what Defendant's Exhibit 5 is,

8       please.

9   A.  This says, "Charge of Discrimination."

10  Q.  And is this your handwriting on Defendant's Exhibit 5?

11  A.  Yes.

12  Q.  When did you write this?  When did you write Defendant's

13      Exhibit 5?

14  A.  13-04-13.

15  Q.  Defendant's Exhibit 5 is not -- does not reflect the

16      conversation you had with the EEOC getting ready to file

17      Defendant's Exhibit 1, your charge of discrimination?

18  A.  No.

19  Q.  Okay.  We'll talk about that later then, for now.

20          So back to your EEOC charge of discrimination from

21      July of 2012, did you write anything out for the EEOC?

22  A.  Could you report that -- or repeat that?

23  Q.  You bet.  In getting ready to submit your charge of

24      discrimination in July of 2012, Defendant's Exhibit 1, did

25      you write anything out for the EEOC?



1   A.  No.

2   Q.  Did you meet with them in person?

3   A.  Yes, I did.

4   Q.  So it wasn't a phone conversation?

5   A.  No.

6   Q.  Was it down in Indianapolis?

7   A.  No, it was here.

8   Q.  In South Bend?

9   A.  South Bend.

10  Q.  So you went to the EEOC office in South Bend?

11  A.  Yes.

12  Q.  And that was somebody -- and talked with that person; is

13      that correct?

14  A.  Yes.

15  Q.  And that person typed up what you said, right?

16  A.  Yes.

17  Q.  Into this charge of discrimination, the Defendant's

18      Exhibit 1, right?  Is that right?

19          MR. DIXON:  Objection, calls for speculation as

20      to what the other person did.  Your question was did

21      they type up what you said, so...

22  BY MS. MAHONY:

23  Q.  She did.  Okay.

24      Is Defendant's Exhibit 1, in the discussion of what

25      happened, is that -- does that fully reflect what you told



1      the EEOC?

2   A.  This little thing right here?

3   Q.  The one that starts, "I am a female, age 56," and ends

4       with, "...in violation of the age discrimination and

5       employment act"?

6   A.  No.  That's not -- no.

7   Q.  That's not everything?

8   A.  No.

9   Q.  What else did you tell the EEOC?

10  A.  Let me see here.  I told them a lot of stuff that we

11      talked about.

12  Q.  Like what?  When you say "we," you mean you and I today?

13  A.  About my supervisor Robert touching my behind.

14  Q.  Okay.

15  A.  About Dave Woodcox and Bruce Burnett asking me to pee in

16      the blue bucket, the write-up is there, about Danielle

17      Alexander and some things that she was doing.  I'm not

18      sure right now, but some of the things she was doing.

19  Q.  Okay.  Ms. Sconiers, you'll see in Defendant's Exhibit 1

20      it says, "Daniel Alexander."  That should have been

21      "Danielle," just so we're clear, right?

22  A.  It should have been Danielle, right, not Daniel.

23  Q.  That's fine.  I just don't want the judge to think later

24      there's a Daniel and a Danielle.

25  A.  No.



1   Q.  As you sit here right now, can you think of anything else

2       that you told the EEOC that is not in Defendant's Exhibit

3       1, other than what you already told me you told them?

4   A.  EEOC, that's not in which one?

5               MR. DIXON:  This one.

6   A.  Anything else?  Well, I mean, yeah, there's lots of

7       things; but let me see here.

8               MR. DIXON:  The question is other than the things

9           you've already talked about today.  Is that your

10          question?

11  BY MS. MAHONY:

12  Q.  Let me ask it this way:  Did you tell the EEOC everything

13      you told me today?

14  A.  Yes.

15  Q.  Okay.  Other than those things, is there anything else

16      that you told the EEOC?

17  A.  Right now, I can't remember.  I just sit there and I

18      talked and talked and talked for a long time.

19  Q.  As you sit here today, you can't think of anything else

20      that you told the EEOC other than what you've already told

21      me; is that correct?

22  A.  Not right now I can't.

23  Q.  Do you remember about how much time you spent with the

24      EEOC person?

25  A.  It could have been maybe 45 to an hour.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 110 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          110

```
 1                 MS. MAHONY:  I just need a minute here to see
 2           where we are.
 3    BY MS. MAHONY:
 4    Q.  Does Danielle still work at the library?
 5    A.  No.
 6    Q.  When did she stop working at the library?
 7    A.  Maybe, probably, to the most, maybe about eight, nine
 8        months ago.
 9    Q.  Do you know why she left the library?
10                 MR. DIXON:  Objection, calls for speculation.
11           You can answer if you know.
12    Q.  Do you know?
13    A.  No.
14    Q.  Was she fired; do you know?
15    A.  I can tell you what I remember, but I'm not sure.
16    Q.  Okay.
17    A.  She was fed up with the library, and she mentioned that
18        she wanted to quit.
19    Q.  She mentioned to you?
20    A.  No.  She mentioned it out loud she wanted to quit.
21    Q.  And did you hear?
22    A.  She did mention it to me.  She did mention it.  And she
23        said she wanted to quit.  That's what the new
24        supervisor -- Deb Futa gave the new supervisor a paper for
25        her to fill out and request her to go on, to leave.
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 111 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                            111

1   Q.  So is it your understanding that Danielle resigned?

2   A.  They gave her a paper and -- she kind of blurted it out.

3   Q.  And they said okay, you can resign?

4   A.  Right, exactly.

5   Q.  I think you said this was about seven or eight months ago?

6   A.  Yeah, I could be wrong, but it's probably about eight

7       months.

8   Q.  Okay.

9              (Exhibit 6 marked for identification.)

10  Q.  All right.  Ms. Sconiers, the court reporter has handed

11      you what's been marked as Defendant's Exhibit 6.  Can I

12      take these other exhibits back from you because they're

13      ultimately going to go to the court reporter.  Your lawyer

14      has copies of everything.  So let's just put these over

15      here for now.

16         All right.  Defendant's Exhibit 6, tell me what that

17      is, if you can, please.

18  A.  U.S. Equal --

19              MR. DIXON:  Objection.  The document speaks for

20         itself.  You can answer it, but it's just a waste of

21         time.

22  BY MS. MAHONY:

23  Q.  Do you know what this is?  If you don't know what it is,

24      that's fine to say you don't know.

25  A.  I know what it is.



1   Q.  You do?

2   A.  Yes.

3   Q.  Okay.  What is it?

4   A.  It's a statement just saying that the EEOC --

5   Q.  Let me back up and ask this, Ms. Sconiers, have you seen

6       Exhibit 6 before today?

7   A.  Yes.

8   Q.  How did you come to see it?

9   A.  I got one in the mail.

10  Q.  From the EEOC?

11  A.  I don't -- St. Joseph County Public -- yeah.

12              (Exhibit 7 marked for identification.)

13  Q.  Ms. Sconiers, the court reporter has handed you what's

14      been marked Defendant's Exhibit 7.  Can you tell me, if

15      you can, what Defendant's Exhibit 7 is?

16              MR. DIXON:  We'll stipulate to this being the

17          dismissal and right-to-sue letter from the EEOC.

18  BY MS. MAHONY:

19  Q.  Do you agree with what your lawyer just said, Ms.

20      Sconiers?

21  A.  Yes.

22  Q.  And you received this from the EEOC, right?

23  A.  Yes.

24  Q.  How did you come to receive it?

25  A.  In the mail.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 113 of 221

BRENDA SCONIERS                                     May 07, 2015
SCONIERS vs. STRAW                                            113

1  Q.  And what was your understanding of what, if anything, you

2      were supposed to do about the notice of right to sue?

3      What was your understanding?

4  A.  My understanding was that I have a notice of sue rights

5      and that I could file a lawsuit against the respondents

6      under the federal law based on this charge in a federal or

7      state court, and it must be filed within 90 days of

8      receipt of this notice or your right to sue based on this

9      charge will be lost.  That's the determination.

10 Q.  And do you know how long after it was issued on September

11     6 that you received it?  Do you remember?

12 A.  Maybe a day or so.

13 Q.  Okay.  A day or so after September 6, 2012?

14 A.  I'm not sure though.  You're saying when I got it at my

15     house?

16 Q.  Yes.

17 A.  Yeah, it probably was a couple days after that.

18 Q.  Okay.  And you didn't talk to Mr. Straw before you filed

19     the EEOC charge, did you?

20 A.  No.

21 Q.  How did you come to meet Mr. Straw?

22 A.  Through Joseph Kiama.

23 Q.  How many times did you meet with him?

24 A.  Once.

25 Q.  Do you know when you met with him?



1   A.  It was shortly after I received this letter here, but I'm
2       not sure of the date.  But it was shortly after that
3       because I knew I had 90 days.
4   Q.  So it was shortly after you received the notice -- let me
5       finish -- the notice of right to sue, Defendant's Exhibit
6       7; is that right?
7   A.  Right.
8   Q.  And you had read the notice of right to sue before you met
9       with Mr. Straw; is that right?
10  A.  That's right.
11  Q.  And so before you met with Mr. Straw, you knew you had a
12      90-day deadline to file suit?
13  A.  Yes.
14  Q.  Can you give the notice of right to sue to Mr. Straw?
15  A.  He took a copy of it.
16  Q.  Did anyone else attend the meeting?
17  A.  Yes.
18  Q.  Who?
19  A.  Joseph Kiama.
20  Q.  Where did this meeting occur?
21  A.  At a church, in a church office on Ewing Avenue.  I'm not
22      sure what the address is, but it's a church at Ewing -- I
23      think it's Ewing and --
24              MR. DIXON:  Twyckenham.
25  A.  Twyckenham.



```
 1   BY MS. MAHONY:
 2   Q.  Do you remember the name of the church?
 3             MR. DIXON:  Joseph's Church.  I can get that for
 4         you.
 5   A.  It was an all people's church.
 6   Q.  In South Bend?
 7   A.  Yeah, South Bend.
 8             MR. DIXON:  It's Presbyterian.  I think
 9         Presbyterian is in the title too.
10   A.  Right.
11             (Exhibit 8 marked for identification.)
12   Q.  Ms. Sconiers, the court reporter has handed you what's
13       been marked as Defendant's Exhibit 8.  Have you seen this
14       document before?
15   A.  Yes.
16   Q.  Tell me how you came to see this document.
17   A.  Through my e-mail.
18   Q.  And is it fair to say this is an e-mail exchange between
19       you and Mr. Straw that outlines Mr. Straw's representation
20       of you and your agreement about that?
21   A.  Yes.
22   Q.  On the last page, if you'd flip to the last page, please,
23       do you see the part that says, "I, Brenda Mae Sconiers,
24       agree to this legal service and of $90,000."
25   A.  Yes.
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 116 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                     116

1   Q.  Did you send this e-mail?

2   A.  Yes.

3   Q.  And you sent it to Mr. Straw?

4   A.  To Mr. Straw.

5   Q.  Is it accurate that you sent it on Thursday, September 13,

6       2012?

7   A.  Yeah, if it says that.

8   Q.  You don't have any reason to believe that's inaccurate?

9   A.  No.

10  Q.  Does that sound about right to you?

11  A.  Yes.

12          MR. DIXON:  I'll make a record that Mr. Straw at

13      that point may have been in Chicago.  So it may have

14      been printed up on his time, which may have been an

15      hour earlier.

16  BY MS. MAHONY:

17  Q.  Does that sound about right to you?

18  A.  Yes.

19          MR. DIXON:  Can I also make a note it's a

20      six-page document, and there's only three pages

21      included in it.  The other one is just communications

22      back and forth.

23          MS. MAHONY:  May I see what you have there?

24          MR. DIXON:  Yeah.  It almost looks like her

25      response is cut off at the end, and then it says it's



1           a six-page document.  It says page 1 of 6, page 2 of

2           6, page 3 of 6.  I don't think we have any

3           disagreement as to the fact that they entered into

4           this agreement through e-mail, and the nature of that

5           is binding, that an e-mail signature in Indiana is a

6           valid signature for a written contract, if that's

7           what your line of questioning is about.  I'm just not

8           sure if this is the entirety.

9    BY MS. MAHONY:

10   Q.  Ms. Sconiers, do you remember anything else, any other

11        part of Defendant's Exhibit 8 in addition to what I've

12        given you?  Do you recall anything else?

13   A.  I will say the contract.

14   Q.  So there was a contract in addition to this?

15   A.  Let me see here.

16   Q.  That's all right.

17   A.  Yeah, there was some other stuff to this.

18   Q.  Do you remember what it was?

19   A.  Uh-huh.  It was a copy of the EEOC letter, something from

20        the EEOC, and a copy of the -- it was a copy of this, and

21        I think it was a copy --

22   Q.  When you say it was a copy of this, you're talking about

23        Defendant's Exhibit 7; is that right?

24   A.  Yeah.  A copy of the notice of right-to-sue letter.

25   Q.  Okay.



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          118

```
 1  A.  And a copy of the -- I think it was a copy of the
 2      supervisor -- maybe this photo right here.
 3  Q.  Defendant's Exhibit 3?
 4  A.  I think.  I know I had something with this altogether with
 5      those two copies.
 6  Q.  Is it your understanding that those were attachments to
 7      this e-mail -- or not attachments.  I'm trying to
 8      understand.
 9  A.  They would have been attachments.
10          MS. MAHONY:  Can we go off the record for a
11      second?
12          (Discussion held off the record.)
13  BY MS. MAHONY:
14  Q.  All right.  In as much detail as you can, tell me
15      everything that was said in your meeting with Mr. Straw.
16  A.  Okay.  In the meeting with Mr. Straw, he came in and
17      Joseph was already there.  He was already -- I guess he
18      had already explained to him some things that were going
19      on there.
20  Q.  But you didn't hear those things?
21  A.  Not before I got there, no.  But he was ready for me to
22      get there because he told him to call me and to tell me to
23      come in because I had the notice of right-to-sue letter.
24      And I had 90 days to file it and he would file that for
25      me.
```



1   Q.  Tell me what was said, what you said, what Mr. Straw said,

2       what Mr. Kiama said.

3   A.  I went in and I met Mr. Straw.  We shook hands.  We

4       started to talk about this photo.  I remember I was

5       talking about this photo here.

6   Q.  Deposition Exhibits 2 and 3; is that right?

7   A.  Right.

8   Q.  And I gave him the right-to-sue letter.

9   A.  Okay.

10  Q.  And that is Deposition Exhibit 7, right?

11  A.  Uh-huh.  And he said yes, and he said he needed that also.

12      And he took his iPhone --

13  Q.  "He" being Mr. Straw?

14  A.  Mr. Straw got his iPhone and got his copy of the

15      right-to-sue letter.

16  Q.  He took a photo of it?

17  A.  Yes.  And then we sat down and talked about this photo

18      here, and he talked about --

19  Q.  I'm sorry to stop you.  When you say "this photo," I want

20      to make sure for the record.  Poor court reporter.  "This"

21      photo meaning Deposition Exhibits 2 and 3.

22          So Mr. Straw took a photo of the notice of right to

23      sue?

24  A.  Right.

25  Q.  And then you started talking about Deposition Exhibits 2



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 120 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        120

1       and 3, right?

2   A.  Right.

3   Q.  I must have had an extra copy of Deposition Exhibit 2 and

4       3.

5   A.  Why is it 2 and 3?

6   Q.  Remember when you put the people's names on there?

7   A.  Right.  He looked at that, and he said, "What is that,

8       your supervisor touching your behind?  Oh, that's not

9       good."  He said, "You could get a lot out of that."  And

10      he asked me how much did I want.

11  Q.  What did you say?

12  A.  And I looked at him because I didn't know what to say.

13      And I think we kind of -- I'm not sure.  We went through

14      some figures.

15  Q.  What figures?

16  A.  Figures.

17  Q.  What were they?

18  A.  I don't remember the figures.  But we ended up saying the

19      $90,000, and he said that that was good.  That was a good

20      one.  I'm sure he had a copy of that.

21  Q.  Of Deposition Exhibit 2?

22  A.  Uh-huh.

23  Q.  Okay.

24  A.  And we finished talking about the thing that was going on

25      in the library.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 121 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              121

 1  Q.  Let me stop you for a second.  When you talk about the
 2      things going on in the library, is that the same things
 3      you told me today?
 4  A.  The things I told you.
 5  Q.  Is there anything in addition that you told Mr. Straw?
 6  A.  Not to my knowledge, that I can remember right now.
 7  Q.  Okay.
 8  A.  We talked about things at the library.  And so he said
 9      that he would be getting back in touch with me.  And I
10      gave him my e-mail and that meeting ended.
11  Q.  Did Mr. Kiama say anything?
12  A.  Yes.  He talked about things that were going -- the same
13      things that we're talking about that went on in the
14      library.
15  Q.  The same things you talked about today in your deposition?
16  A.  Right.
17  Q.  Okay.  When you said we agreed on $90,000, was that a
18      $90,000 demand to make on the library?  Is that what that
19      was for?  Was that your understanding?
20  A.  $90,000?  Could you repeat that?
21  Q.  You said Mr. Straw asked you how much money you wanted,
22      right?
23  A.  Uh-huh.
24  Q.  And you went back and forth with numbers, and you agreed
25      on $90,000?



```
 1   A.  Right.

 2   Q.  And that $90,000 was the amount you were going to ask the

 3       library to pay you; is that right?

 4   A.  Right.

 5   Q.  All right.  So he said he'd get back in touch with you,

 6       and you gave Mr. Straw your e-mail address.  And then what

 7       happened?

 8   A.  Shortly after that I received the contract.  It was pretty

 9       fast.

10   Q.  And when you say "the contract," you mean Defendant's

11       Exhibit 8?

12   A.  Yes.

13   Q.  So you've told me everything to the best of your

14       recollection about what was said in that one and only

15       meeting you had with Mr. Straw?

16   A.  Yeah.  That's the best --

17   Q.  Okay.  What was your understanding of what Mr. Straw was

18       going to do for you?

19   A.  Well, the reason why -- well, I had talked to Joseph, and

20       he knew I had received my right-to-sue letter.  And we

21       talked about it, and I told him I needed an attorney to

22       file this for me because that's the understanding that I

23       thought for a lawsuit you need an attorney to file it.

24   Q.  To file what?

25   A.  To file the notice of right -- sue rights, notice of
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 123 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        123

1        rights to sue, the letter that they sent.

2   Q.  Well, you already have the notice of the right to sue from

3        the EEOC, right?

4   A.  Right.

5   Q.  So what was your understanding of what Mr. Straw was going

6        to do for you?

7   A.  To file this for me.

8   Q.  To file a lawsuit?

9   A.  File the right to sue.

10            MR. DIXON:  She asked the question if you're

11        expectation was that he was going to file a lawsuit

12        for you.

13            THE WITNESS:  Yes.

14            MR. DIXON:  This letter just gives you the right

15        to sue.

16  A.  That's why I needed an attorney to file the suit for me

17        within 90 days.

18  BY MS. MAHONY:

19  Q.  And what you thought he was going to file, it was -- what

20        you wanted was for him to file a lawsuit based on this

21        EEOC charge, Defendant's Exhibit 1, right?

22  A.  Right, because I told him I had 90 days to file that, and

23        that's why he took a photo of it.

24  Q.  So the only lawsuit you thought he was going to file was

25        based on the notice of right to sue and the EEOC charge,



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 124 of 221

BRENDA SCONIERS                                      May 07, 2015
SCONIERS vs. STRAW                                          124

1    Defendant's Exhibit 1, right?

2              MR. DIXON:  You mean at that initial meeting?

3              MS. MAHONY:  Yes.

4    A.  Yes.

5    Q.  Did you -- okay.  Did there come a time when you thought

6        he was going to do anything else for you?

7    A.  Well, I thought he was going to take care of it because he

8        let me know if there was anything he couldn't take care

9        of, that he would.

10   Q.  Go ahead.

11   A.  If anything had to go to trial, that he would help me to

12       get a trial attorney.

13   Q.  Did you think there was anything he was going to do before

14       you needed to file suit?  And here's why I'm asking,

15       Defendant's Exhibit 8 talks about negotiating with the

16       library and sending a demand.  Did you think he was going

17       to negotiate with the library and send a demand?

18   A.  To tell you the truth, I didn't.  I thought -- this is the

19       way I thought he was going to go this way here, file this

20       here.

21   Q.  When you say "this here" --

22   A.  File the dismissal and the notice of right-to-sue letter.

23   Q.  So you thought he was going to file Defendant's Exhibit 7?

24   A.  Yes.  That's why he took a photocopy of it.  It looks --

25             MR. DIXON:  I want to take a break, maybe even a



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 125 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          125

1    lunch break.  It looks like you have a lot --

2         MS. MAHONY:  We're through the bulk.  Are we off

3    the record?

4         (Discussion held off the record.)

5         (Recess taken.)

6         (Exhibits 9 through 12 marked for

7    identification.)

8         MS. MAHONY:  Off the record, the parties

9    discussed Defendant's Exhibits 9 through 12 and

10   stipulate that Defendant's Exhibit 9 is a true and

11   accurate copy of the plaintiff's performance

12   evaluation from the year 2008, right, Counsel?

13        MR. DIXON:  Yes, correct.

14        MS. MAHONY:  Defendant's Exhibit 10 is a copy of

15   plaintiff's performance evaluation from 2010,

16   correct, Counsel?

17        MR. DIXON:  Correct.

18        MS. MAHONY:  Defendant's Exhibit 11 is a true and

19   accurate copy of the plaintiff's performance

20   evaluation from 2011?

21        MR. DIXON:  Correct.

22        MS. MAHONY:  And Defendant's Exhibit 12 is a true

23   and accurate copy of letters of various dates between

24   January 9, 2009, and January 14, 2014, identifying

25   plaintiff's salary for the library, correct?



1              MR. DIXON:  Correct.

2    BY MS. MAHONY:

3    Q.  Ms. Sconiers, I've handed you what the court reporter has

4        marked as Defendant's Exhibit 12.  And that's a set of

5        letters that were sent to you, five letters.  Could you

6        please review those letters?  And when you've had a chance

7        to review them, let me know.

8    A.  Okay.

9    Q.  Ms. Sconiers, does the letter that's the first page of

10       Defendant's Exhibit 12 accurately reflect what your pay

11       was with the library in 2009?  The second paragraph said

12       that you made $11.43 an hour.  Is that correct, for 2009,

13       to the best of your recollection?

14   A.  To the best, yes.

15   Q.  The second page of Defendant's Exhibit 12 is a letter

16       dated January 11, 2010, and it says your pay rate, your

17       rate will be $932.80.  Does that sound correct to you?

18   A.  Yes.  That sounds correct.

19   Q.  Was that monthly?

20   A.  That was monthly.

21              MR. DIXON:  Bimonthly.

22              THE WITNESS:  2010.

23              MR. DIXON:  Every two weeks, I think.

24   Q.  The second page of Defendant's Exhibit 12, the $932.80 is

25       every two weeks?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 127 of 221

BRENDA SCONIERS                                              May 07, 2015
SCONIERS vs. STRAW                                                    127

1    A.   Uh-huh.

2    Q.   Okay.

3    A.   Yes.

4    Q.   Thank you.  Please turn to the third page of Defendant's

5         Exhibit 12, a letter dated January 9, 2012.  And that says

6         that your biweekly rate was $951.20.  Does that sound

7         right for 2012?

8    A.   Yes.

9    Q.   The fourth page of Defendant's Exhibit 12 is dated January

10        9, 2013.  And it says your biweekly rate is -- was, sorry,

11        in 2013, $980.  Does that sound right?

12   A.   Yes.

13   Q.   The last page of Defendant's Exhibit 12 is a letter dated

14        January 14, 2014, and it says that your biweekly rate was

15        $1,000 for 2014.  Does that sound about right to you?

16   A.   Yes.

17   Q.   So you got a raise every year between 2009 and 2014,

18        correct?

19   A.   Yes.

20   Q.   Did you also get a raise in 2015?

21   A.   2015, yes.

22   Q.   What's your biweekly rate for 2015?  You knew I was going

23        to ask that, huh.

24   A.   It's a two percent raise.

25   Q.   It's a two percent raise over the $1,000 biweekly?



1  A.  Two percent, yes.

2  Q.  Ms. Sconiers, I'd like you to look back on Deposition

3      Exhibit 8, which was this e-mail.  On the first page, it

4      says, "We agree," and then that number one.  Do you see

5      that?

6  A.  Yes.

7  Q.  "I will seek a settlement for you," do you see that?

8  A.  Yes.

9  Q.  Was it your understanding that Mr. Straw was going to

10     first try to negotiate a settlement for you with the St.

11     Joseph County Public Library; is that correct?

12  A.  That's what he first asked me what I wanted, so yes.

13  Q.  So you understood that he was going to try to settle this

14     with the library without a lawsuit?

15          MR. DIXON:  Objection, misstates her testimony.

16      You can answer as best you can.

17  A.  Yes.  I understood that.

18  BY MS. MAHONY:

19  Q.  And if you negotiated a settlement with the library

20     through Mr. Straw, you wouldn't need to file a lawsuit,

21     right?  Was that your understanding?

22  A.  Yes.

23  Q.  Okay.  So it was your understanding that Mr. Straw was

24     going to try to seek a settlement.  And then I think your

25     testimony earlier was he would file a lawsuit for you, and



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 129 of 221

BRENDA SCONIERS                              May 07, 2015
SCONIERS vs. STRAW                                      129

1       I assume if there was not a settlement; is that correct?

2   A.  Yes.  That's correct.

3   Q.  Did that ever change?  Was it your understanding that he

4       was going to do anything other than file a lawsuit based

5       on your July 2012 charge of discrimination or seek a

6       settlement with the library?  Did you think he was

7       going -- at any time did you think he was going to do

8       anything other than those two things?

9   A.  I'm not sure how to answer that question.  Anything else

10      besides a lawsuit and settlement?

11  Q.  Was it your understanding that he was going to do anything

12      other than filing a lawsuit based on your July 2012 charge

13      of discrimination or try to get a settlement?  Was he

14      going to do anything else?

15  A.  Well, I'm not sure how things go, but, yes, the lawsuit

16      and this notice of right-to-sue letter.

17  Q.  I think your testimony was that you thought that he would

18      file a lawsuit on your behalf based on the notice of right

19      to sue; is that right?

20  A.  Yes.

21  Q.  Okay.  So you never thought he was going to file any other

22      EEOC charge for you, right?  Is that right?

23  A.  Any other charge?

24  Q.  Yes, other than this one that you filed by yourself.

25          MR. DIXON:  Can I get some clarification?  Are



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 130 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         130

1          you talking when they first entered into this

2          agreement or any time down the road?

3  BY MS. MAHONY:

4  Q.  Any time.

5  A.  No.

6  Q.  Let me just clarify that then.

7          Is it your testimony today that the only things

8      you -- at any time you understood Mr. Straw was going to

9      do for you was to try to seek a settlement from the

10     library.  That was one thing you thought he was going to

11     try to do.  And the other thing was to file a lawsuit

12     based on the 2012 charge of discrimination and the notice

13     of right to sue?

14  A.  Yes.

15  Q.  And you didn't think he was going to do anything else at

16     any time?

17  A.  No.

18  Q.  You agree he wasn't going to do anything other than those

19     things.  Do you agree with that?

20  A.  No.  He said that if they didn't get a settlement, then he

21     was going to help me get a trial attorney to file the

22     lawsuit.

23  Q.  Okay.  So I just want to make sure I'm clear.  There are

24     three things that you thought he was going to do for you.

25     You thought he was going to settle with the library, one;



Case 5:22-cv-07718-EJD  Document 22-16  Filed 01/25/23  Page 131 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              131

```
 1      number two, if that didn't work, he was going to file a
 2      lawsuit based on the notice of right to sue and the July
 3      2012 charge of discrimination; and number three, he was
 4      going to try to find you a lawyer if the settlement didn't
 5      go through?
 6   A. He said he would.
 7   Q. Those are the three things you thought he was going to do?
 8   A. Yes.
 9   Q. And there wasn't anything else that you thought he was
10      going to do?
11   A. No.
12   Q. You agree there wasn't anything else you thought he was
13      going to do?
14             MR. DIXON:  Can you clarify?  Are you talking
15         about at any time until he ended the relationship?
16   BY MS. MAHONY:
17   Q. At any time.
18   A. No.
19   Q. Do you agree that those were the only three things you
20      thought he was going to do at any time?
21   A. Yeah.  That's the only three I thought right then, yes.
22      Wait a minute.  Hold on.  If you want to go through the
23      whole --
24             MR. DIXON:  Just answer her questions.  I have an
25         opportunity to ask questions too.
```



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          132

1   Q.  Is there something else that you thought he was going to
2       do?
3   A.  As far as going over the whole seeking the settlement,
4       there's more things in here.
5   Q.  In the task of trying to settle?
6   A.  Right.
7   Q.  And what were those things that you thought?
8              MS. MAHONY:  I have a question pending.
9              MR. DIXON:  I don't know why you're looking over
10         at me.  If you don't understand her question, ask her
11         to repeat it.  I can't answer her question for you.
12  A.  Okay.  Besides the lawsuit of $90,000, it was going to be
13      an increase in the wage of a thousand dollars per month.
14  BY MS. MAHONY:
15  Q.  And that was part of the settlement he was going to
16      attempt, right?
17  A.  Yes.
18  Q.  All right.
19  A.  Plus all negative information will be removed from your
20      file.
21  Q.  And that was part of the settlement that Mr. Straw was
22      going to attempt; is that correct?
23  A.  Yes.  Plus compensation for the assault against you.
24      That's the $90,000 -- for the $90,000.
25  Q.  Okay.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 133 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           133

1   A.  "The apology will include provisions that you will not be

2       retaliated against for any reason prohibited by law in any

3       manner whatsoever."

4   Q.  And that was going to be part of the settlement, correct?

5   A.  Yes.  "Further, that you will not be discriminated against

6       in promotion, opportunities, meaning specifically that

7       when you apply for an opening for a promotion, you will

8       automatically be interviewed and will be seriously

9       considered for the promotion as fairness naturally

10      dictates."

11  Q.  That was going to be part of the settlement attempts; is

12      that correct?

13  A.  Yes.  "Promotion will in no event be considered fair

14      unless your wage is increased over the agreed upon rate

15      here demanded, $1,000 per month over your current wage as

16      of 9-13-2012."

17  Q.  And that was going to be part of the attempt to settle,

18      correct?

19  A.  Yes.  "It is assumed that a confidentiality agreement

20      would be needed between the other side and you, and you

21      agree to sign this."

22  Q.  And that was going to be part of the settlement attempt,

23      correct?

24  A.  Yes.

25  Q.  Okay.  Defendant's Exhibit 8, this engagement letter, that



1    this defines what Mr. Straw was going to do for you; is

2    that correct?

3  A.  Yes.

4  Q.  And you consented to the terms of Defendant's Exhibit 8,

5     correct?

6  A.  Yes.

7  Q.  And you understood that Mr. Straw couldn't guarantee a

8     specific result, correct?

9  A.  I don't know how to answer that.

10 Q.  He couldn't guarantee you that the library was going to

11    pay you $90,000.  You understood he couldn't guarantee

12    that, right?

13 A.  No, I can't say I didn't know if he guaranteed.  I didn't

14    know.

15 Q.  You didn't know whether he was guaranteeing -- you thought

16    he was guaranteeing you that he was going to get you

17    $90,000?

18 A.  Yes.

19 Q.  And you thought he was guaranteeing you that you were

20    going to get an apology?

21 A.  Yes.

22 Q.  I'm confused then because you testified earlier that you

23    understood if the settlement didn't occur, there would be

24    a lawsuit.  So you understood that the settlement might

25    not occur, right?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 135 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              135

1  A.  I think he did say if it didn't, he would get a trial.

2  Q.  So you understood that the settlement might not occur and

3     that you might not get $90,000?

4           MR. DIXON:  We'll stipulate to that fact because

5           I think she's confused by your question.  We'll

6           stipulate that she understood that negotiations are

7           negotiations and there are no guarantees in

8           negotiations.

9  BY MS. MAHONY:

10 Q.  You understood he couldn't guarantee you to get $90,000 or

11    an apology or any of the other things in Defendant's

12    Exhibit 8; you understood that Mr. Straw couldn't

13    guarantee that, right?

14 A.  Yes.

15 Q.  Did you ever ask Mr. Straw to file a lawsuit for you?

16 A.  Yes.

17 Q.  When?

18 A.  This notice of right to sue, this is where he filed a

19    lawsuit with the 90 days.

20 Q.  When did you ask Mr. Straw to file a lawsuit for you?

21 A.  The day that I talked to him at the church.

22 Q.  What did he say?

23 A.  He said he would.

24 Q.  Did you ever ask him to help you file a lawsuit?

25 A.  No.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 136 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                      136

1   Q.   On Defendant's Exhibit 8, please show me where in

2        Defendant's Exhibit 8 Mr. Straw agreed to file a lawsuit

3        for you.

4   A.   Where he agreed to file a lawsuit for me?

5   Q.   Yeah.  I'll tell you, I don't think it's there.  But I

6        want to see if you think it's in -- Mr. Straw agreeing to

7        file a lawsuit is in Defendant's Exhibit 8.

8              MR. DIXON:  We can stipulate that Exhibit 8 does

9           not have the specific term in there saying he will

10          file a lawsuit.

11  BY MS. MAHONY:

12  Q.   Ms. Sconiers, did Mr. Straw in Defendant's Exhibit 8 state

13       that he would file a lawsuit for you?

14  A.   I just remember him saying he would file; and if it had to

15       go to trial, then he would get a trial attorney.

16  Q.   But that's not in Defendant's Exhibit 8, right?

17  A.   No.

18  Q.   Is that correct, that it's not in Defendant's Exhibit 8;

19       is that correct?

20  A.   Just this page here?

21  Q.   The whole thing, all the pages.

22             MR. DIXON:  Are you talking about verbatim or the

23          motion itself?

24          MS. MAHONY:  I'm asking her if there's anything

25          in Defendant's Exhibit 8 where Mr. Straw said he



1          would file a lawsuit for her.

2              MR. DIXON:  I'm going to object to that question

3          as calling for a legal conclusion on the

4          interpretation of a contract which the Court has

5          already ruled on in our favor, has made a

6          determination as to what the contract means, and what

7          Mr. Straw's obligations were pursuant to filing suit.

8              MS. MAHONY:  You can answer.

9              MR. DIXON:  But you can answer the best you can.

10  A.  It says he would seek a settlement.

11  BY MS. MAHONY:

12  Q.  So you don't see anything in Defendant's Exhibit 8 saying

13      he would file a lawsuit for you?

14              MR. DIXON:  Objection, asked and answered and

15          same objection as stated previously.

16  Q.  You can answer.

17  A.  No.

18  Q.  That "no" is unclear.  So do you agree that there's

19      nothing in Defendant's Exhibit 8 in which Mr. Straw says

20      he'll file a lawsuit for you?  Do you agree with that?

21              MR. DIXON:  Objection.  Same objection.

22  A.  No.  I don't see it here, no.

23  Q.  You do agree?

24  A.  Yes.

25              MR. DIXON:  Objection, asked and answered.



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          138

1   Q.  Now it has.  Okay.  Mr. Straw accompanied you to the South
2       Bend Police Department; is that correct?  That's my
3       understanding.
4   A.  No.
5   Q.  But you filed a charge with the police, correct, about the
6       touching, Mr. Sanders touching you, right?
7   A.  He asked me -- Mr. Straw asked me to go down and do that.
8   Q.  And you did?
9   A.  Yes.
10  Q.  And did Mr. Straw help you with that?
11  A.  No.
12  Q.  Didn't go with you?
13  A.  No.
14  Q.  Did anyone go with you?
15  A.  No.
16  Q.  Do you remember when you did it?
17  A.  No, not like the date.  I don't remember the date.
18  Q.  Was it shortly after you met with Mr. Straw in September
19      of 2012?
20  A.  Probably shortly after that.
21  Q.  Does September 20 sound about right?
22  A.  It could be.
23  Q.  I'm sorry.  I've already asked this.  Did anyone go with
24      you, or did you go by yourself?
25  A.  I went by myself.



1   Q.   What happened with that?

2   A.   I spoke to a guy there, detective -- I think he was a

3        detective -- and talked to him about what had happened.

4   Q.   What did the detective say?

5   A.   He asked me what happened, and then I explained to him

6        what happened.

7   Q.   And this is just the touching by Robert Sanders?

8   A.   Yes.

9   Q.   What, if anything, did the police do about your report?

10  A.   I didn't get any response.

11  Q.   Did the detective tell you that they were going to do

12       anything about it?

13  A.   Only thing I can remember he said was Robert Sanders has

14       hired an attorney.

15  Q.   The detective told you that?

16  A.   Yes.

17  Q.   Do you know how the detective knew that?

18  A.   No.

19  Q.   Did the detective say anything else that you remember?

20  A.   I just remember talking to him and him asking me

21       questions, probably some of the same questions; but that's

22       it.  I don't really remember in detail.

23  Q.   Okay.  And you agree that Mr. Straw sent a demand letter

24       to the library on your behalf and with your permission,

25       correct?



1   A.  Yes.

2   Q.  And that he wrote to the library's attorney later and

3       provided some documentation to support your case.  That's

4       correct?

5   A.  Yes.

6   Q.  And you agree that Mr. Straw told you that the library

7       wasn't going to settle?

8   A.  I remember he wrote me an e-mail, and I don't think he

9       said the library.  I think he said the attorney -- he said

10      something about the attorney.

11  Q.  The library's attorney?

12  A.  The attorney wasn't -- they had a little something going

13      on, an attorney, they won't accept his letters because

14      they were over -- because they were over the e-mail, and

15      he wanted him to send him a letter through the mail.  It

16      just wasn't going the way he wanted it to go.

17  Q.  But there came a time when Mr. Straw told you the library

18      is not going to settle with you?

19  A.  I don't remember him saying the library wasn't going to

20      settle.  I kind of remember him telling me about the

21      attorney.  So I guess the attorney would be for the

22      library.

23  Q.  Yes.

24  A.  So, yeah, he said that, yeah, nobody -- he told me the

25      attorney said nobody touched your client.



1   Q.   And in part of that conversation, did Mr. Straw tell you

2        we don't think anyone touched your client, so they're not

3        going to settle?

4   A.   Yeah, I think that's how.  I'm not quite sure how it went.

5   Q.   You agree that you communicated with Mr. Straw while he

6        was out of the country through e-mail?

7   A.   I don't remember communicating with him while he was out

8        of the country.

9   Q.   Did you know he was out of the country during some of your

10       e-mail exchange?

11  A.   He told me that he was going to be out of the country by

12       e-mail.  But I don't remember talking to him while he was

13       out of the country.

14  Q.   Did you exchange e-mails with him while he was out of the

15       country?

16  A.   I don't think so.  I may have -- I don't even remember

17       that.  I just remember he was out of the country.  I don't

18       think I had heard from him at all.

19  Q.   Okay.  In your mind, when did Mr. Straw stop being your

20       lawyer?

21  A.   I never did talk to him and he told me he wasn't my

22       attorney anymore.  Never did that.  That's a hard question

23       because I don't know when he really stopped being my

24       attorney.

25  Q.   Okay.



1    A.   Once I hired Thomas.

2    Q.   Your current lawyer?

3    A.   Yes.

4    Q.   And in your mind, once you hired your current lawyer,

5         Mr. Straw stopped being your lawyer?

6    A.   Yep.

7    Q.   Okay.  Other than what you've already testified to, is

8         there anything else that Mr. Straw failed to do for you?

9    A.   Well --

10                MR. DIXON:  You mean other than what's alleged in

11            the complaint?

12   BY MS. MAHONY:

13   Q.   No.  I mean other than what we've talked about today.

14   A.   He really failed.  Like sometimes I wanted to talk to him

15        on the phone.  I don't think I ever really did talk to him

16        on the phone maybe once.  I think I've asked him to call

17        me or I even tried to call him.  I just never did get any

18        one-on-one conversation after the church.

19   Q.   Did he fail to return phone calls?

20   A.   Yeah.

21   Q.   Anything else?

22   A.   That's it.

23   Q.   How many phone calls would you estimate he failed to

24        return?

25   A.   I'd say maybe two or -- maybe two or three.  Because after



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          143

1    he wouldn't return calls, I saw he didn't -- he liked

2    doing it e-mail.  So I think I just went ahead and

3    e-mailed him.

4  Q. Is there anything else in your mind that Mr. Straw failed

5    to do for you other than what we've talked about today?

6  A. That's it.

7  Q. Is there anything Mr. Straw did that you believe he should

8    not have done?

9  A. Yes.

10 Q. What's that?

11 A. Well, after I was -- after I hired Thomas, he was

12   e-mailing me letters; and then he mailed a letter or two

13   to my house.

14 Q. Mr. Straw did?

15 A. Yes.

16 Q. And you think he shouldn't have done that?

17 A. Yeah.

18 Q. So that wasn't e-mail.  That was a mailed letter?

19 A. He did send a mail letter to me, but he sent me I'll call

20   it threatening e-mails because he was saying bad -- you

21   know, it was not nice things as far as what my other

22   attorney was trying to do.

23 Q. As you sit here today, what do you mean about what he

24   said?

25 A. He was telling me that Thomas was trying to -- he was



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 144 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           144

1      trying to do something.  I'm not really sure.  Because

2      once I got him, I let Thomas know because I felt

3      threatened.  I know he told me once something about how

4      much money he was trying to get from him, and he was --

5  Q.  So just so we're clear here, Mr. Straw said that he was

6      trying to get money from your current lawyer or your

7      current lawyer was trying to get money from Mr. Straw

8      because we have two he's here?

9           MR. DIXON:  Both of these things are true.

10 A.  He sent me an e-mail and said some things about Thomas,

11     Thomas is trying to file a lawsuit on him, and he needs a

12     certain amount of money from him and -- I don't remember.

13 BY MS. MAHONY:

14 Q.  And Tom needed money from Mr. Straw?

15 A.  Mr. Straw sent me an e-mail and said that Thomas was

16     trying to sue him and he didn't like it, or whatever, and

17     he was trying to get --

18 Q.  Mr. Straw didn't like it?

19 A.  Mr. Straw didn't like it.

20 Q.  All right.

21 A.  I really don't remember.  Like I said, I thought it was

22     threatening, so I sent it.

23 Q.  Is there anything else that you remember other than what

24     you've told me about --

25 A.  He filed a lawsuit against me.



```
 1   Q.  Okay.

 2   A.  And he said that I was discriminating against him because

 3       he had some disabilities.

 4   Q.  That was the lawsuit that went in federal court, correct?

 5   A.  Yeah.

 6   Q.  Is there anything else that Mr. Straw did that you think

 7       he should not have done?

 8   A.  He sent me some e-mails that he --

 9   Q.  And we --

10   A.  And the mail to my house.

11   Q.  What was in the mail to your house?

12   A.  Some other things about Thomas.

13   Q.  Do you remember what it was?

14   A.  No.  I don't remember right now, but he was telling me how

15       much money Thomas was trying to get out of him and he sued

16       him also.

17   Q.  Mr. Straw sued your current lawyer along with you?

18   A.  Against Thomas.  In the court he sued, and he said we were

19       all named in a lawsuit because we discriminated against

20       him.

21   Q.  Is there anything else you think that Mr. Straw did that

22       he should not have done, other than what you've told me

23       today?

24   A.  Well, if it has anything to do with this, I think he

25       shouldn't have said that he would make -- get a settlement
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 146 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                              146

```
 1        for me and then drop it without letting me know anything,
 2        let me know that he was working on it anymore.  Also, he
 3        had me to go out myself after -- well, right before it was
 4        over with, he had me going different places trying to file
 5        another suit with the EEOC.
 6   Q.   Another charge of discrimination?
 7   A.   Yeah.  And it wasn't going anywhere, and he sent me
 8        what -- something 5, some kind of form with the EEOC, and
 9        told me to file that.  And all the things I was doing
10        there, it wasn't getting anywhere.  So I got the
11        runaround.
12   Q.   From Mr. Straw?
13   A.   From Mr. Straw.
14   Q.   Or the EEOC?
15   A.   From Mr. Straw because he was telling me -- and did he
16        know that this was already past, I couldn't do anything
17        about it because it was past due.
18   Q.   The 90 days in the notice of right to sue -- let me
19        finish, please.  So it's your testimony today, and I want
20        to get this right; and if I say it wrong, I need you to
21        tell me.
22            So it's your belief that he asked you to go to the
23        EEOC because the 90 days on your notice of right to sue,
24        Defendant's Exhibit 7, had passed; is that correct?
25   A.   Right.
```



1    Q.  So he instructed you to file another charge of

2        discrimination with the EEOC?

3    A.  Yes.

4    Q.  Did you do that?

5    A.  Yes.

6    Q.  Do you have it?

7              MR. DIXON:  I don't think so.

8    BY MS. MAHONY:

9    Q.  Do you have it?

10   A.  I'm sure -- I have a form that I -- well, as a matter of

11       fact, this is --

12   Q.  Defendant's Exhibit 5?

13   A.  Yeah.

14   Q.  Okay.

15   A.  And I'm going around here and I'm doing things.

16   Q.  What things are you doing?  What things were you doing?

17       Do you want to take a break?

18   A.  (Nodding.)

19   Q.  There is a question pending, but take as much time as you

20       like.

21              (Mr. Dixon left the room.)

22   A.  Okay.  He made me feel like he never got notice for the

23       right to sue.  He made me feel like he had never gotten a

24       copy of it.  And then he went on through another e-mail

25       and said did you get a notice to sue?  Well, you know, if



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 148 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                      148

1      you did get one, I'm going to send you a form; and it was

2      some kind of 5 form.

3           And he said I want you to go and file that.  So I

4      started writing up stuff to file another -- so that I

5      could get another letter.  All this, did he know that -- I

6      mean, it was already too late.  I couldn't -- I couldn't

7      file it again and make that better.  It was already too

8      late.  So I was running, like, to the bank to get -- I

9      wrote out some stuff and I took it to get it notarized,

10     and then I sent stuff out to the EEOC again.

11               (Mr. Dixon back in room.)

12     BY MS. MAHONY:

13     Q.  What things from the bank?

14     A.  To get this stuff that I wrote out.  I had to get stuff

15         notarized.

16     Q.  What stuff did you have to get notarized?  Maybe it's over

17         here.

18     A.  I remember being at the bank, and they told me they

19         couldn't notarize it because stuff had to be notarized.

20     Q.  That's there.  I want the record to reflect that the

21         witness was looking at Defendant's Exhibit 5.  And, Ms.

22         Sconiers, I want to point out that that was dated in 2013.

23               MR. DIXON:  Did she testify to a date while I was

24            in the restroom?

25               MS. MAHONY:  No.



1    Q.  Ms. Sconiers, my recollection from earlier in your

2        testimony today was that Defendant's Exhibit 5 was not

3        done at the time you filed the original July 2012 EEOC

4        charge, Defendant's Exhibit 1.  You testified earlier that

5        that was in 2013; is that correct?

6    A.  Yes.

7    Q.  What prompted you to prepare Defendant's Exhibit 5?  Well,

8        let me back up.  Did you prepare Defendant's Exhibit 5?

9    A.  Yes.

10   Q.  That's your handwriting?

11   A.  Yes.

12   Q.  I think you testified to that earlier today.  So what

13       prompted you to prepare Defendant's Exhibit 5?

14   A.  Andrew.

15   Q.  Mr. Straw.  And what about Mr. Straw and Defendant's

16       Exhibit 5?

17   A.  He asked me to file that.

18   Q.  Andrew told you, Mr. Straw told you to file Defendant's

19       Exhibit 5?

20   A.  If this is this other charge of discrimination, he told me

21       to file that.

22   Q.  And did you send this to the EEOC?  Did you send Exhibit 5

23       to the EEOC?

24   A.  I sent things to them, yes.

25   Q.  Did you send Defendant's Exhibit 5 to the EEOC?



1   A.  As far as I can remember, yes.  That's why I did it, to

2       send it to them.

3   Q.  And with respect -- and that was in 2013?

4   A.  Yes.

5   Q.  The date on there says 13-04-13.  Does that mean it's

6       April 13, 2013?

7   A.  I'm not sure.

8   Q.  Let me ask you a different question.  Typically how do you

9       date things?  And I'm looking at Defendant's Exhibit 1,

10      and how you dated that was 07, July, 30, 2012; is that

11      correct?  Do you see that?

12  A.  Yes.

13  Q.  So Defendant's Exhibit 5, I was reading that as a 13.  But

14      maybe that wasn't a 13.  I think I just heard you say that

15      that's an 03.

16  A.  If this was 12, then this should be March.

17  Q.  So is that March 4, 2013?  Defendant's Exhibit 5 is March

18      4, 2013?

19  A.  Yeah.

20  Q.  So you gave Defendant's Exhibit 5 to the EEOC.  Did you

21      ever sign a charge of discrimination about the things that

22      you documented in Defendant's Exhibit 5?  Did you ever

23      sign a second charge of discrimination with the EEOC?

24  A.  No.

25  Q.  Why not?



BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           151

1  A.  Well, I was -- I don't know why I didn't sign one.  I was
2       talking to the people in Indianapolis because that's who
3       they were referring me to.
4  Q.  And this is in March of 2013; is that correct?
5  A.  I'm not sure about that number in the front there.  I'm
6       trying to see.  That would be March if it was 03.
7  Q.  So why did you never file and sign a second charge of
8       discrimination with the EEOC?
9  A.  I was doing things the way that Andrew told me to do.  And
10      the form that he sent me, like I said, was something 5
11      form; and he told me to write out this stuff.
12          And like I said, I was working with the people in
13      Indianapolis.  And I sent the letter to Indianapolis
14      because I think he said it was some kind of thing -- since
15      I already had a charge, file the F something 5, and that
16      just was another part of the first one.  I don't remember
17      why he told me to do it.
18  Q.  So it was your understanding that it was going to be
19      another part of the first charge of discrimination?
20  A.  Right.
21  Q.  Okay.  Did you do everything the EEOC told you to do with
22      respect to the new material, new things to the EEOC?
23  A.  Well, with the new material, it was really, really strange
24      because, first of all, the things that I said to them,
25      they said they never received them.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 152 of 221

BRENDA SCONIERS                                     May 07, 2015
SCONIERS vs. STRAW                                          152

1   Q.  But you sent them?

2   A.  I sent them.  And also I called the Post Office because I

3       sent it where they had to sign for it.  And they gave me

4       the number.  They said, yep, they gave it to them because

5       they signed for it.  So they called them back in

6       Indianapolis again.  And I was really getting the

7       runaround in Indianapolis.  I could never really speak

8       with anybody.  At the time when I did speak to a guy --

9       because they had told me I was going to talk to an

10      investigator.

11          There was a guy who I was talking to.  He had some

12      kind of disability or whatever there, and he talked really

13      slow; and sometimes he act like he didn't really

14      understand.  But I did call and call.  And like I said, I

15      sent them a letter, and I did get the -- what do you call

16      it when you send it and you get the mail?

17  Q.  Return receipt requested?

18  A.  I did get that also, and they did receive it.  But I just

19      never, ever really heard back from them again.

20  Q.  Do you have a copy of the letter you sent to the EEOC?

21  A.  I'm thinking it's this right here (indicating).  This

22      here.  And I tried to --

23  Q.  So you think the letter that you were talking about that

24      you sent to the EEOC is Defendant's Exhibit 5?

25  A.  Yeah.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 153 of 221

BRENDA SCONIERS                                              May 07, 2015
SCONIERS vs. STRAW                                                     153

1    Q.  Is that correct?

2    A.  Yeah.  But that would be part of it because I said he gave

3        me -- I had a form, and it was some kind of a form that

4        you file with the EEOC.

5    Q.  And did you keep a copy of that form?

6    A.  I got this copy.

7    Q.  When you say you got "this copy," you're talking about

8        Defendant's Exhibit 5?

9    A.  Yeah.  I had this copy, so I may have kept the copy.  I

10       don't know how this one single copy was here.

11   Q.  Will you look for it?

12   A.  Yes, I will.  And I even kept the, like the receipt, like

13       I said.  I have papers all over.  The receipt from when I

14       paid to have it sent so that they would have to sign for

15       it.

16   Q.  Okay.

17   A.  One thing I do have, I do have a letter with him telling

18       me to go and send the other letters to the EEOC.

19   Q.  When you say "him," you mean Mr. Straw?

20   A.  Mr. Straw, yes, I still have that.

21             MS. MAHONY:  All these things would be covered in

22         our earlier request for production of documents.  So

23         I don't need to send another one.  You just need to

24         send them in response to that.

25             (Exhibit 13 marked for identification.)



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 154 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        154

```
 1   BY MS. MAHONY:

 2   Q.  Ms. Sconiers, the court reporter has handed you what's

 3       been marked Defendant's Exhibit 13.  Would you look at

 4       that and tell me what it is.

 5   A.  It looks like a note.  I was writing a note.

 6   Q.  Is all the handwriting on Defendant's Exhibit 13 yours?

 7   A.  Yes.

 8   Q.  What prompted you to write Defendant's Exhibit 13?

 9   A.  Because that's one -- not the policies, but one of the

10       things we usually do before we go home, somebody relieve

11       you early, about 15 minutes early so you can get up and

12       get your lunch together, your bags, put your radio away.

13       That's just something that we did.  And after I filed --

14   Q.  After you filed what?

15   A.  Filed with the EEOC -- yeah, with the EEOC.  After I filed

16       that, you know, they were waiting now till 4:00 o'clock.

17       Don't let them leave.

18           And so, like I said, this guy, Blake, he's been there

19       with me, Blake Harris -- Mr. Bennett hired him in also.

20       And he's the last one there with me that Mr. Bennett hired

21       also.  He usually would relieve me of duties so that I

22       could -- like we had been doing and he said, "No, I can't

23       relieve you.  Robert told me not to."

24   Q.  Who told you?

25   A.  Robert Sanders.  He said not to relieve you.
```



1   Q.  Were other people relieved early?

2   A.  Well, I tell you, I opened up and I left earlier than

3       everybody because I opened up for the library.  So I was

4       mainly like the first one to leave the eight-hour shifts.

5       And so the other people mainly came in like 10:00 o'clock.

6   Q.  So everybody else had to stay their whole shift?  Is that

7       your testimony?

8   A.  No.  I'm saying I left.  So I didn't really get to see.  I

9       never heard anybody complain that they can't leave early

10      anymore.  In fact, I didn't even know.  I just knew that I

11      couldn't leave anymore.  There was nothing said that no

12      one can leave anymore early.  I never heard any

13      announcement or anything like that.  It just started to

14      happen.  And I asked Blake why and he said, he whispered,

15      "He said not to relieve you early."

16  Q.  But you don't know whether other people were relieved

17      early or not; is that correct?

18  A.  Yeah, that's correct.

19              (Exhibit 14 marked for identification.)

20  Q.  Okay.  Ms. Sconiers, the court reporter has handed you

21      what's been marked Defendant's Exhibit 14.  Would you

22      please look through that packet of materials and tell me

23      when you're ready.

24  A.  Okay.  I'm ready.

25  Q.  Have you seen the documents in Defendant's Exhibit 14



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 156 of 221

BRENDA SCONIERS                                         May 07, 2015
SCONIERS vs. STRAW                                              156

1        before today?

2   A.   Yes.

3   Q.   What's the circumstances under which you saw the documents

4        in Defendant's Exhibit 14?

5   A.   This first one here -- and I mentioned it to you today

6        already.  This is my friend, Latika Armstrong, she works

7        with the library.  She works maybe about nine, ten years,

8        nine years.  And sometimes on her break, she'll come up

9        and talk to me for a little bit, or, you know, we see each

10       other and we talk to each other.

11  Q.   And who told her not to talk to you?

12  A.   Dave Woodcox went to her supervisor and told her not to

13       come and talk to me.

14  Q.   Did you hear Mr. Woodcox do that?

15  A.   Do I hear him?

16  Q.   Did you hear Mr. Woodcox tell Latika's supervisor not to

17       talk to you?

18  A.   No, but her supervisor told her.

19  Q.   And Latika told you?

20  A.   Latika told me, yes, she did.

21  Q.   Defense Exhibit 14 is paginated 1 through 6.  Is that your

22       handwriting?  You wrote these page numbers?

23  A.   I think so.

24            MR. DIXON:  These were produced from me?

25            THE WITNESS:  No.



1          MR. DIXON:  I thought you put this together.

2          THE WITNESS:  This is my stuff.

3          MR. DIXON:  Did you write these page numbers on

4      here, 1, 2, 3, 4, 5, 6?

5          THE WITNESS:  I think so, yes.

6          MR. DIXON:  So maybe I did produce it to you.

7          MS. MAHONY:  I don't remember.

8   BY MS. MAHONY:

9   Q.  Page 2 of Defendant's Exhibit 14, what does that -- how

10      does that help you?

11  A.  It's helped me by just saying that this is the monitoring

12      station where I was written up at.

13  Q.  Page 2 is just a picture of the monitoring station?

14  A.  Yeah.

15          MR. DIXON:  Okay.  Now I'm getting it.

16  Q.  Page 3, how does page 3 of Defendant's Exhibit 14 help

17      your case?

18  A.  Well, if you look at page 1, that guy with the blue shirt,

19      he's from the maintenance department.

20  Q.  You mean page 2?

21  A.  Page 2, the guy sitting in that chair there, he's from the

22      maintenance department.  And he's also on 3.  The person

23      behind that desk is Danielle.

24  Q.  Okay.  So how is it that page 2 and 3 of Defendant's

25      Exhibit 14 helps you?

1   A.  Okay.  Well, just to show that there are people that stand

2       there and they stand there and talk to each other and

3       visit.

4   Q.  And chat?

5   A.  And they still do to this day.

6   Q.  How does page 4 of Exhibit 14 help your case?

7   A.  Page 4 is where Dave Woodcox -- Latika comes up on her

8       break sometimes and talks to me, and she still does to

9       this day.  But Dave Woodcox, who is standing there with

10      Danielle, they're just sitting there chattering, just

11      talking and laughing.

12  Q.  So page 4 of Defendant's Exhibit 14, the two people on the

13      left are Danielle and Mr. Woodcox?

14  A.  Dave Woodcox, yeah.

15  Q.  Do you think that page 5 of Defendant's Exhibit 14 helps

16      you?

17  A.  This here is the monitoring station.  Again, that's

18      Danielle.

19  Q.  Which one is Danielle?

20  A.  She's behind the desk.  She works at the library.  That's

21      here.  That other female there is a visitor.

22  Q.  So how --

23  A.  Just a visitor.

24  Q.  So how do you think page 5 of Defendant's Exhibit 14 helps

25      you?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 159 of 221

BRENDA SCONIERS                                      May 07, 2015
SCONIERS vs. STRAW                                          159

1   A.  Just another thing to show you that there was people

2       there, and for a while they laughed and talked.

3   Q.  And chatted about personal things?

4   A.  Chatted about personal things, yes.

5   Q.  Same thing with page 6 of Defendant's Exhibit 14?

6   A.  Okay.  That lady is still there.  Let's see here.  Okay.

7       It's only about five or six minutes passing, but the

8       female visitor who isn't from the library -- I don't know

9       who she was.  But Dave and Bruce Burnett, they're walking

10      through.  And they walked through that day with no problem

11      at all of the visitor standing there.  And that's just to

12      show you that other people --

13  Q.  So do you have personal knowledge that they were talking

14      about non-library business in any of these pages of

15      Defendant's Exhibit 14?

16  A.  Well, the lady here in the back here, she's not even from

17      the library.

18  Q.  Okay.

19  A.  She's not from the library.

20  Q.  My question is do you have personal knowledge that any of

21      the pictures in Defendant's Exhibit 14, what was happening

22      in those pictures were non-library business?

23  A.  Yes.

24  Q.  How do you have personal knowledge of this?

25  A.  Because somebody back here at the monitoring station



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 160 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          160

1    should -- at this time should be only employees.

2    Employees can be there.

3  Q.  Whose policy is that?

4  A.  That had been the library's policy.

5  Q.  But you weren't present and didn't hear what was being

6    said in any of these pictures in Defendant's Exhibit 14,

7    correct?

8  A.  Yeah, correct.

9         (Exhibit 15 marked for identification.)

10  Q.  The court reporter has handed you what's been marked as

11    Defendant's Exhibit 15.  Could you look at that and, if

12    you can, tell me what it is.

13  A.  The first one on the top is -- that's the day when it was

14    one of my officers, older gentleman, John Morton -- 11:55.

15    He was probably doing his roaming because I think -- I'm

16    not sure.  Yeah, okay.  How was that?  I was at the front

17    post and John came.  Somebody needed a bathroom break.

18    I'm not sure which one of us was up there.

19       So after the bathroom break, we talked about --

20    Robert came straight up there, and he started fanning his

21    hands like move, move.  And I said, "Well, what's going

22    on?"  He said, "You all got to move.  That Futa, she's

23    watching you.  So you can't stand here."

24  Q.  Did you write all of Defendant's Exhibit 15?

25  A.  Yes.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 161 of 221

BRENDA SCONIERS                                           May 07, 2015
SCONIERS vs. STRAW                                              161

1   Q.  All right.  And what prompted you to write the second two

2       entries of Defendant's Exhibit 15?

3   A.  Like this one, like I say, I was just making notes, just

4       making notes.  This is another one of the things that

5       Danielle did when she walked past with the sunglasses on.

6       And we were talking about some work-related things, Robert

7       and I.  And that's when she walked by with the sunglasses

8       on and stopped.  And he looked away and she said, "Don't

9       you turn your head when you see me coming."

10  Q.  This is what you told me about earlier in this deposition?

11  A.  This is what I told you about.

12  Q.  All right.  And then you went to Deb Futa's office?

13  A.  But not about that one.  That's just stuff I'm writing.

14      Then I did go to Deb's office because Robert said she was

15      watching us.

16  Q.  Right.  And did you talk to her about that?

17  A.  Yeah, I did talk to her about that.

18  Q.  What did you say?

19  A.  I just wanted to know what was I doing wrong, that she was

20      watching me.

21  Q.  And you asked her that?

22  A.  And I asked her that.

23  Q.  What did she say?

24  A.  She laughed, and she said, "I'm not watching you."  And I

25      told her Robert said that you're watching me and John in



1   the front, and she said no.  And she said something

2   about -- something about John maybe.  I don't remember

3   what she said.  She said she wasn't watching us.  And she

4   said people can talk, and there's only one problem with

5   people talking a long time at the monitoring station.

6   Q.  That's what Deb told you?

7   A.  That's what Deb said.

8   Q.  So were you satisfied with that response from Deb?

9   A.  Yeah, I was satisfied with it.

10             (Exhibit 16 marked for identification.)

11  Q.  All right.  Ms. Sconiers, the court reporter has handed

12      you what has been marked as Defendant's Exhibit 16.  Have

13      you seen this before?

14  A.  Yes.

15  Q.  Did you write it?

16  A.  Looks like my writing, yes.

17  Q.  What prompted you to write this?

18  A.  Okay.  Let me see here.  It must have been just another

19      note because it looks like Danielle called Robert to say I

20      was talking to someone in the front.  And he must have

21      come up there again because that's what he was doing

22      lately, like she could just say anything about anybody and

23      he would go and do whatever she wanted.

24  Q.  And "she" is Danielle and "he" is Robert Sanders?

25  A.  Yeah.  She would tell him -- one way you can tell is she



BRENDA SCONIERS                          May 07, 2015
SCONIERS vs. STRAW                                    163

1   would be sitting at the monitoring station and just say if

2   I was in the front, she would move the camera so that it

3   was on me.  Sometimes I would move away just from the post

4   and stand aside it.

5   Q.  Why would you do that?

6   A.  Because you can do that.  You don't have to stand right

7   there.

8   Q.  Was there a reason you moved away so the camera wouldn't

9   see you?

10  A.  No.  Because the camera can't see -- if you move it, it

11  can see you.  But we usually keep that one stationed in

12  the front for people walking in the front door to get a

13  good view of people walking in the front door.  But when

14  it was my turn, I would rewind it and the camera would be

15  on me.

16  Q.  And that bothered you?

17  A.  Yeah, it bothered me because Robert would come up to the

18  front.  I didn't feel he was watching me talking to

19  anybody; but he would walk up, okay, can't talk or

20  whatever the thing he was doing.

21  Q.  So it sounds like there were a lot of discussions about

22  too much talking going on at the monitoring station; is

23  that right?

24  A.  That wasn't the monitoring station.  That was the front

25  door where you see Dave and Danielle and all --



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 164 of 221

BRENDA SCONIERS                                          May 07, 2015
SCONIERS vs. STRAW                                              164

1  Q.  Defendant's Exhibit 16 is about the monitoring station,

2      right?

3  A.  16, which one is that now?

4  Q.  This one right at the top.

5  A.  Yeah.  It's not about the monitoring station.

6  Q.  It wasn't?

7  A.  No.  Came to me at the front station.  No.  I wrote front

8      monitor station.  That's the front station.  And she was

9      complaining -- that was Donica Hagler, a worker we no

10     longer have.  She was complaining to me about something

11     that Danielle had done wrong and she was angry about it.

12 Q.  Do you remember what that was that Danielle had done

13     wrong, at least according to Donica?

14 A.  No.  I don't remember what it was the -- I don't remember

15     what it was.

16 Q.  I'm sorry, you do?

17 A.  I don't remember what it was.  She was angry, but I don't

18     remember.

19 Q.  Okay.  All right.  Ms. Sconiers, do you recall answering

20     questions -- they're called interrogatories -- from us?  I

21     didn't bring copies, but I was just going to show her

22     this.

23          MR. DIXON:  Uh-huh.

24          MS. MAHONY:  Can you hand it to her, please?

25          MR. DIXON:  Sure.  Let me take a look at it.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 165 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          165

1   BY MS. MAHONY,

2   Q.  When you look through what your attorney has handed you,

3       let me know when you're ready.

4           Ms. Sconiers, do you remember signing your answers to

5       our interrogatory questions?

6   A.  Yes.

7   Q.  And that's your signature on the second page?

8   A.  Yes.

9   Q.  So you identify three people who you believe were treated

10      more favorably than you were during your employment with

11      the library, Danielle Alexander, Robert Sanders, and Dave

12      Woodcox; do you recall that?

13  A.  Uh-huh.

14  Q.  How was Danielle Alexander treated more favorably than

15      you, in your opinion?

16  A.  She came in and she just got to do whatever she wanted to

17      do.

18  Q.  All the things that you told me about earlier?

19  A.  And say whatever she wanted to say to anybody and

20      everything, and it just --

21  Q.  Is there anything that she got to do or say other than

22      what you've already told me about today?

23  A.  Yeah.  I think I probably told you as much as I could

24      think of.

25  Q.  Okay.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 166 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        166

1   A.  I'm not saying it's all, but the majority.

2   Q.  As you sit here today right now, can you think of anything

3       else?

4   A.  Yeah, I could think of something else.

5   Q.  Okay.

6   A.  I remember once when she started -- something happened in

7       the library with the handicap person.  And I wasn't there

8       or remember the situation at all.  But I got a call from

9       human resource, and they said that they had a letter from

10      EEOC.  And they said there was a black female that was

11      very rude to a handicap person there, and they went to

12      EEOC and reported it.

13          She asked me did I know about it.  Danielle, it was

14      Danielle and I at the time, only black female there.  And

15      I hadn't did -- I hadn't treated any handicap or anybody

16      in a bad way.

17  Q.  So you assume it was Danielle?

18  A.  Yeah.  Because she was very, very rude to people like

19      that.  But she also had me, I didn't want to, but she made

20      me write a small letter to the EEOC.

21  Q.  Who is "she"?

22  A.  Connie, Connie Nicely, human resource, stating that it

23      wasn't me and I didn't do it.  I had no problem writing it

24      except I just didn't feel good about that.

25  Q.  Why not?



1   A.  Because I treat the patrons with respect.

2   Q.  And Connie believed you that it wasn't you though,

3       correct?

4   A.  She believed it.  She believed it because she said, "It's

5       not like you, Brenda.  It's just a thought."  I remember

6       that.  I don't know if she ever had to go up and write

7       about it or anything.

8   Q.  All right.  Is there anything else that you remember other

9       than what you testified to today about Danielle Alexander

10      being treated more favorably than you?

11  A.  Not at this moment.

12  Q.  Is there anything you can do to remember, anything else

13      that you can think of?

14  A.  Yes, but not at this moment.

15  Q.  What could you do not at this moment?

16  A.  I got plenty of other notes and stuff at home.

17           MS. MAHONY:  Those would be responsive to what I

18       already asked for.

19           MR. DIXON:  Really?

20           MS. MAHONY:  Yep.

21           MR. DIXON:  Where?

22           MS. MAHONY:  Where?

23           MR. DIXON:  Which one of the responses?

24           MS. MAHONY:  My request for production of

25       documents went through the whole complaint, I think,



```
 1            and asked for all documents that support the

 2            allegation that blah, blah, blah, and just went

 3            through.  So if that supports the allegation that

 4            Danielle Alexander was treated more favorably, then

 5            it's responsive.

 6                 MR. DIXON:  But our complaint wasn't about

 7            Danielle being treated more favorably.  It was about

 8            Andrew Straw not filing a lawsuit in a timely basis.

 9                 MS. MAHONY:  It's also about the underlying EEOC

10            discrimination.  You looked like you were going to

11            say something.

12                 THE WITNESS:  I'm just looking at you guys.

13                 MR. DIXON:  We could do this all day long if we

14            needed to.

15                 THE WITNESS:  I don't want to have to start

16            working.  I mean security.

17                 MR. DIXON:  I'm out numbered here.  You don't

18            have to worry about that.  I'll have to bring my cat

19            inside.

20    BY MS. MAHONY:

21    Q.  You also identified Robert Sanders was treated more

22        favorably.  How was Robert Sanders treated more favorably

23        than you?

24    A.  I feel like he was treated more favorably than I because

25        of the fact that the situation that went on personally,
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 169 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         169

1     what he did to me as far as touching my behind and no one

2     ever said anything, did anything about it, to my

3     knowledge, and never apologized or anything.  And he could

4     do something like that in there still, and I could talk to

5     somebody for a little over time, or whatever they feel

6     like, and I could get written up for it; and he can break

7     one of the policies as far as sexual harassment and

8     nothing was heard.  I didn't hear anything.

9  Q.  But you don't have personal knowledge that nothing was

10     done to him, right?

11 A.  I don't have personal knowledge, but no one ever said, you

12     know, are you okay, or anything, like it just never even

13     happened.

14 Q.  Do you agree that you don't have personal knowledge that

15     nothing happened to him as a consequence to touching you,

16     correct?

17 A.  Yeah.  I only assume.

18 Q.  Is there any other way that you think Robert Sanders was

19     treated more favorably than you?

20 A.  I just only think that breaking policies there, breaking

21     policies and just --

22 Q.  When you say breaking policies, are you talking about the

23     things you told me in the deposition or are there more

24     things?

25 A.  There are more things.



```
 1   Q.  Okay.  What more things?

 2   A.  Well, once we had a female patron.  And, like I said,

 3       we're not supposed to harm or do any harm to patrons also.

 4       And this lady was homeless.  And she was at the reference

 5       desk and she was fussing about something.  And he came

 6       over, and I watched him as she fussed.  He took his foot,

 7       and he stood on top of her foot.

 8   Q.  Oh, man.

 9   A.  And then she lost her mind.  She went crazy.  And so then

10       he had to get two more guys to help him drag her to the

11       back.  It's an older black lady.

12   Q.  And you saw this?

13   A.  It was an older black lady, and they drug her to the back

14       and she -- I mean, she was fighting and the police came.

15       And the police got her and took her away.  She was

16       screaming because he's standing on her foot.

17   Q.  Did you report this to anybody?

18   A.  No.

19   Q.  All right.  Is there anything else that Mr. Sanders -- in

20       any other way that Mr. Sanders was treated more favorably

21       than you, in your opinion?

22   A.  Not right now.  I can't think of anything right now.  I'm

23       starting to get hoarse.

24   Q.  You've been doing a lot of talking today.

25              MR. DIXON:  What time is it?  We could get the
```



1          Tequila out.

2               MS. MAHONY:  I have to drive home.

3    BY MS. MAHONY:

4    Q.  You also identified Dave Woodcox as someone treated more

5         favorably than you.  How was he treated more favorably

6         than you?

7    A.  Dave could go around and say or do whatever he wants to

8         do.  And they just, human resource -- first of all,

9         they're friends.  I've already heard that they're really

10        close friends, maybe relatives.  I've heard that since

11        I've been there.  But he can say what he want to say.

12            We can be in a meeting and he can be talking to us,

13        something about the library and he'll -- you guys are --

14        you guys are just peons.  You think these people care

15        about you.  They don't care about you.  He can say the

16        worst things to people.  Like I'll report that.  I've

17        reported that.  And they say --

18   Q.  What did you report?

19   A.  He called -- he said that we were peons and the people in

20        the library or human resource up there in the office --

21        what am I trying to say?  Anyway, the office upstairs,

22        they said they don't care anything about you.

23   Q.  So who did you report this to?

24   A.  Connie Nicely.

25   Q.  So you reported to Connie that Dave said patrons are



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 172 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          172

```
1         peons, or security staff?

2   A.    Security staff.  He said you guys are nobody.  You guys

3         are just peons in here.  They don't care about you.  But

4         that guy talk like that all the time.  He can say what he

5         want.

6   Q.    Sorry.

7   A.    Even when he told Donica Hagler "eat shit," they reported

8         that.  And nothing's done.

9   Q.    When you reported to Connie that he called you all peons,

10        what specifically did she say?

11  A.    She said he didn't really mean anything by that.  She made

12        it out of a soft -- like it was just nothing.

13  Q.    You just mentioned again that Dave told somebody to eat

14        shit?

15  A.    This same girl right here, Donica, she used to work with

16        us.

17  Q.    And you didn't witness this Dave telling Donica to eat

18        shit?

19  A.    I didn't witness, but she was very upset.  And she let me

20        know when he said it, and she walked off -- she walked off

21        the job.  She left, but she came back the next day.  But

22        she left.

23  Q.    And it's your understanding that Donica reported this to

24        somebody?

25  A.    Uh-huh.
```



1  Q.  Who?

2  A.  It would have been to human resource.

3  Q.  Did Donica tell you she reported it to human resources?

4  A.  Yeah.

5  Q.  What did Donica tell you that human resource said?

6  A.  I don't remember what she said, but I know that she told

7      them.  And I just know they won't do anything because they

8      don't do anything.

9  Q.  You don't have personal knowledge that they didn't do

10     anything?

11 A.  He still there, and he still talking the same way.  That's

12     what I wondered, did they do anything.  Somebody not doing

13     something.

14 Q.  All right.  Is there any other way Dave Woodcox you

15     believe was treated more favorably than you?

16 A.  Just better period.  He just better -- being treated

17     better period because, like I say, just overall.

18 Q.  Tell me everything you remember about how you believe Dave

19     Woodcox has been treated more favorably than you.

20 A.  I guess that's why I say he could go around to people and

21     say what he wanted to say to people.

22 Q.  Are there any other examples that you say he said or did

23     that you thought were inappropriate, other than what you

24     told me today?

25 A.  I can't think of anything right now.



Case 5:22-cv-07718-EJD  Document 22-16  Filed 01/25/23  Page 174 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                         174

1  Q.  Okay.  Is there anything you can do to refresh your
2      recollection on anything else Dave Woodcox might have done
3      that was inappropriate?
4  A.  Not right now.
5  Q.  I'm not asking about right now.  After now, is there
6      anything you can do to refresh your recollection about
7      anything Dave Woodcox did that was inappropriate?
8  A.  No.  That's just period of him right there.
9  Q.  What do you mean "period of him right there"?
10 A.  He just who he is and he does what he does.  It's just no
11     more to really say, just that he is cruel.  He speaks bad.
12     But, you know, the thing about it is, sometimes he'll act
13     nice, you know.  He not always bad all the time.  But then
14     he'll -- you'll hear him say something else later on.
15     Like I say, that's just part of your job.  You have to
16     just take it or leave it.
17 Q.  Can you think of anything else that Dave did that was
18     cruel other than what you've told me about today?
19 A.  No.
20 Q.  Can you think of anything else, any other situation in
21     which he spoke bad other than what you told me about
22     today?
23 A.  No.
24 Q.  I want to go back a little bit to our discussion about
25     Mr. Straw telling you to go talk to the EEOC.  And you had



1      some -- we had some testimony today from you about how you

2      would send things to the EEOC and had some frustrating

3      conversations and frustrating situation with respect to

4      that.  Do you recall that testimony?

5   A.  Yeah.

6   Q.  What the EEOC did or didn't do, that wasn't Mr. Straw's

7      fault, right?

8   A.  Right.

9   Q.  And it looks to me like there was not a second charge of

10     discrimination for you.  Do you agree with that?

11  A.  Yeah, I agree with that.

12  Q.  And that wasn't Mr. Straw's fault that there wasn't a

13     second charge --

14  A.  No.

15  Q.  Other than what you've already talked about today, are you

16     aware of any other facts or evidence that shows that you

17     were treated less favorably because of your sex?

18  A.  If I'm saying the right thing, I just believe because I

19     didn't -- because I didn't join in on all the things that

20     they were doing in and out of the offices and carrying on.

21  Q.  Joining in what way?

22  A.  Joining in the things that they were doing and in the

23     office and closed in and singling themselves off from the

24     other security.

25  Q.  Are you talking about your earlier testimony when Danielle



1    would go in and they would laugh?

2    A.   Laugh and talk and all that.

3    Q.   So it's your testimony today that you believe because you

4         didn't participate in going in the office and laughing,

5         that wasn't -- that was an example of discrimination

6         against you?

7              MR. DIXON:   Objection.   That misstates her

8         testimony.   She was in the process of saying more

9         than just laughing, and that's when you started

10        asking your question.   So that misstates the

11        testimony.

12   BY MS. MAHONY:

13   Q.   And I don't mean to do that.   I asked you if you were

14        aware of any facts or evidence that you were treated less

15        favorably because of your sex.   And I believe, and correct

16        me if I'm wrong, you said I didn't join in with them.   And

17        so my question is how does not joining in with them mean

18        that you were treated less favorably because of your sex?

19   A.   Because I didn't get with them, with their little group

20        and talk and laugh and talk about other security officers

21        and all the little things that they were doing.   I didn't

22        get involved with it.

23        So I started -- so they didn't want me talking to

24        people.   They treated me different because of that.   I

25        couldn't talk to people.   I couldn't leave my post when it



1   was time to go early like I formerly had been doing.  Just

2   those things were changing.  I couldn't even make

3   decisions sometimes anymore.

4  Q.  Tell me about a situation in which you couldn't make a

5   decision.

6  A.  There was a young lady.  I think she was about 18, and she

7   was pregnant.  And she came to the library with a little

8   lap dog.  And when she came in the library, I guess her

9   car was being repossessed.  And her dog was in there.  So

10   the people who repossessed the car came inside to look for

11   her.

12        And when they found her, they told her to come and

13   get her little puppy because we're going to repossess your

14   car.  And so she went back out there with them and then

15   the patron came in and said there's a young lady lying

16   stressed out in the parking lot, and she got a little

17   puppy in her hand.  And I'm afraid she's going to get hit

18   by a car.

19        So I left my post to go out and see.  And that was

20   the same young lady.  She was all distressed, crying.  And

21   I went over and talked to her.  And she was really crying.

22   I said, "Come on.  Get up and come on inside.  Come on."

23   She said, "I called my dad.  I'm waiting for my dad."

24   "Okay.  Come on."  I didn't want her to get hurt.

25        So I walked her inside.  And we have some chairs



1    right in front of the library, some seats, and you can sit

2    right there.  I said you sit right here and wait until

3    your dad come.  She did have a little puppy.

4        And Robert came up and he was angry, and, "Why did

5    you let her come in here?  She got a puppy."  And he went

6    over to the girl and told her to get out, go stand outside

7    with your dog.  I felt really bad because I made a

8    decision there.  I'd been making decisions there as long

9    as I've been there, and he called me across the room,

10   "Officer Sconiers, no dogs in here."  That's the way he

11   said it.

12 Q.  So Mr. Sanders overruled you because she had a little

13   puppy?

14 A.  Yes.  The puppy was so little, and she was distressed and

15   pregnant.  I was trying to look out.  I said, "You stay

16   right here and keep him in your lap."  And I stayed where

17   I was, and he just overruled all that.

18 Q.  And Mr. Sanders was your supervisor?

19 A.  Yes.

20 Q.  All right.  Are you aware of any other facts or evidence

21   that shows that you were treated less favorably because of

22   your sex other than everything you told me today?

23 A.  Not at this point.

24 Q.  Is there anything you can do to identify any other facts

25   or evidence that show that you were discriminated against



1         based on your sex by the library?

2    A.   Right now that's it.

3    Q.   At any other time other than right now, is there anything

4         else you can do to determine any other facts or evidence

5         showing that you were treated less favorably by the

6         library because of your sex?

7    A.   I'm sure if I laid down and thought about it, I can think

8         of more things.

9    Q.   And if you do, would you send that to your lawyer and ask

10        him to send that to me?

11   A.   I will.

12   Q.   Okay.  and I think you testified earlier that you do not

13        think you were discriminated against based on your age; is

14        that correct?

15   A.   Well, like I say, I've had some things said about my age,

16        you know, by Dave Woodcox, "You're old."  But I don't

17        think -- if that's to the discrimination, yes.  Really, he

18        didn't have any business, you know, saying, "She's younger

19        than you," or, "You're old.  Are you the same age as I

20        am?"  He just made jokes like that.  He continued to do

21        it, and he still would do it.

22   Q.   Other than those comments, are you aware of any other

23        facts or evidence that would show that you have been

24        discriminated against by the library because of your age?

25   A.   No.



1   Q.  No one at the library said you were being discriminated

2       against based on your age, did they?

3   A.  No.

4   Q.  And no one at the library said you were being

5       discriminated against based on your sex, right?

6   A.  No.

7   Q.  And no one at the library said you were being retaliated

8       against for any reason; is that correct?

9   A.  Yes, correct.

10  Q.  Okay.  And I want to ask these questions in a different

11      way.  Do you agree that no one at the library said you

12      were being discriminated against based on your age; do you

13      agree with that?

14  A.  Yes.

15  Q.  Do you agree that no one at the library said you were

16      being discriminated against based on your sex?

17  A.  Yes.

18  Q.  Is there anything other than what we've talked about

19      today, what you testified to today that you perceive as

20      harassment other than what we talked about today?

21  A.  No.

22  Q.  Do you think you're still being harassed at the library?

23  A.  No.

24  Q.  When did it stop?

25  A.  Shortly after, shortly after Danielle, after Robert and



1       Danielle left.  But it's not all the way.  Dave is still

2       there.  So he still does his thing, and it's just

3       something I'm living with.  But after the things with the

4       rudeness coming from her and him going along with

5       everything, that stopped.

6    Q. When did they leave?  Are you talking about Robert Sanders

7       and Danielle Alexander?

8    A. Danielle Alexander, I think she left -- I'm not quite

9       sure -- maybe eight or nine months ago.  Robert Sanders I

10      think it's been over a year.

11   Q. Okay.  Are you aware of any other individuals who might

12      have information or evidence related to your treatment at

13      the library other than the three people that you

14      identified, Mr. Sanders, Ms. Alexander, and Mr. Woodcox,

15      and the various people you talked about in your deposition

16      today, anybody in addition to those people that you think

17      might have facts or evidence related to your treatment at

18      the library?

19   A. There are people that just work at the library.  The

20      people that work there, in passing, people always knew

21      that something was going on.

22   Q. What people would have facts or evidence?

23   A. I don't have any specific names.

24   Q. Okay.  Are there any people that might have facts or

25      evidence other than what you talked about today related to



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 182 of 221

BRENDA SCONIERS                                     May 07, 2015
SCONIERS vs. STRAW                                           182

1        your complaints about Mr. Straw?

2   A.   Joseph Kiama.

3   Q.   Anything else?

4   A.   Thomas.

5   Q.   Who?

6              MR. DIXON:  Me.

7   BY MS. MAHONY:

8   Q.   Your lawyer.  Anybody else?

9   A.   No.

10  Q.   Your complaint alleges that you suffered damages because

11       of Mr. Straw.  Do you agree with that?

12  A.   Yes.

13  Q.   Do you think you've been harmed by what Mr. Straw did or

14       did not do?

15  A.   Harmed in what way?

16  Q.   That's my question for you.

17  A.   Yes.

18  Q.   How?

19  A.   He said he was going to do something, and he started it

20       out and then he just -- he let me down, and then he didn't

21       even let me know.

22  Q.   And how did that harm you?

23  A.   It harmed me in a way because it didn't make me feel good

24       about trust, who I could trust now and then after he

25       started to -- after he started to e-mail me that, I got



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 183 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          183

```
 1       nervous.
 2   Q.  What made you nervous?
 3   A.  Because I didn't know what he was going to do.  He said he
 4       had disabilities and I was going after him because of
 5       that.  And I just thought that was just strange.  I didn't
 6       know anything about -- that was not a true statement.
 7   Q.  What was not a true statement?
 8   A.  That he said that I was going after him.
 9   Q.  And that made you nervous?
10   A.  Yeah.  It made me nervous since he e-mailed, yeah.
11   Q.  Anything else?
12   A.  No.
13   Q.  Do you have any financial losses that you believe were
14       caused by Mr. Straw?
15   A.  Well, as far as I'm concerned, I was expecting something
16       from a settlement, and if not, a trial attorney that he
17       was supposed to get for me.  So, yeah, I feel like there's
18       a loss.
19   Q.  So the financial loss was based on the lawsuit for your
20       charge of discrimination that you filed with the EEOC?
21       That's the financial loss?
22   A.  Yes.
23   Q.  That you believe was caused by Mr. Straw?
24   A.  Yes.
25           MR. DIXON:  Can we take a break?
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 184 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           184

```
 1                  MS. MAHONY:  Sure.

 2                  (Recess taken.)

 3    BY MS. MAHONY:

 4    Q.  Any other financial losses other than what you've already

 5        testified that you believe were caused by Mr. Straw?

 6                  MR. DIXON:  Well, I mean, obviously this matter,

 7             right?  I think you're accessible to my fee

 8             agreement, right?

 9    A.  I just got his --

10    Q.  Have you ever paid Mr. Dixon anything?

11    A.  No.

12                  MR. DIXON:  Yes, you have.  Didn't you pay me a

13             retainer?

14                  THE WITNESS:  Yes, I did.

15                  MR. DIXON:  I think it's a retainer, plus on a

16             contingency basis.

17    Q.  How much was the retainer?

18    A.  $1,500.

19    Q.  You were never demoted from the library, right?  Is that

20        right?  Is that correct?

21    A.  Well, not physically.

22    Q.  Demoted means you got a lesser job, that you were reduced

23        in job.

24    A.  No.

25    Q.  Is that correct?
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 185 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           185

1   A.  That's correct.

2   Q.  You didn't apply for any promotions that you didn't get;

3       is that correct?

4   A.  That is correct.  I did not.

5   Q.  You didn't apply for any promotions?

6   A.  No.

7   Q.  And your pay went up every year, right?

8   A.  Yes.

9   Q.  So you didn't lose any pay as a result of what Mr. Straw

10      did or didn't do, right?

11  A.  No, except for I didn't gain any either like he said I was

12      going to.

13  Q.  What he hoped you would get, right?

14  A.  Right, what he hoped.  I was banking on -- I was looking

15      forward to it though.

16  Q.  That's a mistake to promise your clients things.

17  A.  Uh-huh.

18  Q.  And you didn't lose any employee benefits from the library

19      as a result of what Mr. Straw did or didn't do?

20  A.  No.

21  Q.  Other than what you already talked about, did you have any

22      other emotional pain or suffering other than what you

23      already talked about?

24  A.  Pain and suffering from?

25  Q.  Emotionally from any of this?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 186 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           186

1   A.  Yes.

2   Q.  In addition to what we already talked about?

3   A.  Yes.

4   Q.  What?

5   A.  To keep going on, to keep carrying it on.  It just

6       stresses me out.

7   Q.  Keep going on in what way?

8   A.  Keep going on to have to talk about this again and think

9       about what happened.

10  Q.  So your emotional pain is the steps of this lawsuit; is

11      that correct?

12  A.  (Nodding.)

13  Q.  I see you nodding your head.

14  A.  Yes.  Yes.

15  Q.  Any other emotional pain?

16  A.  No.

17  Q.  Other than this lawsuit?

18  A.  No.

19  Q.  Okay.  Any other mental anguish or loss of enjoyment of

20      your life other than what you talked about today?

21  A.  It really is different at work because -- and sometimes I

22      just wonder if they still feel the same way about me.

23  Q.  What makes you wonder that?

24  A.  I don't know.  Because I let them know what was going on.

25  Q.  And when you say "they feel the same way about me," you're



1    talking about the library?

2    A.  Yeah.  Administration, yeah.  I know that the people I

3        work with, you know, I feel okay with them.  But sometimes

4        I just wonder about the administration.

5    Q.  Has the administration done or said anything that would

6        make you think they don't feel the same way about you?

7    A.  It don't feel the same.

8    Q.  You don't feel the same?

9    A.  No.

10   Q.  Have you ever seen any health care provider for emotional

11       pain or anguish, mental anguish, loss of enjoyment of your

12       life?

13   A.  Yes.

14   Q.  Who is that?

15   A.  It's EAP.

16   Q.  And what's that person's name?

17   A.  I can't think of it right now.  I can't think of her name

18       right now.

19   Q.  Do you know what kind of a health care provider she is?  I

20       heard you say "she."

21   A.  It was a mental whatever it is.

22   Q.  Do you know if it was a psychologist or licensed clinical

23       social worker?

24   A.  I think she was a social worker, psychology.  I don't

25       remember.



1   Q.  How many times did you see her?

2   A.  About six times.

3   Q.  Are you continuing to see her?

4   A.  No.

5   Q.  When did you stop seeing her?

6   A.  It was back 2000, I don't know, '12 or '13 sometime.

7   Q.  Was that while Andrew Straw was still your attorney that

8       you were seeing this social worker?

9   A.  I don't think so.  I don't remember.

10  Q.  Mr. Dixon, your lawyer here, also represents you in the

11      federal action where Mr. Straw sued you, right?

12              MR. DIXON:  No.

13              MS. MAHONY:  No, that's not right?

14              MR. DIXON:  I couldn't because I was a named

15          party.

16  BY MS. MAHONY:

17  Q.  Who represents you in the federal court action, if anyone,

18      where Mr. Straw sued you?

19  A.  Who did what?

20  Q.  Do you have a lawyer in the lawsuit where Mr. Straw sued

21      you in federal court?

22  A.  Do I have a lawyer?

23  Q.  That's the question, yes.

24              MR. DIXON:  In that federal case where he sued

25          you as a defendant.



1              THE WITNESS:  That's dismissed, isn't it?

2              MR. DIXON:  Yeah.

3   A.  That's dismissed.

4   BY MS. MAHONY:

5   Q.  Did you have a lawyer?

6   A.  No.

7   Q.  Did you pay anybody any money for that?

8   A.  No.

9   Q.  Do you have any expenses that you've incurred because of

10      what Mr. Straw did or did not do, other than the $1,500

11      retainer that we talked about?

12  A.  No.

13  Q.  I want to get the sex and race and approximate age of the

14      people we've talked about.  Mr. Sanders is an

15      African-American male, right?

16  A.  Yes.

17  Q.  Do you know his approximate age?

18  A.  He's been gone for --

19              MR. DIXON:  Don't speculate.  If you know, you

20          know.  If you don't, you don't.

21  Q.  If you know approximately.  Don't guess, but if you know

22      approximately, you know, between 50 and 60 or 12, and you

23      know he's not 12 --

24  A.  Between 55 and 60.

25  Q.  Okay.



1   A.  Or he might be older than that, really.

2   Q.  Or older.  Okay.  All right.  Larry Bennett, male,

3       African-American, Caucasian?

4   A.  Yeah.

5   Q.  Approximate age?

6   A.  65.

7   Q.  I understand that you probably aren't going to know the

8       exact age of any of these people, so that's why I asked

9       the approximate.  Blake Harris?

10  A.  40.

11  Q.  Male, I assume?

12  A.  Male, white, 40.

13  Q.  Joseph Kiama you told me was an African male.  What's his

14      approximate age?

15  A.  About 40.

16  Q.  Mr. Woodcox, I think I saw a picture of him that he was a

17      Caucasian male?

18  A.  About 58.

19  Q.  Danielle Alexander, African-American, black female?

20  A.  Yeah.

21  Q.  What's her approximate age?

22  A.  I'll say 40.

23  Q.  I understand that you don't know precisely.  Donica,

24      what's Donica's last name again?

25  A.  H-a-g-l-e-r.



1   Q.  And female, Caucasian or black?

2   A.  She's a black female.

3   Q.  Her approximate age?

4   A.  47.

5   Q.  Deb Futa, female, Caucasian, black?

6   A.  She's Caucasian.

7   Q.  What's her approximate age?

8   A.  59.

9   Q.  Connie Nicely?

10  A.  Hispanic.

11  Q.  Hispanic female?

12  A.  And she's 70s.

13  Q.  Good for her to still be working.

14  A.  You better believe it.  You better see her when it's time

15      for her to fire somebody, here she come.

16  Q.  Good for her working at 70.  I don't want to be working at

17      70.

18  A.  I'm telling you.  When you see her coming, you know it's

19      trouble.

20  Q.  Sounds like you respect Connie Nicely?  No?  You do

21      respect Connie Nicely?

22  A.  I heard a noise.

23          Yeah.  She's just a little, tiny lady.  And she's got

24      her son's daughters that she raising, two little girls,

25      you know.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 192 of 221

BRENDA SCONIERS                          May 07, 2015
SCONIERS vs. STRAW                                  192

1   Q.  Bruce Burnett, male?

2   A.  He's a male.

3   Q.  Caucasian?

4   A.  Caucasian.

5   Q.  Caucasian, okay.  Approximate age?

6   A.  59.

7   Q.  You know these better than I thought.

8   A.  Every day I sit right there and see people go by every

9       day.  And you hear them talk about their birthdays and

10      their ages.  So some of the stuff sticks.

11  Q.  I bet a lot of it sticks.

12  A.  Sometimes I feel like the computer when it has too much in

13      it and it's about to crash, all the names of all the

14      employees and all the patrons that you try to remember

15      that know you, but you don't know them, you know.

16  Q.  Because there's a lot of them and only a few of you?

17  A.  Yes, it is.

18  Q.  Brenda, remind me, tell me who Brenda is.

19  A.  Oh, hey.

20  Q.  Sorry, I thought there was another Brenda.  I know your

21      name is Brenda.

22  A.  That's me.

23  Q.  I'm going through my notes.

24  A.  That's Brenda.

25  Q.  All right.  Now I just need to look.  I apologize if



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 193 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                              193

1       you've already answered this.  Do you know when Danielle
2       started at the library?
3  A.   It was sometime --
4  Q.   Is that the one you thought was maybe 2009?
5  A.   No.  It was in March.  So let me see.  I have it.  It
6       should be --
7  Q.   Was that the one that was March 2012?
8  A.   Uh-huh, right.
9  Q.   Thank you.  Sorry about that.
10 A.   That's okay.
11 Q.   All right.  I just need to look through this one more
12      time, make sure I've asked everything I need to ask.
13           So the only action, negative action that the library
14      took against you was that disciplinary letter, Defendant's
15      Exhibit 4; is that correct?
16 A.   You mean as far as writing me up?
17 Q.   As far as anything negative that the library -- you didn't
18      have any demotions, and the only action they took against
19      you -- I understand you think some people didn't treat you
20      well, Mr. Woodcox and Danielle.  But the only employment
21      action they took against you was Defendant's Exhibit 4,
22      this write-up in July of 2012; is that correct?
23 A.   Yeah.  For this stuff, yeah.
24 Q.   For anything, you never had any --
25 A.   It seems like to me they spoke to me about it, yeah.



1   Q.  And who is "they"?

2   A.  The same, Woodcox.

3   Q.  Mr. Woodcox spoke with you about this write-up,

4       Defendant's Exhibit 4?

5   A.  Uh-huh.

6   Q.  Okay.  So other than speaking to you about the

7       disciplinary write-up in Defendant's Exhibit 4 and issuing

8       you this disciplinary write-up, that's the only employment

9       action that the library took against you at any time,

10      correct?

11  A.  Yeah.

12  Q.  That's correct?

13  A.  Uh-huh.

14  Q.  Yes?

15  A.  Yeah, that's correct.

16  Q.  Okay.

17              MS. MAHONY:  I don't have anything further.

18              MR. DIXON:  I don't have too many questions, but

19          I have a few for you.

20              MS. MAHONY:  Can you hold on one second?  Thank

21          you.  Sorry about that.

22              MR. DIXON:  That's okay.

23                      CROSS-EXAMINATION

24  BY MR. DIXON:

25  Q.  Did you want to take a break, or are you ready to go?  I



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 195 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                        195

1      won't have more than ten minutes worth of questions for

2      you.

3   A.  We can do it.

4   Q.  I'm going to point over here to Angela to make sure she

5      hears you.  Some of this is just going to be clarifying

6      some of your responses from your direct testimony.

7          Did you indicate in your direct testimony that

8      Danielle Alexander -- whose office was Danielle Alexander

9      in and out of all day long?

10  A.  There was Dave Woodcox, mainly.  That's the one in the

11     maintenance office, and Robert Sanders.

12  Q.  I think you testified that Danielle flirted with Robert,

13     and he wouldn't do anything about it, and she flirted all

14     day long.  Was she also flirting with Dave Woodcox?

15  A.  Yes.

16  Q.  Did he ever do anything to stop her from flirting with him

17     or with anyone else?

18  A.  No.

19  Q.  How did Dave Woodcox respond to her flirtations?  How did

20     he respond to her flirtations?

21  A.  He laughed and he gave her massages and --

22  Q.  Would it be fair to say that he participated in the

23     flirtation?

24  A.  Yes.

25  Q.  Did Dave Woodcox ever give any other employees massages



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 196 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          196

1       that you're aware of?

2   A.  No, I never seen him do it.

3   Q.  When Dave Woodcox took Danielle Alexander out to lunch on

4       her birthday, was there anyone else who was brought in

5       from security to cover for Danielle not working security?

6   A.  No.

7   Q.  Did he ever take anybody else out on their birthday or any

8       other special occasions?

9   A.  Not to my knowledge.  He could have, but I don't know.

10  Q.  I may have just asked you this.  Did he ever take you out

11      to lunch?

12  A.  No.

13  Q.  You indicated late in the deposition that you felt that

14      you were treated badly because you didn't join in.  Do you

15      remember testifying to that?

16  A.  Yes.

17  Q.  When we talk about joining in, does that include the

18      flirtation that was going on?

19  A.  Yes.

20  Q.  When this flirtation was going on, were you and/or Joseph

21      Kiama responding to it?  Did you talk to anybody about it?

22  A.  I'm sure -- not anybody in administration, I didn't.

23      Well, once I asked Dave -- I mean Deb Futa if she knew

24      what was going on in here, and she said yeah.  But we

25      didn't go into anymore details.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 197 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          197

1   Q.  As far as you know, did Joseph also get written up for

2       talking with you excessively?

3   A.  Yes, he did.

4   Q.  And as far as you know, did Joseph -- how did Joseph

5       respond to the flirtation that was going on when Danielle

6       Alexander arrived?

7   A.  Well, he talked to Robert also.  He talked to Robert and

8       asked him why was it going on, why did she get so many

9       privileges.  And in the end, he wrote a letter and he sent

10      it out to the administration.

11  Q.  And did you ever see the letter?

12  A.  Yes.

13  Q.  Did it have anything to do with the flirtation and all

14      that stuff that you've testified to earlier?

15  A.  Yes.

16  Q.  Take a look at what's been marked as Exhibit 1,

17      Defendant's Exhibit 1, very first document.

18          MS. MAHONY:  It's this one.

19  BY MR. DIXON:

20  Q.  Did you talk with this Nancy Marie O'Brien about the

21      Robert Sanders incident, touching your rear?

22  A.  Yes.

23  Q.  Did she say anything about why that specific incident was

24      not included in this write-up?

25  A.  No.  She didn't say.  And, in fact, I was supposed to be



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 198 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          198

1       talking to another person that was the investigator; and

2       she had more information with them, who I never heard

3       from.

4    Q. When you looked at this document before you signed it, did

5       you ask Nancy O'Brien anything about why it didn't include

6       anything with regard to Robert Sanders?

7    A. No.  I didn't because I know that she had wrote a -- typed

8       out a bigger letter.  So I just thought maybe this was the

9       head.  No, I didn't ask her.

10   Q. What did she say about what was going to happen with

11      regard to the investigation of Robert Sanders touching

12      you?

13            MS. MAHONY:  Objection, assumes facts not in

14         evidence.

15   A. She told me I would be receiving a letter from the EEOC

16      after I signed this.

17   BY MR. DIXON:

18   Q. Did she say anything about another investigator getting in

19      touch with you?

20   A. She said another investigator from Indianapolis would be

21      getting in touch with me.  And any other information that

22      I had, I could share with them and she would be contacting

23      me.

24   Q. Now, there are several mistakes, are there not, in this

25      write-up?



```
 1              MS. MAHONY:  Just for clarification, are we
 2          talking about Defendant's Exhibit 1 still?
 3              MR. DIXON:  Yes.
 4   BY MR. DIXON:
 5   Q.  Defendant's Exhibit 1 there are several mistakes in there.
 6       You mentioned some already.
 7   A.  Yes.
 8   Q.  Let's look in the third line where it says, "Everything
 9       had been going along just fine until March of 2012."
10   A.  Yes.
11   Q.  That's a mistake; is it not?
12              MS. MAHONY:  Just for my clarification, what part
13          of that are you saying is a mistake?
14              MR. DIXON:  The report of everything going along
15          just fine.
16   Q.  If you reported to her that Robert grabbed your rear-end
17       in December of 2011 --
18   A.  Right.
19   Q.  Then everything wasn't going along fine, was it?
20   A.  Right.  That's true.
21   Q.  Weren't you still waiting for the library to have some
22       formal response to you about Robert's actions at that
23       point?
24   A.  Yes.
25   Q.  And then the name Daniel obviously is misspelled.  It's
```



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 200 of 221

BRENDA SCONIERS                                        May 07, 2015
SCONIERS vs. STRAW                                            200

 1      Danielle, correct?

 2  A.  True.  Yes.

 3  Q.  Hold on.  There's not a question in front of you.  And we

 4      already talked about this being a sentence run-on near the

 5      bottom where it says, "After this, Dave Woodcox and Bruce

 6      Burnett, assistant maintenance supervisor, male," and it

 7      doesn't say anything after that, right?

 8              MS. MAHONY:  Well, objection.  It does.  It's a

 9          comma.  It says something that doesn't make a lot of

10          sense, but it does say something.

11  BY MR. DIXON:

12  Q.  It doesn't talk about -- what follows that doesn't talk

13      about anything that Dave Woodcox or Bruce Burnett

14      specifically did, right?  Let me strike that.

15          If you read -- let's read this sentence, "After this,

16      Dave Woodcox and Bruce Burnett, assistant maintenance

17      supervisor, male, I feel that I have been discriminated

18      and retaliated against due to my sex, female."  Do you see

19      that?

20  A.  Yes, I see that.

21  Q.  Were you trying to report to Ms. O'Brien that you felt

22      that Dave Woodcox and Bruce Burnett were also trying to

23      discriminate and retaliate against you?  I mean, we're

24      just trying to make sense of that sentence, or is it not

25      possible to make sense of that sentence?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 201 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          201

```
 1   A.  I'm not sure what she was trying to write there.  I'm not

 2       sure.

 3   Q.  Well, let's do it this way:  The sentence before says,

 4       "When he came back," meaning Robert Sanders, your

 5       immediate supervisor, "I informed Robert what happened,

 6       and he told me that he did not have any reason to write

 7       up."  Does that mean that Dave Woodcox did not have any

 8       reason to write you up?

 9   A.  Right.  That's how I -- that's what I told her, but she --

10   Q.  And did Robert actually say that to you?

11   A.  Yes, he did.

12   Q.  And then, if we're not looking at this document, after

13       Robert said that to you, that Dave Woodcox did not have

14       any reason to write you up, what did Dave Woodcox and

15       Bruce Burnett do?

16           Let me ask this:  Did he withdraw, did Woodcox

17       withdraw the write-up?

18   A.  No.

19   Q.  Did he treat you better at work after this was filed?

20   A.  No.

21   Q.  Did you include the things you've shared today about the

22       flirtatious nature of Danielle Alexander when you talked

23       with Nancy O'Brien?

24   A.  Yes.

25   Q.  Okay.  And did you share the way you shared today with the
```



1    people who were participating in that, including Dave

2    Woodcox?

3  A.  Did I share?

4  Q.  Share with her that Dave Woodcox was participating in it?

5  A.  Yes.

6  Q.  Now, let's look at Defendant's Exhibit 8.  Can you look at

7    paragraph 2 on the second page?  Can you read paragraph 2

8    into the record out loud, please?

9  A.  "We recognize that I am not a trial lawyer.  And if this

10    needs to head to trial, you'll need someone to do those

11    tasks.  If that is the case, I will seek another attorney

12    to assist with this portion of the representation."

13  Q.  Is there anything in that sentence that you just read that

14    indicates that Mr. Straw was withdrawing from

15    representation if you were going to trial?

16        MS. MAHONY:  Objection, the document speaks for

17        itself.

18  A.  No.

19  BY MR. DIXON:

20  Q.  Look at now, read the next sentence, which is still part

21    of paragraph 2, but looks like it's sort of separated as a

22    separate paragraph.

23  A.  "Whether we gain sole job benefit of increased salary

24    through negotiations or litigation, if you are successful

25    in this, my fee is $2,000 payable, $200 monthly for ten



```
 1        months."
 2   Q.   So when he indicated whether or not you'd gain benefits
 3        through negotiation or litigation, did that indicate to
 4        you that he was continue -- that he was going to litigate
 5        this case for you?
 6   A.   Uh-huh, yes.
 7   Q.   Now, look at paragraph 3.  Can you read the first sentence
 8        of paragraph 3?
 9   A.   "The representation ends when the library settles or a
10        trial result happens."
11   Q.   Again, did that indicate to you that he would litigate the
12        case all the way up to trial, at which time he would get
13        some assistance?
14   A.   Yes.
15   Q.   Did Mr. Straw ever tell you when you met with him in
16        September of 2012 or any time thereafter that he's not
17        capable of actually filing a lawsuit?
18   A.   No.
19   Q.   Did his failure to file a lawsuit on your behalf take away
20        your rights to bring that lawsuit on your behalf?
21   A.   Yes.
22   Q.   Did it take away your right to seek justice for what had
23        happened to you against the library?
24   A.   Yes.
25   Q.   As part of your fee agreement with me, is it true that
```



1    you're also responsible for the outside costs of

2    litigation, such as the filing fee and deposition costs

3    and that sort of thing?

4  A.  Could you repeat that, please?

5  Q.  In your fee agreement with me, are you -- isn't it true

6    that you are also responsible to pay for outside costs?

7  A.  Yes.

8  Q.  Such as filing fees and deposition costs?

9  A.  Yes.

10  Q.  You understand that Angela has to get paid for her work

11    today, right?

12  A.  Well, I think she look like she don't need any money.

13    Yes.

14         MS. MAHONY:  She might disagree with you.  Pro

15      bono, we're going to use you a lot.

16  BY MR. DIXON:

17  Q.  And if there are other depositions that we have to take in

18    this case, that the cost of that will be your

19    responsibility?  You understand that, right?

20  A.  Yes.

21  Q.  What was your work environment life like before Robert

22    Sanders grabbed your rear-end or touched your rear-end?

23  A.  My work environment was very professional, very easy going

24    and I just enjoyed it so much.

25  Q.  And since that time, how would you compare what your work



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 205 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          205

1      environment has been since that time?

2   A.  My work environment has really changed.  It's not the same

3      anymore.  And I realize that it will never be the same.

4   Q.  How do you approach your work, or tell me how it was -- I

5      mean, I guess emotionally how was your -- how were you

6      emotionally when you went to work before this happened as

7      compared to what it's like a typical day going into work

8      now?

9   A.  Well, I really looked forward to going to work, and it was

10      really nice to have a job where you enjoy going to, and

11      their events also that I would do for the library.

12      Sometimes the events that they have, they would include

13      me.  And I just looked forward to being there and to -- be

14      vested in the company in my ten years, that was one thing

15      I was really looking forward to, and to retire, to retire

16      there also.

17  Q.  And how is your work environment now?  How are you

18      emotionally when you go into work now?

19          And when I say now, I mean from the point of the

20      incident with Mr. Sanders forward.

21  A.  Well, like I said, it will never be the same.  I just

22      don't feel the same.  But I try to go without giving up.

23      But I just never feel the same about it.

24  Q.  Do you enjoy work now?

25  A.  I do enjoy the work because I like the job.  But as far as



1   the atmosphere -- and, like I said, with the human

2   resource and all, I just -- I just don't feel the same.

3   Q.  Is work harder or easier or the same as it was before?

4   A.  It's not the same as it was before.

5   Q.  Okay.  I'm asking.  This is your opportunity to explain --

6   A.  It's not the same.

7   Q.  -- what it was like before this happened, and what it's

8   like now.

9   A.  Well, before it was like -- I got trained by Larry Bennett

10  the very professional way to work security, you know.  And

11  that's how we kept things.  And we knew when things were

12  coming up, any changes.  We knew ahead of time if there

13  were changes.

14      It's just a whole different thing now.  It's a whole

15  different job now.  I still go there because, like I said,

16  I'm vested in the company.  And that's just about the most

17  that I could think of.  I'm vested, but just keep going.

18  It's not the same after all of the disruptions and the

19  rudeness and all.  It's just not the same.

20  Q.  Looking very quickly at Defendant's Exhibit 4, which is

21  the write-up from Mr. Woodcox, 7-25-2012, it indicates

22  below that you refused to sign.  Did you refuse to sign

23  this?

24  A.  Yes.

25  Q.  Now, do you believe that this write-up was in retaliation



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 207 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           207

1      for you standing in opposition to the flirtatious

2      environment that existed at the -- in the security

3      department?

4              MS. MAHONY:  Objection, leading.

5  BY MR. DIXON:

6  Q.  You can answer.

7  A.  Yes, I do.  I believe also that because of the other

8      employee, Joseph Kiama, reporting it more and I was still

9      a coworker to him and I didn't turn against them as the

10     other ones did, I believe that's the reason why I got

11     written up.  Right now I still work and I still do the

12     same thing.  He's not writing me up.  He sees me there.

13     And I talk to people all the time.

14          That's what I do at work.  I talk.  I talk to

15     patrons.  They come in, senior citizens, little kids.  And

16     as long as I need to hold a conversation with them to help

17     them make their day through, that's what I do.  And he's

18     not writing me up.

19              MR. DIXON:  Okay.  You've answered my question.

20          Thanks.  I don't have any other questions.

21              MS. MAHONY:  I do have a few follow-up, not many.

22                      REDIRECT EXAMINATION

23  BY MS. MAHONY:

24  Q.  You testified in response to a question from your lawyer

25      that Dave Woodcox didn't do anything about Danielle



BRENDA SCONIERS                                     May 07, 2015
SCONIERS vs. STRAW                                          208

1        flirting.  Do you recall that testimony?
2   A.   Yes.
3   Q.   You haven't seen Danielle's personnel file, correct?
4   A.   No.
5   Q.   It's not correct, you have seen Danielle's personnel file?
6   A.   I have not seen Danielle's personnel file.
7   Q.   So you don't know if she got written up for any of her
8        behavior?
9   A.   I've heard her say she got written up before.
10  Q.   So you do have reason to believe she was written up for
11       her behavior?
12  A.   Yes.
13  Q.   Have you ever seen Dave Woodcox's personnel file?
14  A.   No.
15  Q.   And so it's correct that you don't have any reason to know
16       whether he was reprimanded in any way for any of his
17       conduct, correct?
18  A.   Well, there was one time when I did have him to go to a
19       meeting, to the human resource office with me so that I
20       could talk to the human resource manager along with him
21       about some things.  And he was there, and I let them know
22       what was going on at the time.
23  Q.   What did you let them know was going on?
24  A.   It was something going on.  I went up there and asked
25       Connie if we could all meet together.



1   Q.  What was going on?

2   A.  I don't remember.  But we met together and whatever, we

3       met -- whatever the reason was we met, when we talked

4       about it in front of human resource, he denied it.  And

5       then as time went on, he admitted to whatever it was.  I'm

6       not sure what it was.  But I don't know how his files look

7       or if she put anything in his file.  No.

8   Q.  So Mr. Woodcox first denied -- so as I understand this,

9       you went to talk to HR with Mr. Woodcox, about a complaint

10      about Mr. Woodcox?

11  A.  Yes.

12  Q.  That's correct?

13  A.  Yes.

14  Q.  And at first Mr. Woodcox denied what you were complaining

15      about?

16  A.  Right.

17  Q.  And then he admitted it?

18  A.  Right.

19  Q.  He admitted it to HR?

20  A.  Right.

21  Q.  Okay.  Have you seen Robert Sanders' personnel file?

22  A.  No.

23  Q.  So it's correct to say that you don't know whether he ever

24      had any consequences for any of his conduct; is that

25      correct?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 210 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                          210

1   A.  I know that something happened once.  I didn't see his

2       file, but I know that he had three days off.

3   Q.  Suspended for three days?

4   A.  Suspended for three days.

5   Q.  And you don't know what that was about?

6   A.  No.

7   Q.  Did you hear rumors what that was about?

8   A.  I think I remember him saying because he wasn't doing his

9       work correctly.

10  Q.  Okay.  You heard him say that?

11  A.  Yes.

12  Q.  But you don't really know what it was for?

13  A.  No, I don't know what it was for.

14  Q.  In response to a question from your lawyer, and I forget

15      what the question was, you talked something about

16      Danielle's privileges.

17          Were those privileges anything other than what you've

18      already told me about today in the deposition?

19  A.  Some of them were, yes.

20  Q.  Were they about anything else?

21  A.  I can't think of them right now.  But the ones I told you

22      were, yeah.

23  Q.  And as you sit here today, can you think of any other

24      privileges that Danielle had other than the ones you told

25      me about today?



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 211 of 221

BRENDA SCONIERS                                    May 07, 2015
SCONIERS vs. STRAW                                           211

1   A.  No.

2   Q.  Okay.  In a response to a question from your lawyer, you

3       talked about what it was like after Robert Sanders touched

4       you.  Do you recall your testimony earlier today when you

5       said that Dave Woodcox has always been cruel?

6   A.  Yes.

7   Q.  And that he was cruel before Robert Sanders touched you,

8       correct?

9   A.  Yeah.  The way that he spoke to people, yeah.

10  Q.  And that didn't change before and after Robert Sanders

11      touching you incident, did it?

12  A.  The way that he was cruel?

13  Q.  He was cruel before; he was cruel after.  That didn't

14      change, correct?

15  A.  Yeah.  But I feel when he started at me, I felt it was

16      getting more.

17  Q.  Was he cruel to you before Robert Sanders touched you?

18  A.  Yeah.

19  Q.  Dave Woodcox was cruel to you before Robert Sanders

20      touched you?

21  A.  He was.

22  Q.  And Dave Woodcox was cruel to you after Robert Sanders

23      touched you?

24  A.  Yes.

25  Q.  And Robert Sanders is gone, correct?



```
 1   A.  Correct.

 2   Q.  And Danielle Armstrong is gone, correct?

 3   A.  Danielle Alexander.

 4           MR. DIXON:  Alexander.

 5   BY MS. MAHONY:

 6   Q.  I'm sorry, Alexander.  Danielle Alexander is gone from the

 7       library, correct?

 8   A.  Yes.

 9   Q.  And you still plan to retire from the library, correct?

10   A.  I don't know.

11   Q.  Do you want to retire from the library?

12   A.  Yeah.

13   Q.  In response to a question from your lawyer, you said the

14       atmosphere now, and you kind of trailed off.  And I got

15       the impression, and I want to know if my impression is

16       correct, that you just feel sad about the things that

17       happened; is that correct?  Is that what's making the

18       atmosphere bad now for you?

19   A.  Yeah, I do feel sad about it.

20   Q.  So the atmosphere being not as good now is because you

21       feel sad about what happened in the past?

22   A.  (Nodding.)

23   Q.  You nodded your head.  Can you please say yes or no?

24   A.  Yes.

25   Q.  Thank you.  Other than Mr. Woodcox, who I think you
```



1        testified is still cruel, is everybody else kind to you?

2    A.  Yeah, it's pretty good.

3    Q.  When was the last time that you recall Mr. Woodcox saying

4        anything or doing anything inappropriate to you?

5    A.  Well, you know after so long, you just look at it as him,

6        you know.

7    Q.  I do know.

8    A.  Just because somebody told me, "Oh, that's just" -- and

9        even he told me that.  He told me don't take everything --

10       how did he say that?  "Don't worry about stuff."

11   Q.  Do you remember the last thing that Dave Woodcox said to

12       you that you thought was inappropriate?

13   A.  It was probably something about me being older.

14   Q.  Do you remember about when that was?

15   A.  No, I don't remember.

16   Q.  And doesn't have anything to do with Robert Sanders, does

17       it?

18   A.  No.

19   Q.  And it doesn't have anything to do with Danielle

20       Alexander, does it?

21   A.  No.

22   Q.  You said, "He's not writing me up."  Did you mean Dave

23       Woodcox when you say "he's"?

24   A.  Yeah, because he's the one who wrote me up.

25   Q.  That's what I thought, but I didn't want to -- I wanted to



BRENDA SCONIERS                                                    May 07, 2015
SCONIERS vs. STRAW                                                          214

1       clarify that.  Okay.

2           I just want to clarify some titles.  Mr. Sanders was

3       a prior security supervisor, correct?

4    A.  Yes.

5    Q.  Mr. Bennett was a prior security supervisor, correct?

6    A.  Yes.

7    Q.  Blake Harris, security officer?

8    A.  Yes.

9    Q.  Current?

10   A.  Yes.

11   Q.  Mr. Kiama is a current security officer, correct?

12   A.  No.  He got fired.

13   Q.  And Mr. Woodcox, do you know his title?

14   A.  He's a maintenance supervisor.

15   Q.  Is he the head person in maintenance?

16   A.  Yeah.  And he's also a security supervisor too.

17   Q.  And Danielle Alexander is a prior security officer,

18       correct?

19   A.  Yes.

20   Q.  Donica Hagler is a security officer?

21   A.  No, she's no longer there.

22   Q.  Okay.  Do you know if she was fired or quit?

23   A.  No, she quit.

24   Q.  And Deb Futa is VP for the library, correct?

25   A.  Yes.



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 215 of 221

BRENDA SCONIERS                                May 07, 2015
SCONIERS vs. STRAW                                        215

1   Q.  And Connie Nicely is the HR manager, correct?

2   A.  Uh-huh.

3   Q.  And Bruce Burnett?

4   A.  He's assistant maintenance supervisor.

5   Q.  Is he also over security?

6              MS. MAHONY:  I have nothing further.

7                    RECROSS-EXAMINATION

8   BY MR. DIXON:

9   Q.  Did the flirtatious atmosphere continue throughout the

10      time that Danielle Alexander was there?

11  A.  Yes.

12  Q.  And did it stop when -- apparently Danielle and Robert

13      left around the same time?

14  A.  Right.

15  Q.  Is that when the flirtation environment ended?

16  A.  He left first, and then she left a little bit after that.

17  Q.  From that time forward, the flirtatious environment, the

18      sexually charged environment has -- it doesn't exist there

19      anymore; is that correct?

20  A.  Yes.

21             MR. DIXON:  I don't have any other questions.

22         And I'm not going to let you go way beyond those if

23         you have any others.

24             MS. MAHONY:  I don't have any.

25             MR. DIXON:  We're not going to waive signature.



1        MS. MAHONY:  I wouldn't let you either.

2        (The deposition concluded and witness excused at

3   3:53 p.m.)

4                   *      *      *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Case 5:22-cv-07718-EJD   Document 22-16   Filed 01/25/23   Page 217 of 221

BRENDA SCONIERS                                          May 07, 2015
SCONIERS vs. STRAW                                              217

1

2                          CERTIFICATE

3

4          I, Angela J. Galipeau, a Notary Public, in and for
    the County of Porter and State Of Indiana, do hereby
    certify:

5

6          That BRENDA SCONIERS appeared before me on
    Thursday, May 7, 2015, and was duly sworn or affirmed to
    testify the truth, the whole truth, and nothing but the

7    truth to questions propounded at the taking of the
    foregoing deposition in a cause now pending and

8    undetermined in said court;

9          That I further certify that I then and there
    reported stenographically the proceedings at the said time

10   and place; that the proceedings were then transcribed from
    my original shorthand notes; and that the foregoing

11   typewritten transcript is a true and correct record
    thereof;

12

13         That I am not a relative or employee or attorney
    or counsel, nor a relative or employee of such attorney or
    counsel for any of the parties hereto, nor am I interested

14   directly or indirectly in the outcome of this action;

15         IN WITNESS WHEREOF, I have hereunto set my hand
    and affixed my notarial seal this 11th day of May, 2015.

16

17

18

19                          Angela J. Galipeau, RPR, CSR
                            Notary Public, State of Indiana

20                          Residence:   Porter County
                            Commission Expires:   4-23-17

21

22

23

24

25



```
 1                        STATE OF INDIANA
 2              IN THE ST. JOSEPH SUPERIOR COURT

 3
     BRENDA SCONIERS,                    )
 4                                       )
                        Plaintiff,       )
 5                                       )
          vs                             ) Cause No.
 6                                       ) 71D07-1310-CT-00265
     ANDREW STRAW,                       )
 7                                       )
                        Defendant.       )
 8   --------------------------------)

 9

10                        BRENDA SCONIERS

11      I hereby acknowledge that I have read the foregoing
     transcription regarding the case of Brenda Sconiers vs
12   Andrew Straw, taken Thursday, May 7, 2015, and that the
     same is a true and correct transcription of the answers
13   given by me to the questions propounded, except for the
     additions or changes, if any, as noted on the attached
14   errata sheet.

15

16

17                        BRENDA SCONIERS

18                        SUBSCRIBED AND SWORN to
                          before me this         day
19                        of              A.D.        .

20

21                        Notary Public, State of Indiana
                          County of Residence:
22                        My Commission Expires:

23

24

25
```



```
 1   Reference No.: 325313.380651

 2

 3   Case:  SCONIERS vs. STRAW

 4

         DECLARATION UNDER PENALTY OF PERJURY

 5

         I declare under penalty of perjury that

 6   I have read the entire transcript of my Depo-

     sition taken in the captioned matter or the

 7   same has been read to me, and the same is

     true and accurate, save and except for

 8   changes and/or corrections, if any, as indi-

     cated by me on the DEPOSITION ERRATA SHEET

 9   hereof, with the understanding that I offer

     these changes as if still under oath.

10

11         _____

12            Brenda Sconiers

13

14            NOTARIZATION OF CHANGES

15                 (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```



1  | Reference No.: 325313.380651

   | Case:  SCONIERS vs. STRAW

2  |

3  | Page No._____Line No._____Change to:_____

4  | _____

5  | Reason for change:_____

6  | Page No._____Line No._____Change to:_____

7  | _____

8  | Reason for change:_____

9  | Page No._____Line No._____Change to:_____

10 | _____

11 | Reason for change:_____

12 | Page No._____Line No._____Change to:_____

13 | _____

14 | Reason for change:_____

15 | Page No._____Line No._____Change to:_____

16 | _____

17 | Reason for change:_____

18 | Page No._____Line No._____Change to:_____

19 | _____

20 | Reason for change:_____

21 | Page No._____Line No._____Change to:_____

22 | _____

23 | Reason for change:_____

24 |

   | SIGNATURE:_____DATE:_____

25 | Brenda Sconiers



```
1   Reference No.: 325313.380651

    Case:  SCONIERS vs. STRAW

2

3   Page No._____Line No._____Change to:_____

4   _____

5   Reason for change:_____

6   Page No._____Line No._____Change to:_____

7   _____

8   Reason for change:_____

9   Page No._____Line No._____Change to:_____

10  _____

11  Reason for change:_____

12  Page No._____Line No._____Change to:_____

13  _____

14  Reason for change:_____

15  Page No._____Line No._____Change to:_____

16  _____

17  Reason for change:_____

18  Page No._____Line No._____Change to:_____

19  _____

20  Reason for change:_____

21  Page No._____Line No._____Change to:_____

22  _____

23  Reason for change:_____

24

    SIGNATURE:_____DATE:_____

25  Brenda Sconiers
```

